# EXHIBIT 2

**IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND**

| | | |
|---|---|---|
| **CLAUDIA ENGELHORN,** *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | **Case No.: C-24-CV-24-002631** |
| | ) | |
| | ) | |
| | ) | |
| **WHITEFORD, TAYLOR & PRESTON,** | ) | |
| **LLP et al.,** | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**MOTION TO RECONSIDER ORDER DENYING BOLOG DEFENDANTS' PETITION
FOR AN ORDER COMPELLING ARBITRATION AND STAYING PROCEEDINGS
<u>(HEARING REQUESTED)</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ........................................................................................................... 1

PRELIMINARY STATEMENT ......................................................................................... 2

ARGUMENT ................................................................................................................. 5

I.      This Court Is Permitted To Reconsider Its Prior Order. ................................... 5

II.     The Trust Agreement's arbitration clause is an Enforceable Agreement to Arbitrate. ..................................................................................................... 5

III.    The Bolog Defendants Timely Asserted—And Did Not Waive—Their Right To Compel Arbitration. ......................................................................... 9

IV.     As The Arbitrator Will Determine, The Whitewater Investment Claims Fall Within The Arbitration Clause's Scope. ................................................. 13

        A.      Questions Of Arbitrability Should Be Decided By The Arbitrator. .......... 13

        B.      The Whitewater Investment Claims Are Arbitrable. ............................. 14

        C.      The Arbitration Provision Is Enforceable by Darnestown Road, Science Park, and Swain Landing. ..................................................... 16

V.      Ms. Engelhorn Cannot Unilaterally And Retroactively Terminate Her Agreement To Arbitrate. .............................................................................. 17

VI.     The Arbitration Provision Is Not Barred By Rules Of Attorney Professional Conduct. .................................................................................. 18

CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*9103 Basil Ct. Partners LLC v. Monarc Constr., Inc.,*
    2024 WL 3819522 (Md. Ct. Spec. App. Aug. 15, 2024) ........................................................ 21

*Allstate Ins. Co. v. Stinebaugh,*
    374 Md. 631 (2003) ................................................................................................................ 12

*Att'y Grievance Comm'n v. McLaughlin,*
    372 Md. 467 (2002) ................................................................................................................ 22

*Att'y Grievance Comm'n of Maryland v. Korotk,*
    318 Md. 646 (1990) ................................................................................................................ 22

*Att'y Grievance Comm'n of Maryland v. Shapiro,*
    441 Md. 367 (2015) ................................................................................................................ 22

*Att'y Grievance Comm'n of Maryland v. Steinberg,*
    395 Md. 337 (2006) ................................................................................................................ 22

*Att'y Grievance Comm'n of Maryland v. Young,*
    473 Md. 94 (2021) .................................................................................................................. 22

*Boland v. Amazon.com Sales, Inc.,*
    628 F. Supp. 3d 595 (D. Md. 2022) ......................................................................................... 7

*Boyle v. Anderson,*
    301 Va. 52 (2022) .................................................................................................................... 6

*Braude v. Robb,*
    255 Md. App. 383 (2022) ......................................................................................................... 7

*Brendsel v. Winchester Const. Co.,*
    162 Md. App. 558 (2005), *aff'd*, 392 Md. 601 (2006) ..................................................... 10, 11

*Cain v. Midland Funding,*
    452 Md. 141 (2017) ................................................................................................................ 11

*Castellanos v. Mariner Fin., LLC,*
    2018 WL 488725 (D. Md. Jan. 19, 2018) ............................................................................... 10

*Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.,*
    807 F.3d 553 (4th Cir. 2015) .................................................................................................. 21

i

*City of Emporia v. Cnty. of Greensville,*
  81 Va. App. 28 (2024) ................................................................................................8

*Dipnarine v. Champion Opco, LLC,*
  2025 WL 896333, at *7 (D. Md. Mar. 24, 2025) ...............................................13, 14

*Doctor's Assocs., Inc. v. Casarotto,*
  517 U.S. 681 (1996) ................................................................................................21

*Frederick Contractors, Inc. v. Bel Pre Medical Center, Inc.*
  274 Md. 307 (1975) ................................................................................................12

*Gannett Fleming, Inc. v. Corman Constr., Inc.,*
  243 Md. App. 376 (2019) ..................................................................................12, 14

*Gelber v. Glock,*
  293 Va. 497 (2017) ................................................................................................18

*Gertz v. Anne Arundel Cnty.,*
  339 Md. 261 (1995) ..................................................................................................5

*Hagerstown Block Co. v. Durbin,*
  2015 WL 5926086 (Md. Ct. Spec. App. July 15, 2015) ..........................................16

*Harris v. Bridgford,*
  153 Md. App. 193 (2003) ..........................................................................................9

*Iraq Middle Mkt. Dev. Found. v. Harmoosh,*
  848 F.3d 235 (4th Cir. 2017) ....................................................................................9

*In Re Brandon,*
  2021 WL 1346604 (Md. Ct. Spec. App. Apr. 12, 2021) ...........................................5

*In re Ismailoff (Golan),*
  14 Misc. 3d 1229(A) (N.Y. Sur. 2007) ......................................................................6

*In re Laher,*
  496 F.3d 279 (3d Cir. 2007)......................................................................................7

*In re Swain Landing LaPlata JC, LLC,*
  Case No. 25-184-ELG (Bankr. D.D.C. 2025)..........................................................3

*Mayo v. Dean Witter Reynolds, Inc.,*
  258 F. Supp. 2d 1097 (N.D. Cal.), *amended,* 260 F. Supp. 2d 979 (N.D. Cal.
  2003) ....................................................................................................................20

*MicroStrategy, Inc. v. Lauricia,*
  268 F.3d 244 (4th Cir. 2001) ....................................................................................9

*Pabst Brewing Co. v. Frederick P. Winner, Ltd.*,
 478 Md. 61 (2022) .................................................................................8

*Post v. Bregman*
 349 Md. 142 (1998) ..............................................................................21

*The Redemptorists v. Coulthard Servs., Inc.*,
 145 Md. App. 116 (2002) ...............................................12, 15, 16, 21

*Saturn Distrib. Corp. v. Williams*,
 905 F.2d 719 (4th Cir. 1990) ..........................................................4, 20

*Sfreddo v. Sfreddo*,
 59 Va. App. 471 (2012) ..........................................................................7

*Shaw v. Litz Custom Homes, Inc.*,
 2021 WL 5853779 (Md. Ct. Spec. App. Dec. 9, 2021) ........................9

*Smith v. Lindemann*,
 710 F. App'x 101 (3d Cir. 2017) .....................................................5, 20

*Stauffer Const.Co. v. Bd. of Educ.*,
 54 Md. App. 658 (1983) .......................................................................13

*Walter v. Drayson*,
 2007 WL 2694399 (D. Haw. Sept. 12, 2007) .......................................7

**Statutes**

9 U.S.C. § 2 ....................................................................................4, 20

11 U.S.C. § 362(a)(1) ...............................................................................3

Md. Code Ann., Cts. & Jud. Proc. § 3-206 .............................................4

Md. Code Ann., Cts. & Jud. Proc. § 3-207(c) ......................................20

Md. Code Ann., Est. & Trusts § 15-102 .................................................8

Va. Code Ann. § 64.2-752(A) ...............................................................18

Va. Code Ann. § 64.2-778 ................................................................8, 18

**Other Authorities**

CONSTRUCTION, Black's Law Dictionary (12th ed. 2024) .................14

Md. R. of Prof'l Conduct 19-301.8(h) ..................................................18

iii

Restatement (Second) of Trusts § 197 (1959) ....................................................................6

VA LEGIS 165 (2025), 2025 Virginia Laws Ch. 165 (H.B. 2243).................................8

Va. Sup. Ct. R. pt. 6, sec. II ...........................................................................................20

Defendants Erik Bolog, in his individual capacity ("Mr. Bolog") and as Trustee for the JAREB Irrevocable Trust Agreement Dated October 11, 2021 ("Mr. Bolog as Trustee"), Science Park Associates, LLC ("Science Park"), and Darnestown Road, Inc., ("Darnestown Road") (collectively, the "Bolog Defendants") hereby submit this motion for reconsideration of the Court's order denying their petition for an order compelling arbitration of all the Whitewater Investment Claims[1] and a concurrent stay of the Whitewater Investment Claims in this action until resolution of such arbitration (the "Petition for Arbitration"), and state as follows:

## **INTRODUCTION**

On April 19, 2025, the Bolog Defendants filed their Petition for Arbitration. On May 5, 2025, Plaintiffs filed their opposition. Thereafter, the Court scheduled a hearing in this action for June 11, 2025.  While the Bolog Defendants were in the process of finalizing their reply in support of the Petition for Arbitration, the Court issued its Order denying the Petition for Arbitration on three grounds: (a) the Whitewater Trust Agreement is not a "contract" or "agreement" subject to compulsory arbitration under Virginia law; (b) the Bolog Defendants waived their right to seek arbitration "through their actions and omissions"; and (c) the Whitewater Investment Claims are not within the scope of the arbitration provision of the Whitewater Trust Agreement. Respectfully, and as will be argued herein, the Bolog Defendants propound fulsome and substantive responses to each of these grounds, warranting reconsideration.

Under Maryland Law, a non-final judgment "is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. Rules 2-602(a)(3). Accordingly, and based on the following responses to Plaintiffs' Opposition to the

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Bolog Defendants' Petition for Arbitration or in Plaintiffs' Opposition thereto.

Petition for Arbitration (the "Opposition" or "Opp."), the Bolog Defendants respectfully request that the Court reconsider its Order denying the Bolog Defendants' Petition for Arbitration.

## PRELIMINARY STATEMENT

Plaintiffs' Opposition to the Petition for Arbitration (the "Opposition" or "Opp.") represents yet another transparent attempt by Plaintiffs to renege on an agreement made between Ms. Engelhorn and Mr. Bolog. This action hinges on Ms. Engelhorn's giftor's remorse over the $10 million gift she validly, freely and irrevocably gave to the JAREB Irrevocable Trust. Now, Plaintiffs seek to eliminate, by fiat, the binding arbitration agreement embodied in the Whitewater Trust Agreement between Ms. Engelhorn and Mr. Bolog. The Bolog Defendants respectfully request that the Court reconsider its Order and reject Plaintiffs' Opposition for the following reasons.

*First*, the arbitration provision in the Whitewater Trust Agreement is enforceable because it is a binding agreement between its signatories: Mr. Bolog and Ms. Engelhorn in their capacities as trustees and Ms. Engelhorn in her capacity as the grantor. Plaintiffs' argument that a trust agreement creates no contractual obligations is inaccurate. Plaintiffs rely on case law addressing an arbitration provision between a trustee and a trust-beneficiary, which are not the circumstances present. Here, by contrast, the Bolog Defendants seek to enforce an arbitration provision agreed to by the signatories to the Whitewater Trust Agreement, which is an enforceable contractual provision, which the Plaintiffs' cases do not remotely address.

*Second*, the Petition for Arbitration is timely. The Bolog Defendants' participation in this litigation is limited and has not evidenced an intent to waive their right to compel arbitration. Indeed, the Bolog Defendants have consistently taken the position that the Whitewater Investment Claims are subject to mandatory arbitration and should not be litigated until resolution of the Petition for Arbitration by the Court. The only reason that the Bolog Defendants did not file their

Petition earlier is that they—unlike Plaintiffs—did not come into possession of the full version of the Whitewater Trust Agreement, which contained the text of the relevant arbitration provision, until shortly before the Petition was filed.

*Third,* the Whitewater Investment Claims do not fall outside the scope of the arbitration clause—respectfully, that is a matter for the arbitrator to determine, not the Court. Section 9 of the Whitewater Trust Agreement incorporates the rules of the American Arbitration Association, under which the "arbitrator shall have the power to rule . . . [on] the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Ex. D at 14. As courts routinely hold, such a provision constitutes an agreement to submit any questions regarding arbitrability to the arbitrator.

In any event, the plain terms of the arbitration provision set forth in the Whitewater Revocable Trust Agreement encompass the Whitewater Investment Claims. Each of these claims concerns investments made by the then co-Trustees Mr. Bolog and Ms. Engelhorn in their capacities as trustees of the Whitewater Trust, and the application of the terms of the Whitewater Trust Agreement to those investments. And because Darnestown Road, Science Park, and Swain Landing[2] are all the subject of these same claims, as appropriate, any arbitration over the claims against Mr. Bolog must, necessarily, include the claims against them as well. At a minimum, the Whitewater Investment Claims as to Darnestown Road, Science Park, and Swain Landing, should be stayed pending any aspect of the Whitewater Investment Claims that are sent to arbitration.

*Fourth*, Ms. Engelhorn cannot unilaterally amend the terms of the Whitewater Trust

---

[2] The Bolog Defendants recognize that Swain Landing filed a bankruptcy petition (*In re Swain Landing LaPlata JC, LLC*, Case No. 25-184-ELG (Bankr. D.D.C. 2025)) and this Court subsequently stayed all claims against Swain Landing as part of the automatic stay requirements under 11 U.S.C. § 362(a)(1). The Bolog Defendants take no position as to whether the automatic stay should also stay the Petition for Arbitration solely as to the Whitewater Investment Claims as they relate to Swain Landing.

Agreement to eliminate, by fiat, its applicable arbitration provision retroactively. This provision is part of a binding agreement made between Mr. Bolog and Ms. Engelhorn as signatories to the Whitewater Trust Agreement. And, even if Ms. Engelhorn could remove the arbitration provision (which she cannot), no such amended copy (or factual attestation of its removal) has been submitted into evidence in this action by Plaintiffs. Regardless, the Federal Arbitration Act ("FAA") is clear that an arbitration provision "shall be valid, *irrevocable*, and enforceable." 9 U.S.C. § 2 (emphasis added); *see also* Md. Code Ann., Cts. & Jud. Proc. § 3-206 ("a written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is *irrevocable*") (emphasis added). Indeed, the Court did not find in its Order that Ms. Engelhorn revoked the arbitration provision.

*Lastly*, the arbitration provision is not barred by attorney ethics rules. Plaintiffs have not met their burden to show that Mr. Bolog had any role in drafting the arbitration provision in the Whitewater Trust Agreement. Indeed, he did not. And, additionally, in serving as a trustee of the Whitewater Trust, Mr. Bolog was not acting in his role as attorney for Ms. Engelhorn. Thus, any attorney ethics rules are inapplicable to Mr. Bolog when serving in his trustee capacity. Regardless, the FAA preempts any state ethics rules, and dictates that the arbitration provision is enforceable as to the Whitewater Investment Claims. "State laws are subject to preemption not only if they directly contradict federal law, but also if they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FAA. *Saturn Distribution Corp. v. Williams*, 905 F.2d 719, 722 (4th Cir. 1990). Indeed, a "rule prohibiting the inclusion of an arbitration provision in an attorney-client representation agreement" is "preempted by the FAA." *Smith v. Lindemann*, 710 F. App'x 101, 105 (3d Cir. 2017). The Bolog Defendants

note that the Court did not state in its Order that the arbitration provision would be barred by attorney ethics rules and ask that, on reconsideration, it again find arbitration is enforceable here.

## **ARGUMENT**

### I.    **THIS COURT IS PERMITTED TO RECONSIDER ITS PRIOR ORDER.**

Maryland Rule 2–602(a)(3) "makes clear that an order that does not adjudicate all of the claims in an action, or that adjudicates less than an entire claim, or that adjudicates the liabilities of fewer than all the parties to the action is not a final judgment and may be revised at any time before the entry of a final judgment." *Gertz v. Anne Arundel Cnty.*, 339 Md. 261, 272–273 (1995). "[A]n order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action . . . is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties"). *In Re Brandon*, 2021 WL 1346604, at *6 (Md. Ct. Spec. App. Apr. 12, 2021) (granting second summary judgment motion on same grounds as first motion) (internal citations omitted).

Given this liberal standard of revision, the Bolog Defendants ask that the Court reconsider its Order and grant the Petition for Arbitration.

### II.    **THE TRUST AGREEMENT'S ARBITRATION CLAUSE IS AN ENFORCEABLE AGREEMENT TO ARBITRATE.**

The arbitration provision in Section 9 of the Whitewater Trust Agreement, which encompasses controversies between the *trustees* or other *parties* to the Whitewater Trust Agreement—Mr. Bolog and Ms. Engelhorn—is enforceable here. *See* Ex. A at 10. Plaintiffs cite to no rule prohibiting enforcement of an arbitration provision between signatories to a trust. Indeed, there is none.

Instead, Plaintiffs quote liberally from the Virginia Supreme Court case *Boyle v. Anderson* for their proposition that a trust agreement is not a contract and, therefore, any arbitration provision is unenforceable. 301 Va. 52 (2022); *see* Opp. at 6. But *Boyle* is distinguishable from the circumstances here where a trustee seeks to enforce an arbitration provision against a trustee or settlor. In finding that the arbitration provision in *Boyle* was not enforceable, the Supreme Court of Virginia specifically noted that the "fiduciary duties a *trustee owed to the beneficiaries of the trust*" differ from those duties owed between contracting parties and that its reasoning was "without deciding" whether "a *trustee's* obligations might constitute an 'agreement.'" *Boyle*, 301 Va. at 57, 59 (emphasis original). Indeed, the court in *Boyle* based its decision on Section 197 of the Restatement of Trusts, entitled the "Nature of Remedies of *Beneficiary*" which addresses only "the remedies of the beneficiary against the trustee." *See* Restatement (Second) of Trusts § 197 (1959) (emphasis added); *Boyle*, 301 Va. 52, at 57. The Supreme Court of Virginia thus did not address whether an arbitration provision in a trust agreement is enforceable between trustees or between a trustee and grantor.

Contrary to Plaintiffs' unsupported position, Court's routinely enforce arbitration provisions as between trustees. *See, e.g.*, *In re Ismailoff (Golan)*, 14 Misc. 3d 1229(A) (N.Y. Sur. 2007). Mr. Bolog is not a "beneficiary" of the Whitewater Trust, he was a co-trustee with Ms. Engelhorn. And in bringing her claims in this action, Ms. Engelhorn is not acting in her role as a beneficiary of the Whitewater Trust, but, as stated clearly on the case caption in this action, as "*trustee* of the Whitewater Revocable Trust dated September 30, 2021" (emphasis added).

The Whitewater Trust Agreement itself states in Section 12 that it is "binding upon and inures to the benefits of the parties," i.e. the signatories to the agreement, Ms. Engelhorn and Mr. Bolog. Ex. A at 15. And while courts in Maryland and Virginia do not appear to have directly

addressed the issue of whether a trust agreement creates contractual obligations between signatories of a trust agreement, other jurisdictions have found that a trust agreement does establish a contractual relationship with enforceable terms. *See, e.g.*, *In re Laher*, 496 F.3d 279, 289 (3d Cir. 2007) ("All trusts can be described as contractual relationships insofar as the obligations of all the parties are set forth in an agreement[.]"); *Walter v. Drayson*, 2007 WL 2694399, at *4 n.3 (D. Haw. Sept. 12, 2007) ("The Court recognizes that the Trust Agreements are contracts between . . . *the Settlor*, and . . . *the Trustees*, for the benefit of Plaintiff, a third-party beneficiary.") (emphasis added). The Bolog Defendants contend that the Court find similarly here.

All of the requisite elements to establish a contract between Mr. Bolog and Ms. Engelhorn are present. *See Sfreddo v. Sfreddo*, 59 Va. App. 471, 488 (2012) ("The basic elements of a contract are an offer, acceptance, and consideration."); *Braude v. Robb*, 255 Md. App. 383, 397 (2022) (In Maryland, a "valid contract is formed by . . . an offer and acceptance and consideration."). Ms. Engelhorn offered the role of trustee to Mr. Bolog, which he accepted. And, as consideration, in return for Mr. Bolog's services as trustee, he was entitled to receive "reasonable compensation." Ex. A at 7, Section 5.K. And, because the arbitration provision is subject to the rules of the American Arbitration Association, it is the "arbitrator [who] ha[s] the power to determine the existence or validity of a contract of which an arbitration clause forms a part." Ex. D at 15; *see Boland v. Amazon.com Sales, Inc.*, 628 F. Supp. 3d 595, 601 (D. Md. 2022) (compelling arbitration where the parties incorporated the rules of the American Arbitration Association because they "contracted to arbitrate the arbitrability" of the claims).

That a dispute between signatories to trust agreement is subject to arbitration is also consistent with statutory trust principles. Virginia trust law, which governs the Whitewater Trust, contemplates that a trustee may "[r]esolve a dispute concerning the *interpretation of the trust or*

*its administration* by mediation, *arbitration*, or other procedure for alternative dispute resolution." Va. Code Ann. § 64.2-778[3] (emphasis added). Maryland trust law does the same. *See* Md. Code Ann., Est. & Trusts § 15-102 ("a fiduciary may prosecute, defend, or submit to arbitration any actions, claims, or proceedings in any jurisdiction for the protection of the fiduciary estate"). Accordingly, both Virginia and Maryland not only do not bar arbitration provisions in a trust agreement, they, instead, account for their validity. *See City of Emporia v. Cnty. of Greensville*, 81 Va. App. 28, 38–39 (2024) ("[W]e disfavor a construction of statutes that renders any part of the statute useless or superfluous . . . Every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary.") (internal citations omitted); *see also Pabst Brewing Co. v. Frederick P. Winner, Ltd.*, 478 Md. 61, 75 (2022) ("we construe the statute . . . so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory") (internal citations omitted). The Bolog Defendants request that the Court do the same here, reconsider its Order, and find the arbitration provision in Section 9 of the Whitewater Trust Agreement enforceable as to the Whitewater Investment Claims.

## III.    THE BOLOG DEFENDANTS TIMELY ASSERTED—AND DID NOT WAIVE—THEIR RIGHT TO COMPEL ARBITRATION.

Plaintiffs argue that by responding to Plaintiffs' complaint and by filing counterclaims, the Bolog Defendants have waived their contractual right to arbitrate under the Whitewater Trust Agreement. But there is no rule in Maryland prohibiting the Bolog Defendants from petitioning this Court to arbitrate the Whitewater Investment Claims after defending against Plaintiffs' claims.

---

[3] This section of the Virginia code was amended and signed into law by the Governor of Virginia on March 19, 2025. These amendments changed the numbering of this subsection but did not disturb the text of this particular provision. VA LEGIS 165 (2025), 2025 Virginia Laws Ch. 165 (H.B. 2243).

Plaintiffs' argument is inaccurate as a matter of law and equity and the Bolog Defendants respectfully request that the Court reconsider its Order finding waiver

To begin with, the Maryland Uniform Arbitration Act ("MUAA") "embodies a legislative policy in favor of the enforcement of agreement to arbitrate." *Harris v. Bridgford*, 153 Md. App. 193, 201 (2003). So does the Federal Arbitration Act. *See Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 241 (4th Cir. 2017) (acknowledging the "strong federal policy favoring arbitration") (internal citations omitted). To that end, even "resort[ing] to litigation prior to filing a petition with the court to order arbitration d[oes] not constitute, as a matter of law, a knowing and intentional waiver of [the] right to arbitrate." *Harris*, 153 Md. App. at 201. The Bolog Defendants did not *initiate* litigation, but have defended against Plaintiffs' factually and legally deficient claims. Courts in Maryland have clearly "rejected any per se rule that a party who initiates litigation waives arbitration as a matter of law." *Shaw v. Litz Custom Homes, Inc.*, 2021 WL 5853779, at *7 (Md. Ct. Spec. App. Dec. 9, 2021); *see also MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 249 (4th Cir. 2001) ("Neither delay nor the filing of pleadings by the party seeking a stay will suffice, without more, to establish waiver of arbitration."). And if no such rule exists for a party *initiating* litigation, it certainly does not exist for a party *defending* litigation.

Instead, the "dominant theme running through [Maryland] cases is that conduct constituting a waiver of the contractual right of arbitration must be so inconsistent with the continued assertion of that right as to reflect an intention to repudiate it." *Brendsel v. Winchester Const. Co.*, 162 Md. App. 558, 575 (2005), *aff'd*, 392 Md. 601 (2006). Here, the Bolog Defendants have not waived their right to enforce the arbitration clause in the Whitewater Trust Agreement and have not acted inconsistently with an intention to compel arbitration. In *Brendsel*, plaintiff brought a petition to establish a mechanic's lien on defendant's property under Maryland statutory

9

law. *Brendsel*, 162 Md. App at 562. The court rejected the argument that plaintiff's *initiation* of the action evidenced an intent to waive arbitration rights because plaintiff only sought to comply with and enforce their statutory rights. *Id*. Additionally, the court granted the petition to arbitrate even though motions for summary judgment had been filed and discovery had commenced. *Id*. Even more so than the plaintiff in *Brendsel*, the Bolog Defendants did not initiate this action and, at the time the Petition for Arbitration was filed, had not moved for summary judgment, had not propounded discovery requests, objected to Plaintiffs' discovery requests on the grounds that they are premature pending arbitration, and had simply complied with statutory deadlines in responding to Plaintiffs' claims and bringing their own counterclaims. The Bolog Defendants have only participated in this action to a limited extent, and as required by statutory deadlines, in order to protect and preserve their rights.

Contrary to Plaintiffs' protestations (Opp. at 9), the Bolog Defendants did indeed assert in their General Answer a defense that Plaintiffs' claims "are barred by written instruments," i.e. the Whitewater Trust Agreement, and requested a "trial by jury of all claims and issues *so triable*." Ex. B at 3 (emphasis added).  To the extent any of Plaintiffs' claims are not triable, because they are arbitrable, then they should be heard in arbitration. Regardless, "[f]ailing to assert arbitration as an affirmative defense, delay, or participation in litigation do not alone constitute default." *Castellanos v. Mariner Fin., LLC*, 2018 WL 488725, at *2 (D. Md. Jan. 19, 2018).

Plaintiffs' argument that the Bolog Defendants waived arbitration because they filed counterclaims and that some of those counterclaims might also be arbitrable (Opp. at 9) is not dispositive as to whether the Bolog Defendants waived their right to arbitration. *See Brendsel*, 162 Md. App. at 565. The Bolog Defendants filed such counterclaims in accordance with the time-restrictions under Md. Rules 2-331(d), four days before serving the Arbitration Letter on Plaintiffs.

Plaintiffs' reliance on *Cain v. Midland Funding* is inapposite, as the court there addressed whether a party *initiating* an action waived its right to arbitrate. 452 Md. 141 (2017). That is not the situation here. The Bolog Defendants simply exercised their procedural obligation to assert counterclaims against Plaintiffs in this Court within the statutory deadline (Md. Rules 2-331(d)), while simultaneously seeking to bring the Whitewater Investment Claims to arbitration. To the extent Plaintiffs seek to compel the Bolog Defendants' counterclaims into arbitration, the Bolog Defendants have no objection to arbitrating them in conjunction with the Whitewater Investment Claims—indeed, such consolidation would promote judicial economy and efficiency.

Plaintiffs' reference to the Bolog Defendants' position on *WTP*'s petition for arbitration is wholly irrelevant, as that matter concerned whether Plaintiffs' claims against the Bolog Defendants were subject to the arbitration provision in the engagement agreement between Ms. Engelhorn and WTP. None of Plaintiffs' cherry-picked quotations concerning the Bolog Defendants' arguments about WTP's petition to compel arbitration have any relevance here. In their response to WTP's petition, the Bolog Defendants specifically said that the claims against them were not arbitrable because the "arbitration provision at issue is found in the *engagement letter executed by and between WTP and Ms. Engelhorn—none of the Bolog Defendants is a party to that arbitration agreement*." Ex. C at 1 (emphasis added). And any statements made at the subsequent hearing were made in a similar context, not as a general statement that none of Plaintiffs' claims in this action could be subject to arbitration. As Mr. Gansler said at the hearing, the Bolog Defendants "have no dog in the fight" between WTP and Ms. Engelhorn. Ex. F at 32:15-16. Indeed, the Bolog Defendants did not even come into possession of the full version of the Whitewater Trust Agreement, which contained the text of the relevant arbitration provision at issue here, until after the conclusion of initial briefing on the Plaintiffs' Complaint and the subsequent hearing held by

the Court. *See* Gansler Affidavit ¶¶ 4-5; Bolog Affidavit ¶¶ 5-7. And, regardless, the arbitration provision in the engagement letter between WTP and Ms. Engelhorn was specific to a litigation matter that "was long over" by the time "any of the transactions in this case occurred" and has no relevancy to the Whitewater Investment Claims here. Ex. F at 32:1-3.

Plaintiffs cases are distinguishable, inapposite, and even support the Bolog Defendants' position. The court in *Gannett Fleming, Inc. v. Corman Constr., Inc.* provided a lax standard for enforcing an arbitration provision, finding that where an arbitration agreement "do[es] not limit the period in which arbitration can be demanded," it can be sought even after expiration of those same claims under the statute of limitations. 243 Md. App. 376 (2019). *Frederick Contractors, Inc. v. Bel Pre Medical Center, Inc.* provides Plaintiffs with no support, as the court there found that the petition for arbitration was indeed timely filed. 274 Md. 307 (1975). Neither does *The Redemptorists v. Coulthard Servs., Inc.*, where the court found as timely an arbitration petition filed six months after the action was initiated, and even after defendant had already filed a motion to dismiss and participated in the litigation. 145 Md. App. 116 (2002). And the Court rejected the arbitration petition brought by plaintiff in *Allstate Ins. Co. v. Stinebaugh* only because plaintiff sought to compel arbitration *two years* after the underlying case was initially filed and only *after* the parties had already reached a settlement. 374 Md. 631 (2003). Nothing of the sort has happened here, as the Bolog Defendants served the Arbitration Letter on Plaintiffs just *one month* after they obtained a copy of the Whitewater Trust Agreement and 6.5 months after Plaintiffs initiated this action on September 10, 2024.[4]

---

[4] The appellate court in *Stauffer Constr. Co. v. Bd. of Educ.* only remanded the issue of arbitration back to the circuit court for further evaluation of whether "by failing to make a timely demand . . . or . . . by filing a lawsuit against appellee, appellant has effectively waived its contractual right to arbitration." 54 Md. App. 658 (1983). But it did not find the petition was untimely.

Because the Bolog Defendants have only participated in this action to the extent necessary to protect their procedural rights and comply with statutory obligations in an effort to defend against Plaintiffs' claims, they respectfully request that the Court reconsider its Order that they have waived their right to arbitration under the Whitewater Trust Agreement.

## IV.   AS THE ARBITRATOR WILL DETERMINE, THE WHITEWATER INVESTMENT CLAIMS FALL WITHIN THE ARBITRATION CLAUSE'S SCOPE.

### A.   Questions Of Arbitrability Should Be Decided By The Arbitrator.

The Bolog Defendants respectfully request that any decisions on the scope of the arbitration provision in the Whitewater Trust Agreement and whether it encompasses the Whitewater Investment Claims be determined by the arbitrator, not this Court.  The Bolog Defendants further request that the Court reconsider its Order finding the claims non-arbitrable and instead compel arbitration for such a determination by the arbitrator.

"Courts have generally held that the express incorporation of arbitration forum rules constitutes clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability to the arbitrator." *Dipnarine v. Champion Opco, LLC*, 2025 WL 896333, at *7 (D. Md. Mar. 24, 2025). Here, Section 9 of the Whitewater Trust Agreement provides: "arbitration shall comply with the commercial Arbitration Rules of the American Arbitration Association." Ex. A at 14. And under those rules, the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Ex. D at 14. Because the Whitewater Trust Agreement incorporates the rules of the American Arbitration Association, "questions regarding the scope of the Arbitration Agreement should not be determined by this Court, but by the arbitrator." *Dipnarine*, 2025 WL 896333 at *7. Additionally, courts in Maryland "should grant a petition to stay arbitration

Case 25-00159    Doc 42-3    Filed 07/09/25    Page 21 of 199

on the grounds of substantive arbitrability only if the dispute clearly lies beyond the scope of the arbitration clause at issue. Otherwise, the dispute—including the threshold-arbitrability determination—should be handed over to the arbitrator." *Gannett Fleming, Inc.* 243 Md. App. at 401 (2019).

### B.    The Whitewater Investment Claims Are Arbitrable.

Should the Court reconsider its Order and find that it is the proper forum to adjudicate the arbitrability of the Whitewater Investment Claims, the plain language of the arbitration provision in Section 9 of the Whitewater Trust Agreement encompasses:

> *Any controversy between the trustees, or between any other parties to this trust*, including beneficiaries, *involving the construction or application of any of the terms*, provisions, or conditions of this trust agreement shall, on the written request of either or any disagreeing party served on the other or others, be submitted to arbitration.

Ex. A at 13 (emphasis added).

Plaintiffs argue that none of the Whitewater Investment Claims that the Bolog Defendants seek to arbitrate concern the "construction or application" of the terms of the Whitewater Trust Agreement. Opp. at 17. This is incorrect. "Construction" is the "act or process of interpreting or explaining the meaning of a writing." CONSTRUCTION, BLACK'S LAW DICTIONARY (12th ed. 2024). The Whitewater Investment Claims all concern the interpretation of terms of the Whitewater Trust Agreement to determine whether Mr. Bolog was authorized to make certain investments. Provisions of the Whitewater Trust Agreement that would be relevant to this analysis include:

- **Section 5.B**: Empowering the trustee to "retain, invest in, sell at public or private sale, mortgage, lease, exchange, manage . . . any real or personal property";

- **Section 5.F**: Allowing the trustee to "execute, acknowledge, and deliver documents";

- **Section 5.H**: Permitting the trustee to "borrow funds from any party (including the

14

trustee), or to make loans, for any purpose connected with the administration of any trust, upon whatever terms, periods of time, and security the trustee considers advisable"; and

- **Section 5.T**: Granting the Trustee the power "do all things that the grantor would be able to do were the grantor the absolute owner of the trust property" on the assumption that all actions taken by a trustee are "taken in good faith."

Ex. A at 6, 10.

The Whitewater Investment Claims concern alleged transactions made by Mr. Bolog,[5] as a trustee of the Whitewater Trust, which "caused Plaintiff Trust's bank account" to purchase a loan provided to Science Park and "directed the Plaintiff Trust's bank . . . to wire $350,000 to Darnestown Road, Inc.," and whether such investments were consistent with these terms of Whitewater Trust Agreement. *See* Ex. G., Second Amended Complaint ("SAC") ¶¶ 51, 62. The Whitewater Investment Claims are therefore "controvers[ies] . . . involving the construction or application of any of the terms of the Whitewater Trust Agreement." And to the extent any ambiguity exists, a "court must resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, reflecting a strong public policy in favor of arbitration." *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 150 (2002).

### C.    The Arbitration Provision Is Enforceable by Darnestown Road, Science Park, and Swain Landing.

There is no dispute that if the arbitration clause is valid, Mr. Bolog can enforce it. As to the other Defendants, Plaintiffs are incorrect that because Darnestown Road, Science Park, and Swain Landing are not parties to the Whitewater Trust Agreement they cannot enforce the arbitration provision. Opp. at 18.

---

[5] Although Mr. Bolog had no involvement with Swain Landing, nor Ms. Engelhorn's decision to invest in Swain Landing, an attorney sent a letter on behalf of Ms. Engelhorn as "Trustee of the Whitewater Revocable Trust" that she "does not have the appetite to continue the Swain's Landing project any longer." *See* Ex. E. Accordingly, the claims against Swain Landing would likewise fall within the mandatory arbitration provisions of Section 5 and 9 of the Whitewater Trust Agreement.

15

Courts in Maryland "ha[ve] explained that equitable estoppel allows a *non-signatory* to compel arbitration when a signatory to a written agreement containing an arbitration clause must 'rely on' the terms of the written agreement [containing the arbitration clause] in asserting [its] claims against the non-signatory." *Hagerstown Block Co. v. Durbin*, 2015 WL 5926086, at *8 (Md. Ct. Spec. App. July 15, 2015) (internal quotations omitted) (emphasis added). Here, because the Whitewater Investment Claims are brought against Mr. Bolog, Darnestown Road, Science Park, and Swain Landing based on Mr. Bolog's role as a trustee under the Whitewater Trust Agreement and his alleged (and untrue) undisclosed relationships with these entities while serving as a trustee of the Whitewater Trust (SAC ¶¶ 53, 65, 74), Plaintiffs should be barred by equitable estoppel from preventing Darnestown Road, Science Park, and Swain Landing from enforcing the arbitration provision.

Even if the Court were to find otherwise, because these claims necessarily hinge on Plaintiffs' allegations whether Mr. Bolog properly disclosed any alleged conflict of interest, they should nonetheless be stayed pending resolution of any aspects of the Whitewater Investment Claims that are sent to arbitration. This will narrow the relevant issues and streamline any future proceedings before this Court. *See The Redemptorists*, 145 Md. App. at 125 ("The issues as to the non-contracting parties should be stayed pending the outcome of the arbitration.").

## V.    MS. ENGELHORN CANNOT UNILATERALLY AND RETROACTIVELY TERMINATE HER AGREEMENT TO ARBITRATE.

Plaintiffs argue that because the Whitewater Trust is a revocable trust, the settlor, i.e. Ms. Engelhorn, has authority to amend or modify its arbitration provisions at will. Opp. at 9-10. This is a bold and absurd position for which Plaintiffs provide no factual or legal support. The Court did not appear to address this issue in its Order and the Bolog Defendants include it for the purposes of completeness of argument and edification of the Court.

Plaintiffs argue that "Ms. Engelhorn by filing this action, modified the trust to exclude the claims asserted in this litigation from any obligation to arbitrate." Opp. at 9-10. But they do not attach a modified copy of the Whitewater Trust Agreement reflecting such amendments. Nor do they include any attestation that the arbitration provision was actually modified or removed in its entirety in accordance with Section 8 of the Whitewater Trust Agreement, requiring that the grantor deliver by "written instrument . . . to the trustee" any amendment. Ex. A at 13. The unsworn allegations in the Second Amended Complaint only go so far as to say that Ms. Engelhorn amended the Whitewater Trust Agreement to remove Mr. Bolog as a trustee (SAC ¶¶ 5, 58) but does not state if, or what, other amendments were made to its text.

Plaintiffs' argument that by virtue of filing this action Ms. Engelhorn amended the Whitewater Trust Agreement to exclude the Whitewater Investment Claims from arbitration is absurd on its face, as such a position would necessarily allow for unilateral invalidation of any and all arbitration provisions in a trust simply by filing a lawsuit. Any party could entice another party to enter into a trust agreement with an arbitration agreement which the other party relies upon, and then, lose all arbitration rights because the other party unilaterally files a complaint in a court of law. It would be the end of arbitration provisions in trust agreements and for trustees if this absurd argument was allowed by the Court. Instead, the Bolog Defendants respectfully request that the Court find that the binding agreement to arbitrate as stated in Section 9 of the Whitewater Trust Agreement continues to exist, and is enforceable, between Mr. Bolog and Ms. Engelhorn.

Additionally, Plaintiffs' citations to Virginia trust law are inapplicable here as they concern the rights of *beneficiaries* and the settlor's control over trust *property* in a revocable trust. *See* Va. Code Ann. § 64.2-752(A) ("rights of the *beneficiaries* are subject to the control of . . . the settlor") (emphasis added). Virginia courts acknowledge the right of a settlor who established a revocable

trust to "maintain[] control over the [trust] *property*." *Gelber v. Glock*, 293 Va. 497, 505-506 (2017) (emphasis added). But Plaintiffs have cited to no case or authority stating that Virginia (or any other state) trust law allows for a grantor to discard *contractual provisions* of a trust agreement in their entirety. Indeed, just the opposite: Virginia trust law recognizes that a trustee is able to "[r]esolve a dispute concerning the *interpretation of the trust or its administration* by mediation, *arbitration*, or other procedure for alternative dispute resolution." Va. Code Ann. § 64.2-778 (emphasis added).

## VI.    THE ARBITRATION PROVISION IS NOT BARRED BY RULES OF ATTORNEY PROFESSIONAL CONDUCT.

Plaintiffs' argument that under Maryland's attorney ethics rules—particularly Rule 19-301.8(h) of the Maryland Rules of Professional Conduct ("MRPC")—the public policy of the state of Maryland prevents enforcement of arbitration clauses between an attorney and client (Opp. at 11-14) fails here for numerous reasons. As with Section IV, the Bolog Defendants include this argument for the edification of the Court, but note that the Court did not find credence to this argument in its Order.

*First*, by its very terms, the Rule does not apply here. The Rule only prohibits "an agreement prospectively limiting the attorney's liability to a client for malpractice." MRPC Rule 19-301.8(h). None of the Whitewater Investment Claims are grounded in *malpractice*. The only claim for malpractice brought by Plaintiffs concerns the formation of the JAREB Trust. SAC ¶¶ 113-120. Thus, on its face, Rule 19-301.8(h) is inapplicable to the Whitewater Investment Claims. This Court's prior ruling that WTP could not enforce the arbitration provision embodied in the engagement agreement between WTP and Ms. Engelhorn based on Rule 19-301.8(h)(1) has no bearing here because the arbitration provision in the Whitewater Trust Agreement does not prospectively limit malpractice claims between a client and attorney, it addresses disputes

concerning the Whitewater Trust Agreement.

*Second*, even if the claims at issue were for malpractice (they are not), Plaintiffs have not satisfied their burden that *Mr. Bolog* drafted the Whitewater Trust Agreement's arbitration provision. Paragraph 30 of the Second Amended Complaint alleges that an attorney with WTP named MaryEllen Willman "recorded a time entry that was billed by Defendant WTP to Plaintiff Engelhorn for drafting a 'revocable trust.' It is believed that Ms. Willman was billing for the drafting of the Whitewater Revocable Trust[.]" (SAC ¶ 30.) Paragraph 33 alleges that "Plaintiff Engelhorn, with the assistance of Defendant WTP, and its attorneys, established the Whitewater Revocable Trust dated September 30, 2021, and named Defendant Bolog as one of the Trustees. Attorneys at Defendant WTP had drafted the Whitewater Revocable Trust dated September 30, 2021." (SAC ¶ 33.) But nowhere in the Second Amended Complaint did Plaintiffs allege, much less prove, that *Mr. Bolog* had any role in drafting the Whitewater Trust Agreement or its arbitration provision. And they have provided no attestation to that effect in connection with their Opposition to the Petition for Arbitration either, nor have they cited to it elsewhere in the record. Indeed, this is for good reason: Mr. Bolog did not draft the arbitration provision.

Thus, even if Maryland law applied to the enforceability of the arbitration provision, Plaintiffs' scattershot citations to a series of Maryland attorney grievance commission cases presuming that agreements between an attorney and client are invalid (Opp. at 15-16) are irrelevant: Plaintiffs have not pointed to evidence in the record that *Mr. Bolog* took any action to prospectively limit his liability to Ms. Engelhorn or the Whitewater Trust. Moreover, not only did Mr. Bolog not act unethically, but because the Whitewater Investment Claims concern Mr. Bolog's actions taken in his role as a trustee of the Whitewater Trust, not as Ms. Engelhorn's (or the Whitewater Trust's) attorney, he was not bound by any ethical rules limiting his ability concerning

an arbitration clause with Ms. Engelhorn.[6]

*Third*, regardless, Plaintiffs' reliance on Maryland state attorney grievance commission cases is irrelevant because the FAA preempts any state law concerning the enforceability of arbitration provisions. Indeed, a "rule prohibiting the inclusion of an arbitration provision in an attorney-client representation agreement" is "preempted by the FAA." *Smith*, 710 F. App'x 101 at 105; *see Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1099 (N.D. Cal.), *amended*, 260 F. Supp. 2d 979 (N.D. Cal. 2003) (preempting certain ethics standards for arbitrators); *see also Saturn Distrib. Corp.* 905 F.2d at 726 (4th Cir. 1990) ("The Federal Arbitration Act does not allow such singular hostility to the formation of arbitration agreements.") And the FAA is clear that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also* Md. Code Ann., Cts. & Jud. Proc. § 3-207(c) (Under the Maryland Uniform Arbitration Act, the Court "shall order arbitration" upon a finding that a valid arbitration agreement exists.)

Indeed, as the Supreme Court has found, "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration provisions," as "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (internal citations omitted). According to Plaintiffs' own arguments, the attorney ethics rules that they cite single out arbitration provisions to suspect status. Thus, even "where state law prohibits outright the arbitration of a . . . claim . . . [t]he conflicting rule is

---

[6] Plaintiffs briefly contend that should Virginia's rules of professional conduct apply, the arbitration provision in the Whitewater Trust Agreement would still be unenforceable. But for the same reasons as stated above, such argument also fails. *See* Va. Sup. Ct. R. pt. 6, sec. II.

displaced by the FAA," which will compel arbitration. *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 570 (4th Cir. 2015) (internal quotations omitted).

Without any articulation of a public policy against enforcing arbitration because of attorney ethics rules, the FAA's public policy in favor of arbitration should—and under the Supremacy Clause, must—win the day. *9103 Basil Ct. Partners LLC v. Monarc Constr., Inc.*, 2024 WL 3819522, at *4 (Md. Ct. Spec. App. Aug. 15, 2024) (The FAA was enacted to apply to states in an effort to "declare[ ] a national policy favoring arbitration."); *see also The Redemptorists*, 145 Md. App. at 125 (Maryland law reflects "a strong public policy in favor of arbitration."). Accordingly, the Bolog Defendants respectfully request that the Court find that this aspect of public policy holds, a valid enforceable arbitration agreement exists, and compel arbitration on the Whitewater Investment Claims.

In short, Plaintiffs have not carried their burden of showing that Mr. Bolog drafted the arbitration provision in the Whitewater Trust Agreement, and have propounded no cases[7] stating that an arbitration provision between an attorney and client is unenforceable.[8] Regardless, the

---

[7] Plaintiffs rely heavily on *Post v. Bregman* 349 Md. 142 (1998), for their proposition that the Maryland Attorney Rules of Professional Conduct articulate a "statement of public policy with the force and effect of law and that a contract that violates a rule can be unenforceable." (Opp. at 13.) But *Bregman* is inapposite and, to the extent relevant, supports the Bolog Defendants' position. The court in *Bregman* addressed whether a contingency fee-sharing agreement between two attorneys, which did not impact the client's net recovery, may have violated Rule 19-301.5(e)'s "requir[ement] either that the division be in proportion to the services performed or that, by written agreement with the client, the lawyers assume joint responsibility for the representation." *Post*, 349 Md at 155. But *Bregman*'s endorsement that the Maryland Rules of Professional Conduct "constitute a supervening statement of public policy," is measured by its statement that the professional conduct rules are not a "*per se* defense, rendering invalid or unenforceable otherwise valid . . . agreements *merely because of rule violations that are merely technical, incidental, or insubstantial or when it would be manifestly unfair and inequitable not to enforce the agreement*." *Id.* at 168. Accordingly, even if Rule 19-301.8(h) were applicable to the circumstances here (it is not), any alleged violation by Mr. Bolog would be technical and insubstantial to the broader issue of whether Mr. Bolog has the right to enforce the arbitration provision in Section 9 of the Whitewater Trust Agreement.

[8] *Att'y Grievance Comm'n of Maryland v. Korotki*, 318 Md. 646 (1990) (fee arrangement); *Att'y Grievance Comm'n v. McLaughlin*, 372 Md. 467 (2002) (fees); *Att'y Grievance Comm'n of Maryland v. Shapiro*, 441 Md. 367 (2015) (attorney misconduct); *Att'y Grievance Comm'n v. Steinberg*, 395 Md. 337, 365 (2006)

attorney ethics rules relied on by Plaintiffs are preempted by the Federal Arbitration Act, which promotes the public policy of enforcing arbitration provisions. Accordingly, the attorney ethics rules cited by Plaintiffs are inapplicable here.

## **CONCLUSION**

Accordingly, the Bolog Defendants respectfully request that the Court reconsider its Order and (1) issue an order granting the Bolog Defendants' Petition for Arbitration and compelling Plaintiffs to arbitrate the Whitewater Investment Claims and (2) stay the Whitewater Investment Claims pending adjudication of the Petition for Arbitration.

---

(*release* of malpractice claim); *Att'y Grievance Comm'n of Maryland v. Young*, 473 Md. 94 (2021) (*settling* malpractice claim). Similarly, their reliance on Ethics Doc. 1990-12 is inapposite as it addresses a fee dispute. *See* Opp. Ex. 4.

Dated:    June 9 , 2025

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

Respectfully,

Douglas F. Gansler (Bar Number: 8912180208)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300

*Counsel for Defendants Erik D. Bolog,
Individually and as Trustee of the JAREB
Irrevocable Trust Agreement dated October 11,
2021; Darnestown Road, Inc.; and Science Park
Associates, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of June, 2025, a copy of the foregoing was served electronically via MDEC upon counsel of record, and remaining parties served via first class mail.

<u>**Counsel of Record Served via MDEC:**</u>
Wes P. Henderson
**Henderson Law, LLC**
2127 Espey Court
Suite 204
Crofton, MD 21114
*Counsel for Plaintiffs Claudia Engelhorn; Claudia Engelhorn, Trustee; and White Pearl, LLC*

John J. Connolly
William J. Murphy
Kirk E. MacKinnon Morrow
**Zuckerman Spaeder LLP**
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
*Counsel for Defendant Whiteford, Taylor & Preston, LLP*

<u>**Parties Served Via First Class Mail:**</u>
**Tenacity Investments, LLC**
S/O: Mike Postal
7333 New Hampshire Avenue
Takoma Park, MD 20912

**Michael Postal**
4302 Broken Arrow Court
Apt. 606
Clinton, MD 20735

**Swain Landing LaPlata JC, LLC**
S/O: Anjon Jones
4302 Broken Arrow Court
Clinton, MD 20735

**POJO LaPlata LLC**
S/O: Anjon Jones
4302 Broken Arrow Court
Clinton, MD 20735

Respectfully,

Douglas F. Gansler (8912180208)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300

*Counsel for Defendants Erik D. Bolog,
Individually and as Trustee of the JAREB
Irrevocable Trust Agreement dated
October 11, 2021; Darnestown Road,
Inc.; and Science Park Associates, LLC*

# EXHIBIT A

REVOCABLE TRUST AGREEMENT
OF
CLAUDIA ENGELHORN


## TABLE OF CONTENTS

SECTION 1.    CREATION OF TRUST .................................................................. 1
SECTION 2.    TRUST DURING GRANTOR'S LIFETIME ................................. 1
SECTION 3.    UPON GRANTOR'S DEATH ........................................................ 2
  A.    DISTRIBUTION OF TANGIBLE PERSONAL PROPERTY .......... 2
  B.    CASH DISTRIBUTION .................................................................... 2
  C.    PAYMENT OF INDEBTEDNESS ................................................... 2
  D.    DISTRIBUTION OF BALANCE OF TRUST ................................. 2
SECTION 4.    TRUSTEES ............................................................................... 3
  A.    SUCCESSOR TRUSTEES ............................................................... 3
  B.    COMPENSATION ........................................................................... 3
  C.    RESIGNATION ............................................................................... 3
  D.    REMOVAL ...................................................................................... 4
  E.    EMERGENCY ACTION ................................................................. 4
  F.    EMPLOYMENT OF INVESTMENT ADVISOR ........................... 4
SECTION 5.    POWERS OF TRUSTEE ............................................................ 5
  A.    RETAIN RESIDENCE IN TRUST .................................................. 5
  B.    DEAL WITH PROPERTY ............................................................... 6
  C.    MARGIN AND BANK ACCOUNTS .............................................. 6
  D.    REGISTER IN NOMINEE FORM ................................................. 6
  E.    DISPOSE OF CLAIMS .................................................................... 6
  F.    EXECUTE DOCUMENTS ............................................................... 6
  G.    DIVIDE PROPERTY ....................................................................... 6
  H.    BORROW FUNDS OR MAKE LOANS .......................................... 6
  I.    EMPLOY AGENTS .......................................................................... 6
  J.    MAKE TAX ELECTIONS ............................................................... 7
  K.    CARRY ON BUSINESS .................................................................. 7
  L.    S CORPORATION STOCK .............................................................. 7
  M.    TREAT AS COMMON FUND ....................................................... 8
  N.    RECEIVE ADDITIONAL PROPERTY ........................................... 8
  O.    MERGE TRUSTS ............................................................................ 9
  P.    DIVIDE TRUSTS ............................................................................ 9
  Q.    DEAL WITH GENERATION-SKIPPING TRANSFERS ................ 9
  R.    DEAL WITH DIGITAL ASSETS ................................................... 9
  S.    KEEP INFORMATION CONFIDENTIAL ..................................... 10
  T.    DO ALL THINGS WITH FINAL AUTHORITY ........................... 10
SECTION 6.    DUTIES OF TRUSTEE ............................................................. 10

A.  PAY DEATH TAXES AND SATISFY CASH NEEDS.................................. 10
B.  PAY DELIVERY EXPENSES................................................................. 10
C.  PAY DIRECTLY TO BENEFICIARIES................................................. 10
D.  DISTRIBUTE TO OR FOR INCAPACITATED OR MINOR BENEFICIARIES .. 11
E.  MAKE BINDING DECISIONS WITH RESPECT TO DISCRETIONARY
PAYMENTS.......................................................................................... 11
F.  MAKE CERTAIN DECISIONS WITHOUT PARTICIPATION OF INTERESTED
TRUSTEE............................................................................................. 11
G.  PAY INCOME AT TERMINATION OF TRUSTS .................................. 11
H.  ADMINISTER WITHOUT COURT SUPERVISION ............................. 11
I.  RESTRICTIONS ON USE OF RETIREMENT PLAN BENEFITS ........................ 11
SECTION 7.   INCAPACITY................................................................... 12
A.  DETERMINATION OF INCAPACITY .................................................. 12
B.  DURATION OF INCAPACITY .............................................................. 12
C.  EFFECT OF INCAPACITY .................................................................... 13
D.  REPRESENTATION OF INCAPACITATED INDIVIDUALS AND MINORS ...... 13
SECTION 8.   REVOCATION OR AMENDMENT .................................. 13
SECTION 9.   RESOLUTION OF CONTROVERSIES ........................... 13
SECTION 10.   GOVERNING LAW ......................................................... 14
SECTION 11.   RULE AGAINST PERPETUITIES ................................. 15
SECTION 12.   BINDING AGREEMENT ................................................ 15
        SCHEDULE A ................................................................. 17
        SCHEDULE B ................................................................. 18
        SCHEDULE C ................................................................. 19
        SCHEDULE D ................................................................. 20

# REVOCABLE TRUST AGREEMENT
## OF
## CLAUDIA ENGELHORN

THIS REVOCABLE TRUST AGREEMENT is executed on September 30, 2021, by **CLAUDIA ENGELHORN**, of Fairfax County, Virginia, as grantor, and **CLAUDIA ENGELHORN** and **ERIK D. BOLOG**, as trustees, either of whom may act alone. Any reference in this trust agreement to the "trustee" shall apply to any trustee or trustees then serving.

**SECTION 1. CREATION OF TRUST.** The grantor transfers, and the trustees accept, in trust, all of the property listed on the attached schedule of property. The trustees shall administer and dispose of it, together with any other property which the trustees may later receive, as set forth in this agreement. This trust shall be known as the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021.**

**SECTION 2.** **TRUST DURING GRANTOR'S LIFETIME.** During the lifetime of the grantor, the trustee shall pay the net income from the trust, including income accrued to the date of this agreement, or whatever amounts the grantor directs, in monthly or more frequent installments to the grantor.

In addition, the trustee may at any time or times pay to or for the benefit of the grantor so much or all of the principal of the trust as the trustee in the liberal exercise of discretion considers appropriate for her maintenance, support, health, comfort or well-being.

Furthermore, the grantor, in her sole and absolute discretion, may at any time withdraw whatever amounts of principal of the trust as the grantor directs. However, this right may not be exercised if the grantor is incapacitated at the time of such withdrawal.

**SECTION 3.      UPON GRANTOR'S DEATH.**  Upon the grantor's death, this trust shall be administered and disposed of as follows.

**A.      DISTRIBUTION OF TANGIBLE PERSONAL PROPERTY.**  The grantor directs that those items listed on Schedule B of this trust agreement be distributed as specified on that schedule, and that the balance of the tangible personal property be distributed equally among those of the grantor's children who are then living.

**B.      CASH DISTRIBUTION.**  The trustee shall first distribute the sum of Eight Hundred and Fifty Thousand Dollars ($850,000.00) to the grantor's friend, **MARCIA S. BOSCO**, if she is then living, or if she is then deceased, to her children, **ISADORA BOSCO** and **TRISTON BOSCO**, in equal shares, or all to the survivor of them.  If none are then living, this gift shall lapse.

**C.      PAYMENT OF INDEBTEDNESS.**  The trustee shall then pay in full and discharge any unpaid balance, both as to principal and interest, owed by the grantor to the Mannheim Trust and the grantor's named children, **RICHARD BUSSMANN** and **COURTNEY BUSSMANN**, as evidenced by those certain promissory notes executed by the grantor as borrower and not paid from other funds by or on behalf of the grantor.

**D.      DISTRIBUTION OF BALANCE OF TRUST.**  The trustee shall then distribute the balance of the trust to the **CE FOUNDATION**, a charitable foundation organized under the laws of the Commonwealth of Virginia.  If such entity is no longer in existence at the time of distribution, the trustee shall distribute its share to another entity or organization(s) that, in the trustee's sole judgment, has functions most nearly similar to the defunct entity.

---

## SECTION 4.    TRUSTEES.

**A.    SUCCESSOR TRUSTEES.** If either trustee ceases to serve as trustee for any reason, the other shall continue to serve as trustee. If both trustees cease to serve as trustee for any reason, then the grantor's son, **RICHARD BUSSMANN**, shall serve as trustee. If he fails to serve or ceases to serve as trustee for any reason, then the grantor's daughter, **MARGARET BLADES**, shall serve as trustee. If she fails to serve or ceases to serve as trustee for any reason, then the grantor's daughter, **COURTNEY BUSSMANN**, shall serve as trustee. If she fails to serve or ceases to serve as trustee for any reason, then a grandchild of the grantor who has attained thirty-five (35) years of age and has accepted his/her appointment as successor trustee shall serve as trustee. If at any time or times there is no individual trustee serving, then (1) the grantor, or (2) the last serving individual trustee, if living and able to do so, or (3) if not, the then-living beneficiaries of the trusts, by majority vote, shall designate one or more successor trustees. The grantor appoints as a successor trustee any person or corporation so designated.

**B.    COMPENSATION.** For services as trustee, each successor trustee shall be entitled to a trustee's fee, to be paid without court approval, in the annual amount of One Hundred and Twenty-Thousand Dollars ($120,000.00). Such fee shall commence upon the trustees' written acceptance of duties as successor trustee, and shall be paid as follows: 1/12 upon acceptance of the trustees' duties and 1/12 monthly thereafter.

**C.    RESIGNATION.** A trustee may resign at any time by an instrument in writing. No accounting or court proceeding upon any change in trustees is required, unless specifically requested by a present or anticipated beneficiary or a present or successor trustee.

---

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                3

No successor trustee is personally liable for any act or omission of any predecessor trustee. The grantor excuses each trustee from giving bond.

   **D.    REMOVAL.** The individual trustee(s) serving from time to time may remove any corporate trustee by written notice or accept the resignation of any corporate trustee. Simultaneously with the removal or resignation, the individual trustee(s) shall designate as successor trustee a bank or trust company authorized to act as trustee in any jurisdiction. The grantor appoints as successor trustee any such bank or trust company so designated. No trustee may (1) make any discretionary payment of income or principal that would discharge a personal legal obligation of any person who has the right to remove any trustee, or (2) terminate any trust under the special termination provisions that would result in any benefit to, or discharge a personal legal obligation of, any person who has the right to remove any trustee.

   **E.    EMERGENCY ACTION.** If (1) the whereabouts of any individual trustee is unknown to the other trustee(s), or if (2) in the sole judgment of the other trustee(s), any individual trustee is not readily accessible or is so ill or otherwise incapacitated as to be unable practically to signify approval or disapproval of any proposed action by the trustees, then the other trustee(s), in their absolute discretion, may take whatever action they consider advisable without obtaining the approval of that individual trustee. Any action taken by the other trustee(s) is binding on all persons. The other trustee(s) are relieved of any liability for any action taken in good faith under the conditions stated above.

   **F.    EMPLOYMENT OF INVESTMENT ADVISOR.** The successor trustee then serving shall continue to engage the services of the investment advisor employed by

---

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                         4

the grantor at the time of her death or incapacity to manage the investment of the trust property. If no investment advisor was employed by the grantor at the time of her death or incapacity, the successor trustee shall engage a professional investment advisory firm to manage the investment of the trust property.

SECTION 5.    POWERS OF TRUSTEE.  In addition to any powers given to the trustee by statute, common law, or rule of court, the grantor confers upon the trustee, and any successor trustees, the powers listed below, which they may exercise without prior or subsequent approval by any court.  In addition, the grantor specifically incorporates the provisions of §64.2-105 and §64.2-778 of the Code of Virginia to the extent they are not inconsistent with the powers listed below.  The grantor recognizes that the powers and duties granted to and imposed on the trustee impose heavy and difficult burdens on the trustee.  In order to induce the trustee to exercise these powers and duties in the manner the trustee believes will most closely approximate the intentions of the grantor, the grantor stipulates that any exercise of any power or discretion in good faith by the trustee is binding on all persons.  The trust shall indemnify and hold each individual trustee harmless for any act or omission of such trustee, except for an act of gross negligence or willful misconduct.  For convenience the grantor is referring to these fiduciaries in the masculine singular; however, the masculine, feminine, and neuter, and the singular and plural, include each other wherever appropriate in any reference to any person or corporation in this agreement.

A.    RETAIN RESIDENCE IN TRUST.  To retain in any trust any residence transferred to the trust by the grantor.  The trustee shall permit the grantor to occupy the residence, rent free, for whatever period of time the trustee may reasonably determine.  The trustee is not required to make any charge against income or principal for depreciation.  The trustee shall pay from the principal of the trust all taxes, assessments, homeowner's insurance

---

**WHITEWATER** Revocable Trust Agreement

premiums, repair and maintenance expenses, and the cost of any improvements, connected with the residence. If the trustee considers it advisable, he may sell the residence and buy another residence, and may thereafter make further sales and purchases of residences. In that case, the provisions of this paragraph will apply to the other residence or residences.

**B.    DEAL WITH PROPERTY.** To retain, invest in, sell at public or private sale, mortgage, lease, exchange, manage, subdivide, develop, build, alter, repair, improve, raze, abandon, buy and sell puts, calls, futures and futures options, or otherwise deal with or dispose of any real or personal property, regardless of its nature, the lack of diversification of any trust, or the fact that any arrangement with respect to such property extends beyond the duration of any trust. The trustee is authorized to sell, lease or mortgage any property of the trust for any period even if it extends beyond the period in which an interest would be required to vest under the common law, including the common law rule against perpetuities, if it were to apply to this agreement and to the trusts created under this agreement.

**C.    MARGIN AND BANK ACCOUNTS.** To buy, sell and trade in securities of any nature, including short sales and on margin. The trustee may maintain and operate margin accounts with brokers, and may pledge any securities held or purchased by the trustee with such brokers as security for loans and advances made to the trustee. The trustee is authorized to establish and maintain bank accounts of all types in one or more banking institutions that the trustee may choose.

**D.    REGISTER IN NOMINEE FORM.** To register any property in the name of a nominee or in other form without disclosure of the fiduciary capacity.

**E.    DISPOSE OF CLAIMS.** To pay, extend, renew, prosecute, defend, compromise or submit to arbitration all rights, obligations, or claims of any trust against others or of others against any trust.

**F.    EXECUTE DOCUMENTS.** To execute, acknowledge, and deliver documents.

**G.    DIVIDE PROPERTY.** To make any division or distribution in cash, in kind, or partly in cash and partly in kind, and to allocate or distribute undivided interests or different assets or disproportionate interests in assets. The division of, values assigned to, and beneficiaries selected to receive, any property is binding on all persons.

**H.    BORROW FUNDS OR MAKE LOANS.** To borrow funds from any party (including the trustee), or to make loans, for any purpose connected with the administration of any trust, upon whatever terms, periods of time, and security the trustee considers advisable.

**I.    EMPLOY AGENTS.** To employ brokers, investment counsel, custodians, realtors, accountants, attorneys, and other agents, and to delegate powers and discretions to any of them.

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                                                6

**J.     MAKE TAX ELECTIONS.** To make any tax election permitted by any tax law, and to file any tax return. There shall be no adjustment of any interests because of any such election or return. The trustee may determine in a fair, equitable and practical manner how all trustee commissions, disbursements, receipts, and wasting assets will be credited, charged, and apportioned between principal and income. The trustee may allocate capital gain to income rather than principal.

**K.     CARRY ON BUSINESS.** Without filing reports with any court, to continue, incorporate, enter into, or carry on any business, whether as a stockholder, general or limited partner, sole or joint owner, or otherwise; to invest whatever assets may be needed in the business; to employ agents to operate the business; to serve in any capacity with the business; to receive reasonable compensation for such services, in addition to compensation for services as a fiduciary; and to reorganize, liquidate, merge, consolidate, or transfer the business or any part of it.

**L.     S CORPORATION STOCK.** During any period when any trust is not treated for tax purposes as a grantor-owned trust under Internal Revenue Code Sections 671 or 678, the trustee may elect to hold any S corporation stock held by the trust as a separate "electing small business trust" as defined in Internal Revenue Code Section 1361(e)(1) or as a separate "qualified subchapter S trust," as defined in Internal Revenue Code Section 1361(d)(3). In making this determination, the trustee may consider any changes to the terms and conditions of the trust that will be required as a result of either election. For purposes of this agreement, "S corporation stock" means all capital stock issued by a corporation (or other entity taxable as a corporation for federal income tax purposes) that is treated, or intends to be treated under Internal Revenue Code Section 1361(a), as an "S corporation" for federal income tax purposes.

**(1)     Electing Small Business Trust.** If the trustee elects under Internal Revenue Code Section 1361(e)(3) to qualify the trust or portion thereof as an "electing small business trust", the trustee shall (a) apportion to the electing small business trust a reasonable share of the unallocated expenses of all trusts created under this agreement, in accordance with the applicable provisions of the Internal Revenue Code and Treasury Regulations; and (b) administer the trust as an electing small business trust under Internal Revenue Code Section 1361(e).

**(2)     Qualified Subchapter S Trust.** If the trustee elects under Internal Revenue Code Section 1361(d) to qualify the trust or portion thereof as a "qualified subchapter S trust", the trustee shall (a) administer the qualified subchapter S trust in accordance with the same provisions contained in the trust to which the S corporation stock was originally allocated; provided, however, that the provisions of this subparagraph N(2) of Section 9 control the administration of the trust to the extent that they are inconsistent with the provisions of the original trust; (b) maintain the qualified subchapter S trust as a separate trust held for the benefit of one beneficiary as required in Internal Revenue Code Section 1361(d)(3); and (c) request that the current income beneficiary of the trust, with the assistance of the trustee, make an election in accordance with Internal Revenue Code Section 1361(d)(2) to qualify the trust as a qualified subchapter S trust within the meaning of Internal Revenue Code Section 1361(d)(3).

---

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    7

(a) If under the terms of this agreement, there is more than one person who has a present right to receive income distributions from the trust originally holding the S corporation stock, the trustee shall segregate the S corporation stock into separate qualified subchapter S trusts for each person who has a present right to receive income distributions so that each trust has one current income beneficiary.

(b)   Until the first to occur of (i) the death of the current income beneficiary and (ii) the date on which the qualified subchapter S trust no longer holds any S corporation stock (the "QSST termination date"), the trustee shall distribute to the current income beneficiary, at least annually, all of the trust's "net income," as that term is defined in Internal Revenue Code Section 643(b). Until the QSST termination date, the trustee may only distribute principal to the current income beneficiary of the qualified subchapter S trust. If a qualified subchapter S trust terminates during the lifetime of the current income beneficiary, the trustee shall distribute all assets of the qualified subchapter S trust to the current income beneficiary.

(c)   The trustee shall characterize receipts and expenses of any qualified subchapter S trust in a manner consistent with Internal Revenue Code Section 643(b).

(d)   The trustee may not merge or consolidate any qualified subchapter S trust with the assets of another trust if doing so would jeopardize the qualification of either trust as a qualified subchapter S trust.

(3)   **Governance of Trusts.** The following additional provisions apply to any separate trust created under this paragraph N.

(a)   The trustee must not administer a trust holding S corporation stock in a manner that would cause the termination of the S corporation status of the entity whose stock is held as part of the trust. Therefore, during any period that the trust holds S corporation stock, the terms of this agreement shall be construed in a manner that is consistent with the trust qualifying as an electing small business trust or as a qualified subchapter S trust.

(b)   No method of distribution permitted under this Section 9.N may be used in a manner that would jeopardize the qualification of the trust as an electing small business trust or as a qualified subchapter S trust. If the continuation of any trust would, in the trustee's opinion, result in the termination of the S corporation status of any entity whose stock is held as a part of the trust property, the trustee may, in addition to the power to sell or otherwise dispose of the stock, distribute the stock to the person who is then entitled to receive the income from the trust.

**M.**   **TREAT AS COMMON FUND.**  To treat any trust as a common fund for investment and administrative purposes.

**N.**   **RECEIVE ADDITIONAL PROPERTY.**  To receive and to administer in trust any additional property from any source.

---

**WHITEWATER** Revocable Trust Agreement

**O.    MERGE TRUSTS.**  To merge any trust held under this agreement with any other trusts created by the grantor under will or agreement, if the terms of the other trusts are substantially similar and if they are for the primary benefit of the same persons.

**P.    DIVIDE TRUSTS.**  To divide any trust held under this agreement into two or more separate trusts according to the fair market value of the trust assets on the date of division.

**Q.    DEAL WITH GENERATION-SKIPPING TRANSFERS.**  To deal with any potential generation-skipping transfer (GST) as follows:

**(1)    Fund With Appreciating Assets.**  To fund any trust that is exempt from GST tax with assets which, in the judgment of the trustee, are most likely to appreciate in value in the future.

**(2)    Disregard GST Tax Consequences.**  To make any required or permitted distributions from any trust without regard to (a) whether the distributions will be subject to GST tax, (b) the amount of the GST tax, or (c) the identity of the person or entity responsible for paying the GST tax.  The trustee shall make no adjustment of any beneficiary's interest in any trust because of the payment or non-payment of any GST tax on account of a distribution made to him or her.

**(3)    Make Distributions From Divided Trusts.**  With respect to trusts that have been divided into a trust exempt from GST tax and a trust not exempt from GST tax:

(a)    To make distributions of income and principal to skip persons from the exempt trust;

(b)    To make distributions of income and principal to non-skip persons from the non-exempt trust; and

(c)    To pay estate, inheritance and other death taxes from the non-exempt trust.

**R.    DEAL WITH DIGITAL ASSETS.**  To (i) access, use and control the grantor's digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smartphones, and any similar digital device which currently exists or may exist as technology develops for the purpose of accessing, modifying, deleting, controlling, or transferring the grantor's digital assets and (ii) to access, modify, delete, control, and transfer the grantor's digital assets, including but not limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, financial accounts, banking accounts, domain registrations, DNS service accounts, web hosting accounts, tax preparation service accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops, and (iii) to obtain, access, modify, delete, and control the grantor's

---

**WHITEWATER** Revocable Trust Agreement

passwords and other electronic credentials associated with the grantor's digital devices and digital assets described above.

**S.    KEEP INFORMATION CONFIDENTIAL.** In light of the grantor's desire that the provisions of this trust agreement are to remain confidential as to all parties, to reveal information concerning the benefits paid to any particular beneficiary only to such individual. Accordingly, no other individual shall have the right to information concerning the benefits paid to any other beneficiary.

**T.    DO ALL THINGS WITH FINAL AUTHORITY.** To do all things that the grantor would be able to do were the grantor the absolute owner of the trust property. All decisions taken in good faith are binding on all persons.

**SECTION 6.    DUTIES OF TRUSTEE.** The grantor authorizes the trustee and any successor trustees, without prior or subsequent approval by any court:

**A.    PAY DEATH TAXES AND SATISFY CASH NEEDS.** Subject to the provisions of Section 6.I of this agreement, to pay all taxes due because of the grantor's death, whether with respect to property passing under this agreement, under the grantor's will, or otherwise. Taxes include interest and also penalties not caused by negligence or bad faith. Subject to the provisions of Section 6.I of this agreement, the trustee shall also pay all debts, administration expenses, legacies, and other cash requirements of the grantor's estate. Payment shall be made from the entire trust available for distribution under Section 3.D before its distribution to its beneficiaries.

However, the following taxes shall not be paid from the trust: (1) any tax resulting from the inclusion in the grantor's gross estate of property over which the grantor has a general power of appointment, (2) any tax resulting from the inclusion in the grantor's gross estate of property in which the grantor has a qualifying income interest for life, (3) any generation-skipping transfer tax, and (4) any additional tax imposed by Internal Revenue Code §2032A or a corresponding provision of state law.

In no event shall any payment be made from any assets that are excludible from the grantor's gross estate for federal estate tax purposes. In no event shall there be any right of reimbursement from any person.

**B.    PAY DELIVERY EXPENSES.** To pay from the trust the cost of safeguarding and delivering all gifts made under this agreement.

**C.    PAY DIRECTLY TO BENEFICIARIES.** To make all payments of income and principal directly to the beneficiary entitled to them and not to any other person. A deposit of funds to the beneficiary's account in a bank or other financial institution is the equivalent of direct payment to the beneficiary. No payment may be assigned, anticipated, or

---

**WHITEWATER** Revocable Trust Agreement

encumbered by the beneficiary; nor may any payment be attached, garnished, or executed upon by any creditor of the beneficiary.

**D.    DISTRIBUTE TO OR FOR INCAPACITATED OR MINOR BENEFICIARIES.**    Notwithstanding any other provision of this agreement, to make distributions from any trust to or for the benefit of any beneficiary who is incapacitated or who is a minor, without the necessity of obtaining a receipt or the approval of any court, in any one or more of the following ways:  (1) directly to the beneficiary; (2) directly in payment of the beneficiary's expenses; (3) if the beneficiary is a minor, to a custodian for the minor named by the trustee to be held as a gift made under any applicable Uniform Transfers to Minors Act or Uniform Gifts to Minors Act, with the custodial arrangement continuing until the beneficiary reaches 21 years of age; or (4) to a relative, friend, guardian, committee, conservator, or other person or institution who in the trustee's judgment is responsible for the beneficiary or for the property of the beneficiary, whether or not appointed by any court.

**E.    MAKE BINDING DECISIONS WITH RESPECT TO DISCRE-TIONARY PAYMENTS.**    In making discretionary payments of income or principal to any person, to do so after taking into consideration, or without taking into consideration, as the trustee considers appropriate, any other income or financial resources reasonably available to the person. No creditor of any beneficiary, including any governmental agencies that may furnish services, payments, or benefits to a beneficiary, shall have any claim to any of the income or principal of any trust. All aspects of decisions with respect to discretionary payments of income and principal shall be made by the trustee in his absolute discretion and are binding on all persons.

**F.    MAKE CERTAIN DECISIONS WITHOUT PARTICIPATION OF INTERESTED TRUSTEE.**    No successor trustee may make any discretionary payment of income or principal from any trust if such payment would discharge a personal legal obligation of that trustee. No individual trustee, other than the grantor, may participate in any decision with respect to any insurance policy on the life of the trustee that may be a part of any trust unless there is only one trustee.

**G.    PAY INCOME AT TERMINATION OF TRUSTS.**    To pay any net income of any trust unpaid or accrued at the death of any trust beneficiary to the next succeeding beneficiary, without apportionment to the estate of the deceased beneficiary. If a trust is the successor, payment will be made to the income beneficiary and not to its trustee.

**H.    ADMINISTER WITHOUT COURT SUPERVISION.**    To administer all trusts without court supervision. If it becomes advisable to apply to a court for any purpose, the trustee shall request the court to take jurisdiction of the specific matter only and not of any trust as a whole.

**I.    RESTRICTIONS ON USE OF RETIREMENT PLAN BENEFITS.** Notwithstanding any contrary provision in this agreement, and except as is provided in this section, from and after the grantor's death the trustee shall not distribute to or for the benefit of

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    11

the grantor's estate, or to or for the benefit of any charitable organization or any other non-individual beneficiary, any retirement plan benefits which are subject to the "minimum distribution rules" of Internal Revenue Code §401(a)(9) and applicable regulations. It is the grantor's intent that all such retirement plan benefits be distributed to, or held for the benefit of, only individual beneficiaries within the meaning of Internal Revenue Code §401(a)(9) and applicable regulations. Accordingly, the grantor directs that any such retirement plan benefits may not be used to make payment of the grantor's debts, taxes and other claims against the grantor's "estate" except to the minimum extent that would be required under applicable state or federal law in the absence of any specific provision on the subject in the grantor's will or this agreement. This section shall not apply to any charitable bequest which is specifically directed to be funded with retirement benefits or proceeds by other provisions of this agreement. As used in this section, the term "retirement plan" shall mean any qualified retirement plan, individual retirement account or other retirement arrangement.

## SECTION 7.    INCAPACITY.

**A.    DETERMINATION OF INCAPACITY.**    Any individual shall be deemed to be "incapacitated" for all purposes of this agreement if the grantor or any trustee comes into possession of any of the following:

(1)    Written certificates of incapacity, which the recipient believes to be currently valid, executed and acknowledged by two physicians. In each certificate, the physician shall state that (i) he is certified by a recognized medical licensing body, (ii) he has examined the individual, and (iii) he has concluded that such individual was unable to act rationally and prudently in his own financial best interest because of accident, illness, deterioration, or other similar cause, whether physical or mental, progressive, intermittent or chronic. The grantor, by written instrument filed with trust records, may designate one or both of the physicians who shall examine herself for purposes of determining her own competency. If the grantor has designated less than two physicians, or if less than two of the named physicians are able or willing to serve, then the agent nominated by the grantor under an advance directive - appointment of health care agent, shall designate the needed number of physicians to examine the grantor.

(2)    A court order, which the recipient believes to be currently valid, holding the individual to be legally incapacitated to act on his own behalf, or appointing a guardian of his person or property.

(3)    Other evidence that the recipient believes to be credible and still applicable that the individual has disappeared, is unaccountably absent, or is being detained under duress, so that he is effectively unable to look after his own financial best interest.

**B.    DURATION OF INCAPACITY.**    Once an individual has been determined to be incapacitated, he or she shall continue to be treated as incapacitated until the certificates, court order, and/or circumstances have been revoked or become inapplicable. Any

**WHITEWATER** Revocable Trust Agreement

physician's certificate may be revoked by a similar certificate to the effect that the individual is no longer incapacitated, executed either by the two original certifying physicians or by two other licensed physicians.

### C.     EFFECT OF INCAPACITY.

(1)     If any trustee or other fiduciary is determined to be incapacitated, he may not continue to serve as such while his incapacity continues.  If and when he ceases to be incapacitated, he may resume serving as a fiduciary.

(2)     If the grantor is determined to be incapacitated, then notwithstanding any other provision of this agreement, the grantor will have no power to (i) withdraw income or principal from the trust during her lifetime, (ii) remove any trustee, or (iii) revoke or amend any part of this agreement.  If and when the grantor ceases to be incapacitated, the grantor may resume exercising all of these powers.

### D.     REPRESENTATION OF INCAPACITATED INDIVIDUALS AND MINORS.  Notwithstanding any other provision in this agreement, the interests of any incapacitated individual may be represented by any person appointed as an attorney in fact of the incapacitated individual under a valid durable power of attorney.  The interests of any minor may be represented by a parent or guardian of the minor, whether or not appointed by any court.  The decision of any attorney in fact, parent or guardian is binding on all persons.

### SECTION 8.     REVOCATION OR AMENDMENT.  The grantor reserves the power, at any time or times during the lifetime of the grantor, by a written instrument delivered to the trustee, to revoke or amend this agreement in whole or in part without the consent of any other person.  In addition, the grantor's agent under a valid general durable power of attorney may exercise the grantor's powers to revoke, amend or direct distributions of trust property by a written instrument signed by the agent and delivered to the trustee during the grantor's lifetime. This trust shall become irrevocable upon the grantor's death.

### SECTION 9.     RESOLUTION OF CONTROVERSIES.  Any controversy between the trustees, or between any other parties to this trust, including beneficiaries, involving the construction or application of any of the terms, provisions, or conditions of this trust

---

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    13

agreement shall, on the written request of either or any disagreeing party served on the other or others, be submitted to arbitration. The parties to such arbitration shall each appoint one person to hear and determine the dispute and, if they are unable to agree, then the two persons so chosen shall select a third impartial arbitrator whose decision shall be final and conclusive upon both parties. The cost of arbitration shall be borne by the losing party or in such proportion as the arbitrator(s) shall decide. Such arbitration shall comply with the commercial Arbitration Rules of the American Arbitration Association.

Furthermore, the grantor desires that this trust, the trustee and beneficiaries shall not be involved in time-consuming and costly litigation concerning the function of this trust and disbursement of the assets. Additionally, the grantor has taken great care to designate, through the provisions of this trust, how the grantor wants the assets of the trust distributed. Therefore, if a beneficiary, or a representative of a beneficiary, or one claiming a beneficial interest in the trust, should legally challenge this trust, its provisions or asset distributions, then all assets to such challenging beneficiary shall be retained in trust and distributed to the remaining beneficiaries named in this trust agreement, as if such challenging beneficiary and his or her issue has predeceased the distribution of the trust assets. The defense of such litigation, including costs incurred by representatives of the grantor's estate, the trustees of this trust and their agents, attorneys, accountants and representatives, shall be paid for by the trust.

**SECTION 10.    GOVERNING LAW.** This agreement and the trusts created by it have been accepted by the trustee in the Commonwealth of Virginia. All questions pertaining to the validity and construction of the agreement shall be determined, and the trust shall be administered, under Virginia law.

---

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    14

**SECTION 11.   RULE AGAINST PERPETUITIES.**   The common law rule against perpetuities shall not apply to this agreement and the trusts created by this agreement.

**SECTION 12.   BINDING AGREEMENT.**   This agreement is binding upon and inures to the benefit of the parties and their respective personal representatives, successors in interest, and successors in trust.

**EXECUTED** on September 30, 2021.

WITNESS:

_____ (SEAL)
**CLAUDIA ENGELHORN**, Grantor

_____ (SEAL)
**CLAUDIA ENGELHORN**, Trustee

_____ (SEAL)
**ERIK D. BOLOG**, Trustee

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on September 30, 2021, before me, a notary public of the jurisdiction aforesaid, personally appeared **CLAUDIA ENGELHORN**, the grantor and one of the trustees named in this revocable trust agreement, and acknowledged it to be her act and deed.

_____
Notary Public

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on September 30, 2021, before me, a notary public of the jurisdiction aforesaid, personally appeared **ERIK D. BOLOG**, one of the trustees named in this revocable trust agreement, and acknowledged it to be his act and deed.

_____
Notary Public

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    15

## ASSET TRANSFER
## ACKNOWLEDGMENT AND RELEASE

I, **CLAUDIA ENGELHORN**, grantor of the foregoing **WHITEWATER REVOCABLE TRUST AGREEMENT DATED SEPTEMBER 30, 2021,** have been advised of the importance of assuring that my trust be properly funded with assets in order to accomplish my estate planning goals. I understand that it is my obligation and responsibility to transfer my assets and to confirm that the transfers of such assets have in fact been effectively completed. I hereby release the law firm of WHITEFORD, TAYLOR & PRESTON, LLP of any and all liability that may arise out of an omitted, incomplete or ineffective asset transfer. I intend this release to be binding on my successors and beneficiaries. Furthermore, I understand that it is my responsibility to maintain the records of the trust assets in a current and complete manner.

September 30, 2021

_____ (SEAL)
CLAUDIA ENGELHORN, Grantor

## SCHEDULE A

## ASSETS

The following schedule of assets is a record of any assets transferred to the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021,** and includes any attached memorandum, any asset titled in the name of the trust, and any personal property assigned to the trust.

| Asset | Estimated Value | Initials | | Date Transferred |
|---|---|---|---|---|
| | | Grantor | Trustee | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    17

## SCHEDULE B

## DESIRED DISTRIBUTION OF TANGIBLE PERSONAL PROPERTY

Some of my personal belongings have special meaning to me. I desire that, after my death, these items, as listed below, be distributed from the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021,** to the person named, if, in each case, that person is living 30 days after my death.

| *Description of Personal Property* | *Desired Recipient And Relationship* |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CLAUDIA ENGELHORN

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*            18

## SCHEDULE C

## ADVANCEMENTS

The following gifts and distributions made during my lifetime shall be considered advancements. When the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021**, is divided into shares after my death, I direct the trustee to make an equitable adjustment for those advancements listed below that were made to persons for whom a share of the trust is then set apart.

| _Recipient_ | _Amount_ | _Grantor's Initials_ | _Date_ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CLAUDIA ENGELHORN

**WHITEWATER** Revocable Trust Agreement

_Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260_                    19

## SCHEDULE D

## LOANS AND INDEBTEDNESS

The following loans have been made by me. To the extent that any such indebtedness from any person for whom a share of the trust is to be set apart remains outstanding when the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021**, is divided into shares after my death, I direct the trustee to allocate such indebtedness to the share of the indebted person.

| *Recipient* | *Amount* | *Grantor's Initials* | *Date* |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CLAUDIA ENGELHORN

**WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703)280-9260*                    20

# ABSTRACT OF TRUST
## OF
## WHITEWATER REVOCABLE TRUST
## DATED
## SEPTEMBER 30, 2021

I, **CLAUDIA ENGELHORN,** hereby certify that I have created a revocable trust. That revocable trust agreement was executed on September 30, 2021 by **CLAUDIA ENGELHORN,** of Fairfax County, Virginia, as grantor, and **CLAUDIA ENGELHORN** and **ERIK D. BOLOG,** as trustees. The trust shall be known as the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021.**

Any reference in the trust agreement to the "trustee" shall apply to any trustee or trustees then serving. If two or more trustees are ever serving as such, any administrative or ministerial powers and duties may be exercised by any one trustee. If more than two trustees are ever serving as such, any action may be undertaken by the consent of a majority of the trustees then serving.

**CLAUDIA ENGELHORN** and **ERIK D. BOLOG** are the trustees of this trust, either of whom may act alone. The grantor is also the beneficiary of the trust during her lifetime. Under Section 4.A of the trust agreement, if either trustee ceases to serve as trustee for any reason, the other shall continue to serve as trustee. If both trustees cease to serve as trustee for any reason, then the grantor's son, **RICHARD BUSSMANN,** shall serve as trustee. If he fails to serve or ceases to serve as trustee for any reason, then the grantor's daughter, **MARGARET BLADES,** shall serve as trustee. If she fails to serve or ceases to serve as trustee for any reason, then the grantor's daughter, **COURTNEY BUSSMANN,** shall serve as trustee. If she fails to serve or ceases to serve as trustee for any reason, then a grandchild of the grantor who has attained thirty-

five (35) years of age and has accepted his/her appointment as successor trustee shall serve as trustee. If at any time or times there is no individual trustee serving, then (1) the grantor, or (2) the last serving individual trustee, if living and able to do so, or (3) if not, the then-living beneficiaries of the trusts, by majority vote, shall designate one or more successor trustees.

In addition to any powers given to the trustee by statute, common law, or rule of court, including the powers specified in §64.2-105 and §64.2-778 of the Code of Virginia, under Section 5 of the trust agreement, the trustee, and any successor trustees, have additional powers, some of which are listed below, and all of which they may exercise without prior or subsequent approval by any court:

**DEAL WITH PROPERTY.** To retain, invest in, sell at public or private sale, mortgage, lease, exchange, manage, subdivide, develop, build, alter, repair, improve, raze, abandon, buy and sell puts, calls, futures and futures options, or otherwise deal with or dispose of any real or personal property, regardless of its nature, the lack of diversification of any trust, or the fact that any arrangement with respect to such property extends beyond the duration of any trust.

**REGISTER IN NOMINEE FORM.** To register any property in the name of a nominee or in other form without disclosure of the fiduciary capacity.

**DISPOSE OF CLAIMS.** To pay, extend, renew, prosecute, defend, compromise or submit to arbitration all rights, obligations, or claims of any trust against others or of others against any trust.

**EXECUTE DOCUMENTS.** To execute, acknowledge, and deliver documents.

**DIVIDE PROPERTY.** To make any division or distribution in cash, in kind, or partly in cash and partly in kind, and to allocate or distribute undivided interests or different assets or disproportionate interests in assets. The division of, values assigned to, and beneficiaries selected to receive, any property is binding on all persons.

**BORROW FUNDS OR MAKE LOANS.** To borrow funds from any party (including the trustee), or to make loans, for any purpose connected with the administration of any trust, upon whatever terms, periods of time, and security the trustee considers advisable.

**EMPLOY AGENTS.** To employ brokers, investment counsel, custodians, realtors, accountants, attorneys, and other agents, and to delegate powers and discretions to any of them.

---

Abstract of **WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703) 280-9260*                    2

**MAKE TAX ELECTIONS.** To make any tax election permitted by any tax law, and to file any tax return. There shall be no adjustment of any interests because of any such election or return.

**CARRY ON BUSINESS.** Without filing reports with any court, to continue, incorporate, enter into, or carry on any business, whether as a stockholder, general or limited partner, sole or joint owner, or otherwise; to invest whatever assets may be needed in the business; to employ agents to operate the business; to serve in any capacity with the business; to receive reasonable compensation for such services, in addition to compensation for services as a fiduciary; and to reorganize, liquidate, merge, consolidate, or transfer the business or any part of it.

**KEEP INFORMATION CONFIDENTIAL.** In light of the grantor's desire that the provisions of this trust agreement are to remain confidential as to all parties, to reveal information concerning the benefits paid to any particular beneficiary only to such individual. Accordingly, no other individual shall have the right to information concerning the benefits paid to any other beneficiary.

**DO ALL THINGS WITH FINAL AUTHORITY.** To do all things that the grantor would be able to do were the grantor the absolute owner of the trust property. All decisions taken in good faith are binding on all persons.

The grantor recognizes that the powers and duties granted to and imposed on the trustee impose heavy and difficult burdens on the trustee. In order to induce the trustee to exercise these powers and duties in the manner the trustee believes will most closely approximate the intentions of the grantor, the grantor stipulates that any exercise of any power or discretion in good faith by the trustee is binding on all persons. The trust shall indemnify and hold each individual trustee harmless for any act or omission of such trustee, except for an act of gross negligence or willful misconduct.

Abstract of **WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP ▪ Attorneys At Law ▪ (703) 280-9260*                  3

THE UNDERSIGNED declare under penalty of perjury that the foregoing abstract of trust, executed on September 30, 2021, is true and correct.

WITNESS:

_____ arlington NC          _____ (SEAL)
                                                        CLAUDIA ENGELHORN, Grantor

_____ arlington NC          _____ (SEAL)
                                                        CLAUDIA ENGELHORN, Trustee

_____ fairfax                _____ (SEAL)
                                  VA                    ERIK D. BOLOG, Trustee

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on September 30, 2021, before me, a notary public of the jurisdiction aforesaid, personally appeared **CLAUDIA ENGELHORN,** the grantor and one of the trustees of the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021,** and acknowledged the foregoing abstract of trust to be her act and deed.

_____
Notary Public

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on September 30, 2021, before me, a notary public of the jurisdiction aforesaid, personally appeared **ERIK D. BOLOG,** one of the trustees of the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021,** and acknowledged the foregoing abstract of trust to be his act and deed.

_____
Notary Public

                                            Fairfax, VA

_____

Abstract of **WHITEWATER** Revocable Trust Agreement

*Whiteford, Taylor & Preston, LLP • Attorneys At Law • (703) 280-9260*                4

# ASSIGNMENT OF TANGIBLE PERSONAL PROPERTY
## TO
## WHITEWATER REVOCABLE TRUST
## DATED SEPTEMBER 30, 2021

I assign and transfer to CLAUDIA ENGELHORN and ERIK D. BOLOG, trustees of the **WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021**, all of my right, title and interest in all tangible personal property that I currently own, wherever located, except for any registered motor vehicle, boat or vessel, to be administered and disposed of as part of that trust.

I further declare that all tangible personal property that I hereafter acquire, except for any registered motor vehicle, boat or vessel not titled in the name of the trust, shall be acquired by me in my capacity as trustee of the revocable trust referred to above.

I agree to execute such further assurances as may be required to effectuate the purposes of this assignment.

**EXECUTED** as of September 30, 2021.

WITNESS:

_____          _____ (SEAL)
                                          CLAUDIA ENGELHORN

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on September 30, 2021, before me, a notary public of the jurisdiction aforesaid, personally appeared **CLAUDIA ENGELHORN**, the person named in the foregoing assignment of tangible personal property, and acknowledged it to be her act and deed.

_____
Notary Public

SHONTA DENISE JOHNSON
NOTARY PUBLIC
REG # 7861193
MY COMMISSION EXPIRES
08/31/2024
COMMONWEALTH OF VIRGINIA

E-FILED; Baltimore City Circuit Court
Docket: 6/9/2025 12:24 PM; Submission: 6/9/2025 12:24 PM
Envelope: 21551344

# EXHIBIT B

## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | | |
|---|---|---|
| **CLAUDIA ENGELHORN,** *et al.,* | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | **Case No.: C-24-CV-24-002631** |
| | ) | |
| | ) | |
| **WHITEFORD, TAYLOR & PRESTON, LLP et al.,** | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| **ERIK D. BOLOG** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **DARNESTOWN ROAD, INC.** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **SCIENCE PARK ASSOCIATES, LLC** | ) | |
| | ) | |
| *Counterclaim Plaintiffs* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CLAUDIA ENGELHORN** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **CLAUDIA ENGELHORN, AS TRUSTEE OF THE WHITEWATER REVOCABLE TRUST DATED SEPTEMBER 30, 2021** | ) | |
| | ) | |
| *Counterclaim Defendants* | ) | |

## BOLOG DEFENDANTS' COUNTERCLAIMS

Counterclaim Plaintiffs Erik D. Bolog ("Mr. Bolog"), Science Park Associates, LLC, and Darnestown Road, Inc. (collectively, the "Counterclaim Plaintiffs"), bring these counterclaims against Counterclaim Defendants Claudia Engelhorn and Claudia Engelhorn, as Trustee of the Whitewater Revocable Trust, dated September 30, 2021 ("Trustee" and collectively with Ms. Engelhorn, the "Counterclaim Defendants") and allege the following:

## NATURE OF THE ACTION

1.      These are counterclaims that Mr. Bolog never imagined he would be forced to bring against one-time friend, business colleague and former client, Ms. Claudia Engelhorn, individually and as the Trustee of the Whitewater Revocable Trust, dated September 30, 2021 ("WWT").

2.      Mr. Bolog first became acquainted with Ms. Engelhorn when he successfully represented her in a massive cross-border litigation, during the height of the global COVID pandemic, traveling back and forth from the United States to Europe, with threats on his life because of his involvement in a very public legal battle. It would not be an understatement to say that Mr. Bolog risked his health, well-being, and physical safety in relation to his representation of Ms. Engelhorn.  *See* **Exhibit C** at 1.

3.      Ms. Engelhorn is the daughter of Curt Engelhorn, who, according to Ms. Engelhorn, was at one time the self-proclaimed wealthiest man in Germany, with an estimated $10 billion value of his estate and affiliated entities at the time of his death.  Approximately 25 years before his death, Mr. Engelhorn funded the Manheim Trust, created for the benefit of Ms. Engelhorn and her children in the amount of $500 million, to be managed as a family office. Ms. Engelhorn has served as the life trustee of the Manheim Trust, which paid her a salary of

2

approximately $1,000,000 per year  and loaned her approximately $30,000,000 to fund her lifestyle and various litigations.

4.      Mr. Engelhorn, who became a resident of Gstaad, Switzerland, towards the end of his life, and later died in Gstaad, left his entire estate to his (fourth) wife. Unsatisfied with the $500 million her father gifted to the Manheim Trust (for the benefit of her and her three children), Ms. Engelhorn chose to pursue a forced heirship claim to her statutory entitlement from her father's estate under the laws of Switzerland (the "Switzerland Litigation").

5.      As a result of his dogged and tireless efforts representing Ms. Engelhorn in the Switzerland Litigation, Mr. Bolog obtained a $130 million, tax-free settlement, on behalf of Ms. Engelhorn.

6.      After paying 100% of her legal fees and expenses to Mr. Bolog's then-law firm, Whiteford Taylor & Preston, LLP ("WTP"), Ms. Engelhorn decided, on her own, to fund an irrevocable trust known as the JAREB Irrevocable Trust Dated October 11, 2021 ("JAREB Irrevocable Trust") for the benefit  of Mr. Bolog and his children, in the amount of $10,000,000 (the "Gift").  *See* **Exhibit C** at 1-2.

7.      From the date of the Gift to the JAREB Irrevocable Trust through the early summer of 2022, Ms. Engelhorn continued her professional relationship and personal friendship with Mr. Bolog.  For the 11 months after she made the Gift, Ms. Engelhorn, Mr. Bolog, and others, travelled domestically and internationally for business and pleasure to Spain, Ireland, Hawaii, the Bahamas, Nashville, New York, Charleston, South Carolina, Virginia, West Virginia, and San Francisco, and spent countless days together—in business meetings, on family outings, and at celebrations, including spending New Year's Eve 2021, together with Mr. Bolog's significant other.

8.     Additionally, after settlement of the Switzerland Litigation, Ms. Engelhorn insisted that Mr. Bolog act as her co-trustee for a trust known as the Whitewater Revocable Trust, dated September 30, 2021—*i.e.*, the WWT—which was funded with an initial $100 million from the settlement proceeds Mr. Bolog obtained for her in the Switzerland Litigation.

9.     Mr. Bolog, with the full knowledge and approval of his then-law firm Whiteford Taylor & Preston, agreed to serve as a co-trustee of the WWT.

10.     Then, on or around July 6, 2022, after Ms. Engelhorn and Mr. Bolog had had a falling out because Mr. Bolog had admonished her after she made a racially hateful statement to an African-American family at a restaurant—telling the family that it was nice that they were allowed to eat in restaurants—and after Mr. Bolog's significant other, who was also had become good friends with Ms. Engelhorn, counseled Ms. Engelhorn against terminating her relationship with her daughter because her daughter was involved in a same-sex relationship, a relationship that Ms. Engelhorn believed would result in her daughter going to "hell," and approximately nine months after Ms. Engelhorn made the irrevocable Gift, including voluntarily, knowingly, and intentionally transferring to the JAREB Irrevocable Trust the $10 million from her Bank of America Bank personal bank account, constituting the Gift, which in October 2021 was received and accepted by the JAREB Irrevocable Trust, Ms. Engelhorn sent an email, attempting to revoke the irrevocable Gift.  A copy of the email is attached hereto as **Exhibit D**.[1]  This email stated that she made the Gift when she was intoxicated and that Mr. Bolog had transferred the money from Ms. Engelhorn's personal bank account to the JAREB Irrevocable Trust.  Neither of these assertions were true.  Ms. Engelhorn was not intoxicated at the time that she, and she alone, executed the Notice of Gift, which was notarized, nor was she intoxicated days later when she, and

---

[1] The undersigned have implemented certain limited redactions to **Exhibit D** to protect personally identifiable information, including banking information and personal email addresses.

she alone, initiated and authorized the $10 million Gift to the JAREB Irrevocable Trust in a verified phone call with Bank of America (satisfying all of Bank of America's security protocols). Mr. Bolog had no involvement with the transfer by Ms. Engelhorn of the Gift.

11.     The JAREB Irrevocable Trust, through counsel, responded to the email, advising Ms. Engelhorn that it would not allow her to revoke her irrevocable Gift.

12.     Then, approximately a year later, during the summer of 2023, at the invitation of Ms. Engelhorn's new attorney Anthony Williams, a partner at the international law firm, Dentons, Mr. Bolog and his attorney travelled to New York City to discuss the Gift. At that meeting Mr. Williams stated a new version of why Ms. Engelhorn wished to revoke the irrevocable Gift, stating that she was "on the spectrum" and not very smart. Then, shortly after he was advised of the actual facts concerning the transfer—more specifically that Ms. Engelhorn transferred the funds from her personal bank account at Bank of America, with no involvement by Mr. Bolog and that the Notice of Gift was notarized—Mr. Williams offered to resolve the matter by splitting the $10 million Gift, requesting that Mr. Bolog return $5 million. Mr. Williams further offered that, if that compromise was acceptable, he would have Ms. Engelhorn file a gift tax return in the amount of $5 million and had further advised that Ms. Engelhorn had not yet filed a gift tax return for the $10 million Gift as a result of his advice. Of course, if Ms. Engelhorn did not know that she had made the Gift, she would have never been considering the need to file a gift tax return. This suggested resolution by Mr. Williams was rejected.

13.     Frustrated by the JAREB Irrevocable Trust's unwillingness to allow Ms. Engelhorn to revoke the irrevocable Gift, Ms. Engelhorn then embarked on a scorched-earth mission to destroy Mr. Bolog's career and his financial well-being. She began this by defaming and slandering Mr. Bolog to clients and friends of Mr. Bolog.

5

14.     Then, on or around July 11, 2024, new attorneys for Ms. Engelhorn sent a letter to WTP, a third-party, defaming Mr. Bolog and impugning his capacity as an attorney, his honesty, and his commitment to his ethical obligations.  In this letter, Ms. Engelhorn, through her agent Wes Henderson, defamed Mr. Bolog by stating the following:

- "Mr. Bolog defrauded Ms. Engelhorn";

- "Mr. Bolog improperly caus[ed] the transfer of $10M to a trust created for his benefit";

- "Ms. Engelhorn may not have been Mr. Bolog's *first and only victim*" (emphasis added).

15.     Then, 35 months after making the Gift, and almost two years after Ms. Engelhorn and Mr. Bolog had a falling out, Ms. Engelhorn, in the above-captioned action, accused Mr. Bolog of inappropriate and unethical conduct in obtaining the very Gift she insisted on making for the benefit of Mr. Bolog and his family.

16.     Mr. Bolog has now been forced to bring these counterclaims to seek redress for wrongs and reputational damage he has suffered and continues to suffer at the hands of Ms. Engelhorn.

## JURISDICTION AND VENUE

17.     Jurisdiction over this Counterclaim is proper with this Court under Md. Code Ann., Cts. & Jud. Proc. § 1-501, § 6-102(a), and § 6-103(b)(1)-(6); as well as Md. Code Ann., Est. & Trusts § 14.5-202.

18.     This Court has jurisdiction to declare the parties' "rights, status, and other legal relations whether or not further relief is or could be claimed." Md. Code Ann., Cts. & Jud. Proc. § 3-403.

19.     Jurisdiction is also proper with this Court for the adjudication of counterclaims.

20.    Venue is proper in Baltimore City, Maryland, under Md. Code Ann., Cts. & Jud. Proc. § 6-201(a), §6-201(b), and §6-202(8).

21.    Venue is proper with this Court for the adjudication of counterclaims.

## PARTIES

22.    Counterclaim Plaintiff Erik D. Bolog whose principal place of business is Washington, DC is an individual. Mr. Bolog has served, and continues to serve, as trustee of the JAREB Irrevocable Trust since October 11, 2021.

23.    Counterclaim Plaintiff Science Park Associates, LLC is a limited liability company with its principal place of business in the State of Maryland.

24.    Counterclaim Plaintiff Darnestown Road, Inc. is a corporation with its principal place of business in the State of Maryland.

25.    Counterclaim Defendant Claudia Engelhorn is an individual and resides in the State of Tennessee.

26.    Counterclaim Defendant Claudia Engelhorn is the Trustee for the Whitewater Revocable Trust dated September 30, 2021, as amended.

## FACTUAL ALLEGATIONS

A.    **Defamation**

27.    On or around July 1, 2024, Wes Henderson, of the law firm Henderson Law LLC, and acting as an agent of Ms. Engelhorn, sent a letter to WTP, defaming Mr. Bolog (the "Defamatory Letter," attached hereto as **Exhibit A**).

28.    The Defamatory Letter impugned Mr. Bolog's capacity as an attorney, his honesty, and his commitment to his ethical obligations.

29.    For example, the Defamatory Letter contained the following libelous and defamatory statements:

7

- "Mr. Bolog defrauded Ms. Engelhorn";

- "Mr. Bolog improperly caus[ed] the transfer of $10M to a trust created for his benefit";

- "Ms. Engelhorn may not have been Mr. Bolog's *first and only victim*" (emphasis added);

30.     These statements constitute defamation *per se*.

**B.     Whitewater Trust Agreement**

31.     Mr. Bolog, at the insistence of Ms. Engelhorn, served as a co-trustee of the Whitewater Revocable Trust (attached hereto as **Exhibit B**) from its inception until November 3, 2022.  During this time Mr. Bolog, as Trustee had all of the authority bestowed upon him by the Whitewater Revocable Trust.

32.     Under all relevant times herein, Mr. Bolog was the co-trustee of the Whitewater Revocable Trust.

33.     The Whitewater Revocable Trust failed to pay Mr. Bolog a reasonable trustee fee for his services as its trustee, overseeing $100 Million of assets.

34.     Under Section 5.K. of the Whitewater Revocable, Trust, Mr. Bolog is entitled to compensation for his services as trustee of the Whitewater Revocable Trust.  Pursuant to Virginia law, which governs the Whitewater Revocable Trust, Mr. Bolog is entitled to be paid a reasonable trustee fee for his services for the 13 months he served as the co-trustee.

35.     Under Section 9 of the Whitewater Revocable Trust, Mr. Bolog, as a co-trustee, is indemnified by the Whitewater Revocable Trust for the cost of defending all forms of litigation relating to any actions against him as Trustee of the Whitewater Revocable Trust.  Additionally, pursuant to Section 9 of the Whitewater Revocable Trust, all legal fees and costs incurred by Mr. Bolog for any claims relating to his actions as Trustee of the Whitewater Revocable Trust are to be immediately paid by the Whitewater Revocable Trust.

36.    To date, the Whitewater Revocable Trust has not paid Mr. Bolog's legal fees and costs relating to his services on behalf of the Whitewater Revocable Trust.

37.    On or around March 2022, with Ms. Engelhorn's full knowledge and consent, the Whitewater Revocable Trust purchased a loan and security interest from a regional bank relating to an entity, Science Park Associates, LLC, for approximately $3,352,650 (the "Science Park Investment"). This loan was secured by a deed of trust on an office building located at 9001 Edmonston Lane, Greenbelt, Maryland (the "Greenbelt Property").

38.    Whitewater Revocable Trust, through Ms. Engelhorn, learned of this opportunity while sitting in Mr. Bolog's office in Washington, DC overhearing Mr. Bolog discussing the opportunity to purchase the loan documents with another investor, and thereafter, insisting on the Whitewater Revocable Trust making the investment.

39.    The Greenbelt Property was shortly thereafter sold by Science Park Associates, LLC and the Whitewater Revocable Trust was repaid all principal, interest and costs. This was an opportunistic investment and proved very profitable for Ms. Engelhorn and the Whitewater Revocable Trust (Ms. Engelhorn is the sole beneficiary of the Whitewater Revocable Trust).

40.    Mr. Bolog, in his capacity as the co-Trustee of the Whitewater Revocable Trust was completely authorized (without Ms. Engelhorn's consent) to make the Science Park Investment on behalf of the Whitewater Revocable Trust. However, Mr. Bolog fully informed his co-Trustee, Ms. Engelhorn, about the investment and Ms. Engelhorn, after being fully apprised of any and all conflicts of interest relating to the investment, insisted and approved of the Whitewater Revocable Trust investment and the purchase of the loan and security instruments.

41.    At the time of the sale of the Greenbelt Property, the Whitewater Revocable Trust was represented by Dentons, a large international law firm, that provided the payoff

calculation to the Whitewater Revocable Trust and accepted, without any objection or complaint, the total amount due pursuant to the loan documents it purchased relating to the Greenbelt Property, thereby profiting by approximately $330,000.00.

42.　　Similarly, the Whitewater Revocable Trust, with the full knowledge and consent of both Whitewater Revocable Trust Trustees, Ms. Engelhorn and Mr. Bolog, made a $350,000 loan to Darnestown Road, Inc., relating to a 100,000 square foot operating shopping center located in Richmond, Virginia (the "Darnestown Road Loan").  Whitewater Revocable Trust, through Ms. Engelhorn, learned of this opportunity while sitting in Mr. Bolog's office in Washington, DC, overhearing Mr. Bolog discussing the loan for the property with another lender, and thereafter, insisting on the Whitewater Revocable Trust making the loan.  Ms. Engelhorn was fully aware of and consented to a waiver of the conflicts of interest that existed as a result of Mr. Bolog's and WTP's decades long representation of the ownership entity of the Richmond Shopping Center and Darnestown Road, Inc.  The Darnestown Road Loan is not yet mature.

43.　　Ms. Engelhorn, who is a sophisticated business person, in charge of more than $630 million of assets (over $500 million of her family office assets and $130 million of the Whitewater Revocable Trust assets), requested, after full disclosure of all potential conflicts, that she be able to make the Darnestown Road Loan to profit from the interest.

44.　　Complete loan documents and conflict waivers were fully discussed and signed.

45.　　The Darnestown Road loan is not due until December 31, 2025.

46.　　At the time the Science Park Investment and the Darnestown Road Loan was made, interest rates on bank accounts were paying approximately 1%.  Ms. Engelhorn, as Trustee, wanted a higher yield on the Whitewater Revocable Trust assets and was fully motivated

to take advantage of business opportunities which she, on behalf of the Whitewater Revocable Trust, learned about from Mr. Bolog.

47.    The Darnestown Road Loan was at an interest rate of 8%.

48.    The Science Park Investment was at an interest rate of 9%.

49.    Upon information and belief, and based upon a letter sent by Ms. Engelhorn's attorneys at Dentons to defendant Michael Postal, a certain investment made in Swain Landing LaPlata JC LLC ("Swain Landing") is owned by the Whitewater Revocable Trust.

50.    As alleged in the Second Amended Complaint, Ms. Engelhorn sold a home she owned in Tennessee and the proceeds were transferred to Swain Landing for a real estate investment.

51.    Mr. Bolog had no involvement with the Swain Landing investment other than at Ms. Engelhorn's directive, communicated with developer of the investment to ascertain the investment amount.

52.    However, the Second Amended Complaint alleges that Mr. Bolog, who was the Trustee of WWT, should have taken certain action(s) relating to the investment.  As a result of the fact that WWT purportedly owns the Swain Landing Investment, and Mr. Bolog was the co-trustee of the WWT at the time of the investment, the WWT must indemnify Mr. Bolog for any purported liability and immediately pay all of his legal fees and costs associated with his defense of the Second Amended Complaint.

**C.    Ms. Engelhorn Abuses the Court Process by Filing this Action**

53.    Plaintiffs initiated this action on September 10, 2024.

54.    On February 5, 2025, Ms. Engelhorn along with Plaintiffs filed the Second Amended Complaint.

55.     The Second Amended Complaint contains numerous allegations that are either intentionally deceptive to the Court or demonstrably false on their face, and reveal the true ulterior motive behind Ms. Engelhorn's filing, namely to assert professional and ethical breaches against Mr. Bolog for the sole purpose of causing him personal pain, suffering, and harm and of attempting to destroy his professional reputation and ability to practice law; her sole motive for attempting to revoke the irrevocable Gift was to harm Mr. Bolog, not to use the judicial process for a proper purpose or to recover the funds.

56.     Upon information and belief, Ms. Engelhorn brought the Second Amended Complaint expecting that Mr. Bolog would submit to the pressure of defending against a multi-million dollar action and return the Gift (which he could not, anyway, because it belongs to the JAREB Irrevocable Trust) to preserve his reputation in the face of baseless and unsubstantiated claims.

57.     For example, paragraphs 35-37 of the Second Amended Complaint address the transfer of the $10M Gift from Ms. Engelhorn to the JAREB Irrevocable Trust. But the Second Amended Complaint deceptively and intentionally avoids that it was Ms. Engelhorn who actually initiated and completed the transfer of the Gift and instead implies that Mr. Bolog transferred the Gift.

58.     The only way for Ms. Engelhorn to have effectuated the Gift was for her, herself, to initiate the transfer through a direct phone call with Bank of America (after following all of its security protocols) and through the use of a personal security confirmation code sent to her and read back to the bank. Her instructions to make the Gift to the Bank of America satisfied all of the security protocols and Mr. Engelhorn, and only Ms. Engelhorn, was able to and did start and complete the Gift by authorizing Bank of America to transfer $10 Million from her personal

account to the JAREB Irrevocable Trust account, all of which was done without any involvement from Mr. Bolog.

59.     In another example, paragraph 36 of the Second Amended Complaint describes Mr. Bolog directing Ms. Engelhorn to sign documents upside down. But, of course, Ms. Engelhorn's conclusory allegations ignore that Ms. Engelhorn's signature on the documents appear right-side up.  But in reality, Ms. Engelhorn knows that none of the documents that she signed, which were notarized, caused the Gift to occur, she, and only she had the authority to direct the Gift to be made and if she didn't know exactly what she was doing, as she eloquently articulated in the Notice of Gift, she would have simply not have directed Bank of America to make the irrevocable Gift during the call that was required to transfer the $10 Million.

60.     Indeed, the Second Amended Complaint baselessly and conclusory accuses Mr. Bolog of tricking Ms. Engelhorn, not explaining documents to her, deceiving her into thinking she was signing routine documents, and not providing her an opportunity to review documents before pressuring her into signing them.

61.     Ms. Engelhorn is a centi-millionaire who doesn't seriously need, nor care about the Gift, but instead, her filing of this action is solely to seek vengeance against Mr. Bolog and seeks to punish him following the end of their friendship and thereafter suffering from Giftor's remorse.

## COUNT I
### (DEFAMATION)
(Counterclaim Plaintiff Erik Bolog against Counterclaim Defendant Claudia Engelhorn)

62.     Counterclaim Plaintiff Erik Bolog incorporates each of the allegations and preceding paragraphs as set forth above into this Count I.

63.     Ms. Engelhorn has made false and defamatory statements to and through third parties, including, but not limited, to lawyers at WTP.

64.     These libelous defamatory statements by Ms. Engelhorn through her attorneys at Henderson Law LLC were made on or around July 1, 2024, within the past year of the date of these counterclaims.

65.     None of the defamatory statements are true and Ms. Engelhorn and her agents knew that the statements were untrue at the time the statements were made and sent to WTP.

66.     The Defamatory Letter was sent to a third party, WTP.

67.     Ms. Engelhorn's defamatory statements about Mr. Bolog were in furtherance of her objective to cast heinous aspersions on Mr. Bolog in an effort to inflict the maximum amount of economic and reputational damage against Mr. Bolog.

68.     Because Ms. Engelhorn's statements accuse Mr. Bolog of violating the law, and accuse him of a lack of integrity in his practice of law, his honesty, and his commitment to ethical obligations, and her statement that he has done this to other clients, Ms. Engelhorn's false statements constitute defamation *per se*.

69.     In making these defamatory statements, Ms. Engelhorn, injured Mr. Bolog's professional reputation, and caused Mr. Bolog personal humiliation, embarrassment, emotional pain, emotional harm, and emotional suffering.

70.     Additionally, as a result of her defamatory statements, Mr. Bolog has suffered assumed and actual damages including, but not limited to, loss and injury to his business, harm to his name and reputation, out-of-pocket losses incurred in defending against the Second Amended Complaint, personal humiliation, embarrassment, emotional pain, emotional harm, and emotional suffering.

71.     Ms. Engelhorn's knowingly or recklessly false statements were a substantial factor in causing the above stated injuries to Mr. Bolog.

72.    As a direct result of Ms. Englehorn's defamatory statements, Mr. Bolog suffered injury to his professional reputation and damages in excess of $20 Million.

## **COUNT II**
## (**INDEMNIFICATION**)

(Counterclaim Plaintiffs Erik Bolog, Darnestown Road, Inc., and Science Park Associates LLC against Counterclaim Defendant Claudia Engelhorn, as Trustee of the Whitewater Revocable Trust dated September 30, 2021)

73.    Counterclaim Plaintiffs Erik Bolog, Darnestown Road, Inc., and Science Park Associates, LLC  incorporate each of the allegations and preceding paragraphs as set forth above into this Count II.

74.    The Whitewater Revocable Trust indemnifies in two separate respects.

75.    *First*, it provides for immediate payment of litigation fees and costs.

76.    *Second*, the Whitewater Revocable Trust indemnifies Mr. Bolog against loss.

77.    Section 9 of the Whitewater Revocable Trust provides that "[t]he defense of [Trust-related] litigation, including costs incurred by . . . the trustees of this trust and their agents, attorneys, accountants and representatives, shall be paid for by the trust."

78.    The "litigation" to which this sentence in Section 9 refers encompasses any civil litigation.

79.    The obligation of the Whitewater Revocable Trust to pay litigation fees and costs is unconditional and immediate—there is no language limiting the circumstances under which the Whitewater Revocable Trust must pay or an opportunity to defer such payments to some future time.

80.    Mr. Bolog was the Trustee of the Whitewater Trust during all times relevant to the following claims asserted by Plaintiffs in the Second Amended Complaint that relate to

investments using funds from the Whitewater Revocable Trust in Science Park Associates, LLP, Darnestown Road, Inc., and Swain Landing (collectively, the "Whitewater Investment Claims"):

- Counts X and XI (constructive trust over Darnestown Road, Inc. and Swain Landing LaPlata JC, LLC, respectively);

- Counts XIII and XIV (dissolution and liquidation of Swain Landing Swain Landing LaPlata JC, LLC); and

- Counts XVII, XVIII, and XIX (fraudulent conveyance, fraud, and unjust enrichment related to Science Park Associates, LLC).

81.     The Whitewater Investment Claims all concern investments that Mr. Bolog, as Trustee of the Whitewater Revocable Trust, made—with full authority under the Whitewater Revocable Trust and with the full knowledge, awareness, and participation of Ms. Engelhorn—using funds of the Whitewater Revocable Trust.

82.     In addition to the immediate obligation to pay all defense costs (legal fees and costs), the Whitewater Trust is obligated to indemnify Mr. Bolog as trustee against damages arising from "any act or omission" under Section 5 of the Whitewater Revocable Trust.

83.     Science Park Associates, LLP, Darnestown Road, LLC., and Swain Landing are third-party beneficiaries under the Whitewater Revocable Trust and are also indemnified under Sections 5 and 9 of the Whitewater Revocable Trust and with the other applicable terms of the Whitewater Revocable Trust.

84.     Accordingly, Mr. Bolog is indemnified for defending all of the Whitewater Investment Claims as provided in Sections 5 and 9 of the Whitewater Revocable Trust and with the other applicable terms of the Whitewater Revocable Trust.

## COUNT III
## (ABUSE OF PROCESS)
(Counterclaim Plaintiffs Mr. Erik Bolog as an individual and trustee against Counterclaim Defendant Claudia Engelhorn)

85.    Counterclaim Plaintiff Erik Bolog as an individual and as trustee incorporate each of the allegations and preceding paragraphs as set forth above into this Count III.

86.    Ms. Engelhorn has willfully and maliciously used the court process for an illegal purpose: to punish and oppress Mr. Bolog and seek vengeance on him following the end of their friendship.

87.    After Mr. Bolog refused to return the irrevocable Gift (which he could not, regardless), Ms. Engelhorn initiated this action.

88.    Ms. Engelhorn either knew, or acted with intentional and/or reckless disregard for the truth, that the allegations in the Second Amended Complaint were false or deceptive.

89.    Ms. Engelhorn has used the court process to inflict reputational harm on Mr. Bolog and coerce him into returning the Gift.

90.    Because of Ms. Engelhorn's actions, Mr. Bolog has suffered reputational damage, loss and injury to his business, harm to his name and reputation, out-of-pocket losses incurred in defending against the Second Amended Complaint, personal humiliation, embarrassment, emotional pain, emotional harm, and emotional suffering.

91.    Mr. Bolog is also entitled to punitive damages as a result of Ms. Engelhorn's willful and malicious abuse of process.

## COUNT IV
## (BREACH OF CONTRACT)
(Counterclaim Plaintiff Erik Bolog against Counterclaim Defendant Claudia Engelhorn, as Trustee of the Whitewater Revocable Trust dated September 30, 2021)

92.     Counterclaim Plaintiff Erik Bolog incorporates each of the allegations and preceding paragraphs as set forth above into this Count IV.

93.     Under Section 5.K. of the Whitewater Revocable, Trust, Mr. Bolog is entitled to compensation for his services as trustee of the Whitewater Revocable Trust.

94.     In his role as trustee of the Whitewater Revocable Trust, Mr. Bolog performed valuable services for the Whitewater Revocable Trust from its inception through November 2022, serving as the trustee of a trust with over $130 Million in assets.

95.     Mr. Bolog has not received compensation for serving as the trustee for the Whitewate Trust for 13 months, and pursuant to Virginia law, which governs Whitewater Revocable Trust, Mr. Bolog is owed reasonable compensation for performing these services, and hereby demands payment in an amount of at least $500,000.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Bolog, individually and as trustee, Science Park Associates, LLC, and Darnestown Road, Inc., ask the Court to enter judgment in their respective favor against all Counterclaim Defendants as follows:

a) Enter judgment in favor of Erik Bolog against Counterclaim Defendant Ms. Claudia Engelhorn for liability on the defamatory statements identified above in Count I;

b) Enter judgment in favor of Erik Bolog against Counterclaim Defendant Ms. Claudia Engelhorn for liability on the abuse of process identified above in Count III;

c) Award Erik Bolog compensatory damages, together with pre- and post-judgment interest in an amount to be determined at trial on Counts I and III;

d) Award Erik Bolog punitive damages in an amount to be determined at trial on Counts I and III;

e) Enter judgment on Count II that Erik Bolog, Darnestown Road, Inc., and Science Park Associates, LLC are indemnified under the Whitewater Revocable Trust for the costs and disbursements of defending the Whitewater Investment Claims;

f) Award Erik Bolog, Darnestown Road, Inc., and Science Park Associates, LLC the costs and disbursements of defending this action, including reasonable attorneys' fees and court costs, in an amount to be determined at trial under Count II;

g) Award Erik Bolog a minimum of $500,000 on Count IV for his services as trustee of the Whitewater Revocable Trust, during which time neither Ms. Engelhorn nor the Whitewater Revocable Trust provided any compensation to Mr. Erik Bolog; and

h) Grant Counterclaim Plaintiffs any such other, further, and different relief that the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

96.    Counterclaim Plaintiffs demand a jury trial for all claims and issues in this Counterclaim that are triable before a jury.

Dated:      March 24, 2025

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

Respectfully,

/s/ Douglas Gansler

Douglas F. Gansler (Bar Number: 8912180208)
J.B. Howard (Bar Number: 9106200125)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300
j.b.howard@cwt.com

*Counsel for Defendants Erik D. Bolog, Individually
and as Trustee of the JAREB Irrevocable Trust
Agreement dated October 11, 2021; Darnestown
Road, Inc.; and Science Park Associates, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this March 24th, 2025, a copy of the foregoing was served electronically via MDEC upon counsel of record, and remaining parties served via first class mail.

**Counsel of Record Served via MDEC:**
Wes P. Henderson
**Henderson Law, LLC**
2127 Espey Court
Suite 204
Crofton, MD 21114
*Counsel for Plaintiffs Claudia Engelhorn; Claudia Engelhorn, Trustee; and White Pearl, LLC*

John J. Connolly
William J. Murphy
Kirk E. MacKinnon Morrow
**Zuckerman Spaeder LLP**
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
*Counsel for Defendant Whiteford, Taylor & Preston, LLP*

**Parties Served Via First Class Mail:**
**Tenacity Investments, LLC**
S/O: Mike Postal
7333 New Hampshire Avenue, Unit 103
Takoma Park, MD 20912

**Michael Postal**
4302 Broken Arrow Court
Apt. 606
Clinton, MD 20735

**Swain Landing LaPlata JC, LLC**
S/O: Anjon Jones
4302 Broken Arrow Court
Clinton, MD 20735

**POJO LaPlata LLC**
S/O: Anjon Jones
4302 Broken Arrow Court, Apt. 606
Clinton, MD 2073

Respectfully,

Douglas F. Gansler (8912180208)
J.B. Howard (9106200125)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300
j.b.howard@cwt.com

*Counsel for Defendants Erik D. Bolog,*
*Individually and as Trustee of the JAREB*
*Irrevocable Trust Agreement dated*
*October 11, 2021; Darnestown Road,*
*Inc.; and Science Park Associates, LLC*

E-FILED; Baltimore City Circuit Court
Docket: 6/9/2025 12:24 PM; Submission: 6/9/2025 12:24 PM
Envelope: 21551344

# EXHIBIT C

E-FILED; Baltimore City Circuit Court
Docket: 12/17/2024 7:24 PM; Submission: 12/17/2024 7:24 PM
Envelope: 19226119

**IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND**

| | | |
|---|---|---|
| CLAUDIA ENGELHORN, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | **Case No.: C-24-CV-24-002631** |
| | ) | |
| | ) | |
| | ) | |
| WHITEFORD, TAYLOR & PRESTON, | ) | |
| LLP et al., | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

---

**DEFENDANTS BOLOG, SCIENCE PARK, AND DARNESTOWN ROAD'S RESPONSE TO WHITEFORD, TAYLOR & PRESTON LLP'S PETITION FOR AN ORDER COMPELLING ARBITRATION AND MOTION TO STAY PROCEEDINGS**

Defendants Erik Bolog, in his individual capacity and as Trustee for the JAREB Irrevocable Trust Agreement Dated October 11, 2021; Science Park Associates, LLC ("Science Park"); and Darnestown Road, Inc., ("Darnestown Road") (collectively, the "Bolog Defendants") hereby respond to Whiteford, Taylor & Preston LLP's ("WTP") Petition for an Order Compelling Arbitration (the "Arbitration Petition") and Motion to Stay Proceedings.

None of the claims against the Bolog Defendants is subject to arbitration, and WTP's Petition For An Order Compelling Arbitration does not contend otherwise. The claims against the Bolog Defendants are nonarbitrable because the arbitration provision at issue is found in the engagement letter executed by and between WTP and Ms. Engelhorn—none of the Bolog Defendants is a party to that arbitration agreement. See *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 134 (2002) (A "party cannot be required to submit any dispute to arbitration that it has not agreed to submit."). Accordingly, the Bolog Defendants take no position

on the arbitrability of disputes arising under the engagement letter's arbitration agreement, which is binding on WTP and Plaintiff Engelhorn, but not on any of the Bolog Defendants. *See The Redemptorists*, 145 Md. App. at 151-158 (finding only claims and issues subject to arbitration clause are arbitrable; the remainder are stayed in court).

Nonetheless, the Bolog Defendants join in WTP's related Motion to Stay Proceedings and respectfully submit that if the Court orders the arbitration of any of the claims the Plaintiffs have brought against WTP, all proceedings in this action (including discovery) should be stayed pending a final determination in the arbitration.   See *The Redemptorists*, 145 Md. App. at 125 ("The issues as to the non-contracting parties should be stayed pending the outcome of the arbitration.").   WTP has already taken the position that it will not respond to discovery requests until resolution of the Arbitration Petition (and subsequent arbitration); allowing claims to proceed against the Bolog Defendants without the benefit of discovery against WTP would prejudice the Bolog Defendants' ability to adequately prepare its defenses in this case. Furthermore, allowing arbitration to conclude before resuming litigation in this action (including discovery) will narrow the outstanding issues and promote judicial economy. Completing arbitration will also materially impact the claims against the Bolog Defendants and determine, what, if any, claims can continue in this Court.

Therefore, a final determination by any arbitration adjudicating the claims brought by Plaintiffs against WTP must precede the litigation of the claims against the Bolog Defendants.


[*Remainder of Page Intentionally Omitted*]

Dated:      December 17, 2024

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

Respectfully,

Douglas F. Gansler (Bar Number: 8912180208)
J.B. Howard (Bar Number: 9106200125)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300
j.b.howard@cwt.com

*Counsel for Defendants Erik D. Bolog,
Individually and as Trustee of the JAREB
Irrevocable Trust Agreement dated October 11,
2021; Darnestown Road, Inc.; and Science Park
Associates, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of December, 2024, a copy of the foregoing

was served in the manner indicated on the following:.

**Counsel of Record Served via MDEC:**
Wes P. Henderson
**Henderson Law, LLC**
2127 Espey Court
Suite 204
Crofton, MD 21114
*Counsel for Plaintiffs Claudia Engelhorn; Claudia Engelhorn, Trustee; and White Pearl, LLC*

John J. Connolly
William J. Murphy
Kirk E. MacKinnon Morrow
**Zuckerman Spaeder LLP**
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
*Counsel for Defendant Whiteford, Taylor & Preston, LLP*

**Parties Served Via First Class Mail:**
**Tenacity Investments, LLC**
S/O: Mike Postal
7333 New Hampshire Avenue
Takoma Park, MD 20912

**Michael Postal**
4302 Broken Arrow Court
Apt. 606
Clinton, MD 20735

**Swain Landing LaPlata JC, LLC**
S/O: Anjon Jones
4302 Broken Arrow Court
Clinton, MD 20735

**POJO LaPlata LLC**
S/O: Anjon Jones
4302 Broken Arrow Court
Clinton, MD 20735

Respectfully,

Douglas F. Gansler (8912180208)
J.B. Howard (9106200125)
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Ave N.W.
Washington D.C. 20006
Douglas.Gansler@cwt.com
Telephone: (202) 862-2300
j.b.howard@cwt.com

*Counsel for Defendants Erik D. Bolog,
Individually and as Trustee of the JAREB
Irrevocable Trust Agreement dated
October 11, 2021; Darnestown Road,
Inc.; and Science Park Associates, LLC*

# EXHIBIT D

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



American Arbitration Association®

Available online at **adr.org/commercial**
Rules Amended and Effective September 1, 2022

If you would like to speak to a member of the AAA Commercial Team, please visit **https://go.adr.org/commercial-contact.html**.

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Large, Complex Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Commercial Arbitration Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  R-1. Agreement of Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council . . 11

  R-3. National Roster of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  R-4. Filing Requirements and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  R-8. Consolidation and Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

  R-9. Interpretation and Application of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  R-10. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  R-11. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  R-12. Fixing of Locale. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  R-13. Appointment from National Roster. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  R-14. Direct Appointment by Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

  R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or
  the AAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

  R-16. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  R-17. Number of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  R-18. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  R-19. Disqualification of Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  R-20. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  R-21. Vacancies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  R-22. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  R-23. Pre-Hearing Exchange and Production of Information. . . . . . . . . . . . . . . . . . . . . . 22

R-24. Enforcement Powers of Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R-25. Date, Time, Place, and Method of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R-26. Attendance at Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-27. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-28. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-29. Official Record of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-30. Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-31. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-32. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . . . . . 25

R-33. Conduct of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-34. Dispositive Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R-35. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other

Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R-37. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-38. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-39. Emergency Measures of Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-40. Closing of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

R-41. Reopening of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

R-42. Waiver of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

R-43. Extensions of Time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

R-44. Serving of Notice and Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

R-45. Confidentiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

R-46. Majority Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

R-47. Time of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

R-48. Form of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

R-49. Scope of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

R-50. Award Upon Settlement – Consent Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R-51. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R-52. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R-53. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R-54. Applications to Court and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R-55. Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

R-56. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

R-57. Neutral Arbitrator's Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

R-58. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

R-59. Remedies for Nonpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

R-60. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## Preliminary Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## Expedited Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-1. Limitation on Extensions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-3. Serving of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-5. Discovery, Motions, and Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through

Document Submission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E-7. Date, Time, Place, and Method of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-10. Arbitrator's Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## Procedures for Large, Complex Commercial Disputes. . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-1. Administrative Conference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## Administrative Fee Schedules (Standard and Flexible Fees) . . . . . . . . . . . . . . . . . . . . . 43

## Commercial Mediation Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-3. Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-7. Duties and Responsibilities of the Mediator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-9. Privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-12. Termination of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-13. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-15. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-17. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)



## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at www.adr.org.

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $100,000, the Rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in reaching a

settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

*If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

*The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs. The key features of these Procedures include:

> A highly qualified, trained Roster of Neutrals;

> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference or other electronic means;

> Broad arbitrator authority to order and control the exchange of information, including depositions;

> A presumption that hearings will proceed on a consecutive or block basis.

# Commercial Arbitration Rules

## R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These Rules and any amendment to them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these Rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties agree or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $100,000, exclusive of interest, attorneys' fees, and arbitration fees and costs. Parties may also agree to use these Procedures in larger cases. Unless the parties agree otherwise, these Procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Procedures E-1 through E-10, in addition to any other portion of these Rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $1,000,000, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $1,000,000 or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Procedures L-1 through L-3 in addition to any other portion of these Rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures; the Procedures for Large, Complex Commercial Disputes; or the Procedures for the Resolution of Disputes Through Document Submission (Procedure E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Rules R-1 through R-60 of these Rules.

*\* The AAA will apply the Employment/Workplace Rules to any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements. Should a contract call for the Consumer Rules, and the dispute is not between a consumer and a business, the AAA has the discretion to apply the Commercial Rules and Commercial Fee schedule. (Revised 5/1/25)*

*\* Beginning June 1, 2021, the AAA will apply the Consumer Arbitration Fee Schedule to any dispute between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims.*

### R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council

**(a)** When parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, they thereby authorize the AAA to administer the arbitration.

**(b)** The authority and duties of the AAA are prescribed in the agreement of the parties and in these Rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

**(c)** The AAA requires that parties and their representatives conduct themselves in accordance with the AAA's *Standards of Conduct for Parties and Representatives* when utilizing the AAA's services. Failure to do so may result in the AAA's declining to further administer a particular case or caseload.

**(d)** For cases proceeding under the Procedures for Large, Complex Commercial Disputes, and for other cases where the AAA, in its sole discretion, deems it appropriate, the AAA may act through its Administrative Review Council to take the following administrative actions:

**i)** determine challenges to the appointment or continuing service of an arbitrator;

**ii)** make an initial determination as to the locale of the arbitration, subject to the power of the arbitrator to make a final determination; or

**iii)** decide whether a party has met the administrative requirements to file an arbitration under these Rules.

### R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these Rules. The term "arbitrator" in these Rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

### R-4. Filing Requirements and Procedures

**(a)** Filing Requirements

**i)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration. The filing fee must be paid before a matter is considered properly filed.

**ii)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

    **a)** The filing party shall include a copy of the court order.

    **b)** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

    **c)** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to Rule R-33.

**iii)** Parties to any existing dispute who have not previously agreed to use these Rules may commence an arbitration under these Rules by filing a written Submission Agreement and the administrative filing fee. To the extent that the parties' Submission Agreement contains any variances from these Rules, such variances should be clearly stated in the Submission Agreement.

**iv)** Information to be included with any arbitration filing includes:

    **a)** the name of each party;

    **b)** the address of each party and, if known, the telephone number and email address;

    **c)** if applicable, the name, address, telephone number, and email address of any known representative for each party;

    **d)** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

    **e)** the locale requested if the arbitration agreement does not specify one.

**(b)** Filing Procedures

**i)** The initiating party may file or submit a dispute to the AAA in the following manner:

    **a)** through AAA WebFile®, located at www.adr.org;

    **b)** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing; or

    **c)** by emailing the complete Demand or Submission to casefiling@adr.org, with payment to follow as directed by the AAA.

**ii)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.

   **iii)** Any papers, notices, or process necessary or proper for the initiation of an arbitration under this Rule may be served on a party:

      **a)** by mail addressed to the party or its authorized representative at their last known address;

      **b)** by electronic service/email, with the prior agreement of the party being served;

      **c)** by personal service; or

      **d)** by any other service methods provided for under the applicable procedures of the courts of the state where the party to be served is located.

   **iv)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

   **v)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised with the arbitrator for determination.

   **vi)** The AAA has the authority to make an administrative determination whether the filing requirements set forth in this Rule have been met.

   **vii)** If the filing does not satisfy the filing requirements set forth in Section (a) above, the AAA shall acknowledge to all named parties receipt of the incomplete filing, and the filing may be returned to the initiating party.

**(c)** *Authority of arbitrator.* Any decision made by the AAA regarding filing requirements and procedures shall not interfere with the arbitrator's authority to determine jurisdiction pursuant to Rule R-7.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the

amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of filing.  The claimant may file an answering statement or reply in response to the counterclaim with the AAA within 14 calendar days after notice of the filing of the counterclaim is sent by the AAA.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by any earlier date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in the administrative fee, the balance of the fee is due before the change of claim or counterclaim amount may be accepted by the arbitrator.  After the arbitrator is appointed, however, a party may increase the amount of its claim or counterclaim, or alter its request for non-monetary relief, only with the arbitrator's consent.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent.

**(c)** A party that filed a claim or counterclaim of an undisclosed or undetermined amount must specify the amount of the claim or counterclaim to the AAA, all parties, and the arbitrator at least seven calendar days prior to the commencement of the hearing or by any other date established by the arbitrator. If the disclosed amount of the claim or counterclaim results in an increased filing fee, that fee must be paid at the time the claim or counterclaim amount is disclosed. For good cause shown and with the consent of the arbitrator, a party may proceed to the hearing with an undisclosed or undetermined claim or counterclaim, provided that the final amount of the claim or counterclaim is set forth in a post-hearing brief or submission and any appropriate filing fee is paid.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Consolidation and Joinder

**(a)** Consolidation

**i)** Two or more arbitrations may be consolidated if all parties to all of the arbitrations to be consolidated so agree.

**ii)** Unless all parties agree to consolidation, the party requesting consolidation of two or more arbitrations must file with the AAA and serve on all other parties a written request for consolidation with the supporting reasons for such request within 90 days of the date the AAA determines that all administrative filing requirements were satisfied for the last-filed case that is part of the consolidation request. Such time limit may be extended by the arbitrator appointed in the first-filed case upon a showing of good cause for the late request. The other parties to the arbitrations shall provide their written responses to the consolidation request within 10 calendar days after the AAA sends notice of receipt of the request.

**iii)** At its discretion, the AAA either may direct that the consolidation request be decided by the arbitrator appointed in the first-filed case or may appoint a consolidation arbitrator for the sole purpose of deciding the consolidation request.

**iv)** The arbitrator deciding consolidation may order consolidation of two or more cases for all purposes or for such limited purposes and under such conditions as the arbitrator may direct.

**v)** Absent agreement of all parties, an arbitrator appointed for the sole purpose of deciding the consolidation request shall have no further power to act, and shall be removed from the case, after the consolidation request is decided.

**vi)** In deciding whether to consolidate, the arbitrator or consolidation arbitrator shall take into account all relevant circumstances, including:

**a)** the terms and compatibility of the agreements to arbitrate,

**b)** applicable law,

**c)** the timeliness of the request to consolidate and the progress already made in the arbitrations,

**d)** whether the arbitrations raise common issues of law and/or fact, and

    **e)**  whether consolidation of the arbitrations would serve the interests of justice and efficiency.

**(b)** Joinder

    **i)**   Additional parties may be joined to an arbitration if all parties to the arbitration and the parties proposed to be joined so agree.

    **ii)**  Absent such consent, all requests for joinder must be submitted to the AAA prior to the appointment of an arbitrator pursuant to these Rules or within 90 days of the date the AAA determines that all administrative filing requirements have been satisfied. The arbitrator may extend this deadline on a showing of good cause for the late request.

    **iii)** If the existing parties and the parties proposed to be joined are unable to agree to the joinder of those additional parties to an ongoing arbitration, the arbitrator shall decide whether parties should be joined. If an arbitrator has not yet been appointed in the case, the AAA may appoint an arbitrator for the sole purpose of deciding the joinder request. Absent agreement of all parties, the arbitrator appointed for the sole purpose of deciding the joinder request shall have no further power to act, and shall be removed from the case, after the joinder request is decided.

    **iv)** The party requesting the joinder of one or more parties to a pending arbitration must file with the AAA a written request that provides the names and contact information for such parties; the names and contact information for the parties' representatives, if known; and the supporting reasons for such request, including applicable law. The requesting party must provide a copy of the joinder request to all parties in the arbitration and all parties it seeks to join at the same time it files the request with the AAA. The other parties to the arbitration and the parties sought to be joined shall provide their written responses to the joinder request within 14 days after the AAA sends notice of receipt of the request for joinder.

    **v)**  The requesting party shall comply with the provisions of Rule R-4(a) as to all parties sought to be joined.

**(c)** If an arbitrator determines that separate arbitrations shall be consolidated or that the joinder of additional parties is permissible, that arbitrator may also determine:

    **i)**   whether any arbitrator previously appointed to an existing case that was consolidated shall remain on the newly constituted case;

    **ii)**  whether any arbitrator previously appointed to a case where additional parties have been joined shall remain;

    **iii)** if appropriate, a process for selecting the arbitrator(s) to fill any vacancies; and

    **iv)** unless agreed otherwise by the parties, the allocation among the parties of arbitrator compensation and expenses, subject to reapportionment by the arbitrator appointed to the ongoing or newly constituted case in the final award.

**(d)** The AAA may take reasonable administrative actions to accomplish any consolidation or joinder ordered by the arbitrator or as agreed to by the parties. Pending the determination on a consolidation or joinder request, the AAA shall have the authority to stay the arbitration or arbitrations impacted by the consolidation or joinder request, at its sole discretion.

## R-9. Interpretation and Application of Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

## R-10. Mediation

In all cases where a claim or counterclaim exceeds $100,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally }opt out of this Rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this Rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

## R-11. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person, by videoconference or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

## R-12. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator that

applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days after the AAA sends notice of the filing of the Demand or by the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

**(a)** When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA shall initially determine the locale of arbitration, subject to the power of the arbitrator after appointment to make a final determination on the locale.

**(b)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

**(c)** If the parties' arbitration agreement specifies more than one possible locale, the filing party may select any of the specified locales at the time of filing, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-13. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. At its discretion, the AAA may limit the number of strikes permitted. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if

for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-14. Direct Appointment by Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. If a party selects an arbitrator for appointment, it shall file the name, address, telephone number, and email address of the arbitrator with the AAA. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Rule R-19 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Rule R-19(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA

**(a)** Where there is a panel of three or more arbitrators, one arbitrator will be designated as the panel chairperson. Such designation will be according to the terms of the parties' arbitration agreement. However, if the parties' arbitration agreement does not specify how the chairperson is to be selected, the chairperson can be designated, at the AAA's discretion, by the party-appointed arbitrators, the parties, the panel, or the AAA.

**(b)** If the arbitration agreement specifies a period of time for appointment of the chairperson and no appointment is made within that period or any agreed extension, the AAA may appoint the chairperson. If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**(c)** Absent the agreement of the parties, the chairperson shall be appointed from the National Roster, and the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Rule R-13, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Rule.

## R-16. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these Rules.

## R-17. Number of Arbitrators

**(a)** The parties may agree on the number of arbitrators to hear and determine the case. If the arbitration agreement does not specify the number of arbitrators or is ambiguous, and the parties do not otherwise agree, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Use of terms such as "the arbitrator", "an arbitrator", or "the arbitrators" in the arbitration agreement, without further specifying the number of arbitrators, shall not be deemed by the AAA to reflect an agreement as to the number of arbitrators.

**(c)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the Rule R-6-required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-18. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this Rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-42.

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Rule R-18 is not an indication that the arbitrator considers the disclosed circumstance likely to affect impartiality or independence.

## R-19. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

**i)** partiality or lack of independence,

**ii)** inability or refusal to perform his or her duties with diligence and in good faith, and

**iii)** any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Rule R-14 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified on the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-20. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Rule R-14 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Rule R-20(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Rule R-19(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Rule R-19(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Rule R-20(a) should nonetheless apply prospectively.

**(c)** As set forth in Rule R-44, unless otherwise instructed by the AAA, in the Rules, or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

## R-21. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these Rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-22. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person, by video conference or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Procedures P-1 and P-2 of these Rules address the issues to be considered at the preliminary hearing.

## R-23. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

   **i)** require the parties to exchange documents in their possession or custody on which they intend to rely;

   **ii)** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

   **iii)** require the parties, in response to reasonable document requests, to make available to the other party documents in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, and reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

**iv)** require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-24. Enforcement Powers of Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of Rules R-22 and R-23 and any other rule or procedure and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-25. Date, Time, Place, and Method of Hearing

The arbitrator shall set the date, time, place, and method (including video, audio or other electronic means when appropriate) for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.

### R-26. Attendance at Hearing

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

### R-27. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

### R-28. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

### R-29. Official Record of Proceedings

**(a)** Any party desiring a transcribed record of a hearing shall make arrangements directly with a transcriber or transcription service and shall notify the arbitrator and the other parties of these arrangements at least seven calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

**(b)** No other means of recording any proceeding will be permitted absent the agreement of the parties or per the direction of the arbitrator.

**(c)** If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties at the direction of the arbitrator.

**(d)** The arbitrator may resolve any disputes with regard to apportionment of the costs of the transcription or other recording.

### R-30. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

### R-31. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

### R-32. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

### R-33. Conduct of Proceedings

**(a)** The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

**(b)** The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

**(c)** The arbitrator may also allow for some or all of the presentation of evidence by alternative means including video, audio or other electronic means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

**(d)** The parties may agree to waive oral hearings in any case and may also agree to utilize the *Procedures for Resolution of Disputes Through Document Submission*, found in Procedure E-6.

## R-34. Dispositive Motions

**(a)** The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of or narrow the issues in the case.

**(b)** Consistent with the goal of achieving an efficient and economical resolution of the dispute, the arbitrator shall consider the time and cost associated with the briefing of a dispositive motion in deciding whether to allow any such motion.

**(c)** Fees, expenses, and compensation associated with a motion or an application to make a motion may be assessed as provided for in Rule R-49(c).

## R-35. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.

**(c)** If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

## R-37. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-38. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-39. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this Rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013. This Rule shall not apply to cases administered pursuant to the Expedited Procedures.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or email or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

**(c)** Within one business day of receipt of notice from the AAA initiating the request referenced in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall expeditiously disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule R-7, including the authority to rule on her or his own jurisdiction, and shall resolve any disputes over the applicability of this Rule R-39.

**(e)** If, after consideration, the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief under applicable law, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the non-emergency ("merits") arbitrator is appointed; thereafter such a request shall be addressed to the merits arbitrator. The emergency arbitrator shall have no further power to act after the merits arbitrator is appointed unless the emergency arbitrator is named as the merits arbitrator or as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this Rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this Rule, and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the merits arbitrator to determine finally the apportionment of such costs. The emergency arbitrator may take into consideration whether the request for emergency relief was made in good faith.

## R-40. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-36, or if briefs are to be filed, the hearing shall be declared closed as of the date the arbitrator is satisfied that the record is complete, and such date shall occur no later than seven calendar days from the date of receipt of the last such submissions or hearing transcript.

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-41. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (or 14 calendar days if the case is governed by the Expedited Procedures).

## R-42. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these Rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-43. Extensions of Time

The parties may modify by mutual agreement any period of time established by these Rules or the parties' arbitration agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.

## R-44. Serving of Notice and Communications

**(a)** The service methods set forth in Rule R-4(b)(iii) may also be used for the delivery of any filing, notice or communication throughout the course of the arbitration proceeding.

**(b)** The AAA, the arbitrator, and the parties may also use alternative methods of communication or other platforms as directed by the AAA or as agreed by the parties or directed by the arbitrator to exchange any communication or other notice required by these Rules during the course of the arbitration.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any party submitting any document or written communication to another party, the AAA or the arbitrator, shall simultaneously provide that material to all other participants, including the AAA.

**(d)** Failure to provide the other party with copies of communications provided to the AAA or the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(e)** The AAA may direct that any oral or written communications sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to comply with any such direction may result in the AAA's refusal to consider the issue raised in the communication

**(f)** The AAA may initiate administrative communications with the parties or their representatives either jointly or individually.

**(g)** Any method of service on or notice to a party must be made in such a manner to provide that party with reasonable opportunity to be heard with regard to the dispute.

## R-45. Confidentiality

**(a)** Unless otherwise required by applicable law, court order, or the parties' agreement, the AAA and the arbitrator shall keep confidential all matters relating to the arbitration or the award.

**(b)** Upon the agreement of the parties or the request of any party, the arbitrator may make orders concerning the confidentiality of the arbitration proceedings or of any other matters in connection with the arbitration and may take measures for protecting trade secrets and confidential information.

## R-46. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this Rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to

resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

**(c)** Absent an objection of a party or another member of the panel, the chairperson may sign any order on behalf of the panel.

## R-47. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-48. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. Signatures may be executed in electronic or digital form. The award shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

## R-49. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award or any order disposing of all of the case, the arbitrator shall assess the fees, expenses, and compensation provided in Rules R-55, R-56, and R-57. The arbitrator may also assess such fees, expenses, and compensation in any order or award disposing of part of the case. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator may include:

    **i)**   interest at such rate and from such date as the arbitrator may deem appropriate; and

    **ii)**   an award of attorneys' fees if all parties have requested such an award or it is authorized by law or the parties' arbitration agreement.

### R-50. Award Upon Settlement – Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses as set forth in Rule R-49(c).

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

### R-51. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-52. Modification of Award

**(a)** Within 20 calendar days after the transmittal of any award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, interpret the award or correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to re-determine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

**(b)** If the arbitrator has established a different schedule for such requests, responses, and disposition, the arbitrator's schedule will supersede the deadlines set forth in this Rule.

### R-53. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

### R-54. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these Rules is a necessary or proper party in any judicial proceedings relating to the arbitration or any other services provided by the AAA.

**(c)** Parties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these Rules shall be deemed to have consented that the AAA shall not be liable to any party in any action for damages, or injunctive or other relief, for any act or omission in connection with any arbitration administered in whole or in part by the AAA or conducted under these Rules. Parties shall also be deemed to have consented that the arbitrator shall not be liable to any party in any action for damages, or injunctive or other relief, for an act or omission in connection with any arbitration administered in whole or in part by the AAA.

**(e)** Parties to an arbitration under these Rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-55. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the Demand is filed will apply throughout the pendency of the case. The administrative fees shall be paid initially by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-56. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-57. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation at the time their AAA resume is presented to the parties for consideration pursuant to Rule R-13, unless otherwise determined by the AAA. Such compensation will be consistent with the provisions of the arbitrator's executed *Notice of Compensation Arrangements*.

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-58. Deposits

**(a)** The AAA will require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's compensation and expenses, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case. A party's failure to make the requested deposits by the date established by the AAA may result in the AAA's or the arbitrator's taking any appropriate steps as set forth in Rule R-59.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** The AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

**(d)** The AAA will allocate the deposits requested among the parties and will establish due dates for the collection of those deposits.

## R-59. Remedies for Nonpayment

If arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative fees or deposits for arbitrator compensation or expense have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment. Such measures may include, but are not limited to:

  **i)** limiting a party's ability to assert or pursue its claim, and

  **ii)** prohibiting a non-paying party from filing any motion.

**(b)** In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full payments requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-60. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these Rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

# Preliminary Hearing Procedures

## P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

## P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

  **i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to Rule R-10;

  **ii)** whether all necessary or appropriate parties are included in the arbitration;

  **iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

  **iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

  **v)** which

   **a)** arbitration rules;

   **b)** procedural law; and

   **c)** substantive law govern the arbitration;

  **vi)** issues related to cybersecurity, privacy and data protection to provide for an appropriate level of security and compliance in connection with the proceeding;

  **vii)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

   **a)** any preconditions that must be satisfied before proceeding with the arbitration;

   **b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;

**c)** consolidation of the claims or counterclaims with another arbitration; or

**d)** bifurcation of the proceeding.

**viii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**ix)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**x)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**xi)** whether any measures are required to protect confidential information;

**xii)** Whether the parties shall disclose:

**a)** whether any non-party (such as a third-party funder or an insurer) has undertaken to pay or to contribute to the cost of a party's participation in the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the undertaking; and

**b)** whether any non-party (such as a funder, insurer, parent company, or ultimate beneficial owner) has an economic interest in the outcome of the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the interest;

**xiii)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**xiv)** whether, according to a schedule set by the arbitrator, the parties will:

**a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

**b)** exchange and pre-mark documents that each party intends to submit; and

**c)** exchange pre-hearing submissions, including exhibits;

**xv)** the date, time and place of the arbitration hearing;

**a)** whether, at the arbitration hearing,

**b)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**xvi)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**xvii)** whether any procedure needs to be established for the issuance of subpoenas;

**xviii)** the identification of any ongoing, related litigation or arbitration;

**xix)** whether post-hearing submissions will be filed;

**xx)**   the form of the arbitration award; and

**xxi)**   any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.

## Expedited Procedures

### E-1. Limitation on Extensions

**(a)** Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Rule R-5.

**(b)** Any other extension requests may be granted only after consideration of Procedure E-7.

### E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, any time prior to the appointment of the arbitrator. However, after the arbitrator is appointed, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $100,000, the case will be administered under the regular Commercial Arbitration Rules unless all parties and the arbitrator agree that the case may continue to be administered under the Expedited Procedures.

### E-3. Serving of Notice

In addition to notice provided by Rule R-44, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

### E-4. Appointment and Qualifications of Arbitrator

**(a)** The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

**(b)** The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

**(c)** The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Rule R-19.

The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Discovery, Motions, and Conduct of Proceedings

**(a)** At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

**(b)** No other discovery shall be permitted except as allowed by the arbitrator for good cause shown. If the arbitrator allows additional discovery, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** There shall be no motions except as allowed by the arbitrator for good cause shown.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

**(a)** Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

**(b)** The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

**(c)** If the parties agree to in-person hearings after a previous agreement to proceed under this Procedure, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this Procedure, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

**(d)** The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

**(e)** Unless the parties have agreed to a form of award other than that set forth in Rule R-48, when the parties have agreed to resolve their dispute by this Procedure, the

arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in Rule R-48, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the regular Commercial Arbitration Rules which pertain to awards.

## E-7. Date, Time, Place, and Method of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, place, and method of the hearing, to be scheduled to take place no more than 60 days after the preliminary hearing or as otherwise mutually agreed to between the parties and the arbitrator. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Absent good cause shown, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing.

**(b)** For good cause shown, the arbitrator may schedule one additional day of hearings to be completed within seven business days after the initial day of hearing or as soon as practicable as determined by the arbitrator. In cases where the hearing is scheduled to exceed one day, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** Generally, there will be no stenographic record. Any party desiring a transcribed record of the hearing may arrange for one pursuant to the provisions of Rule R-29.

## E-9. Time of Award

Unless otherwise agreed by the parties and arbitrator, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

**(a)** Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

**(b)** For cases that are removed from the Expedited Procedures after the preliminary hearing is held, the arbitrator shall be compensated pursuant to Rule R-57.

# Procedures for Large, Complex Commercial Disputes

## L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA may, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call or video conference. The conference will take place as soon as practicable after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

**(a)** to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

**(b)** to discuss the views of the parties about the technical and other qualifications of the arbitrators;

**(c)** to obtain conflicts statements from the parties; and

**(d)** to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

## L-2. Arbitrators

**(a)** Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties do not agree upon the number of arbitrators and a claim or counterclaim involves at least $3,000,000 then three arbitrators shall hear and determine the case; otherwise one arbitrator shall hear and determine the case.

**(b)** In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, regardless of the amount of the claim and counterclaim.

**(c)** The AAA shall appoint the arbitrator as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator shall not have served as the mediator in the mediation phase of the instant proceeding.

### L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with Procedures P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator determines otherwise.

**(d)** The parties and the arbitrator shall address issues pertaining to the pre-hearing exchange and production of information in accordance with Rule R-23 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within a scheduling order.

**(e)** The arbitrator, or any single member of the panel, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within their discretion, including, without limitation, the issuance of orders set forth in Rules R-23 and R-24 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

## Administrative Fee Schedules (Standard and Flexible Fees)

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT
www.adr.org/feeschedule.

# Commercial Mediation Procedures

## M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via AAA WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

**(i)** A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

**(ii)** The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

**(iii)** A brief statement of the nature of the dispute and the relief requested.

**(iv)** Any specific qualifications the mediator should possess.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

American Arbitration Association

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**(i)** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**(ii)** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**(iii)** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

(i)   The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

(ii)  The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

(iii) The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

(iv)  The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

(v)   In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

(vi)  The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

(i) Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

(ii) Admissions made by a party or other participant in the course of the mediation proceedings;

(iii) Proposals made or views expressed by the mediator; or

(iv) The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

**(i)** By the execution of a settlement agreement by the parties; or

**(ii)** By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

**(iii)** By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

**(iv)** When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.

© 2025 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the
American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services.
Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws.
Please contact 800.778.7879 or websitemail@adr.org for additional information.

E-FILED; Baltimore City Circuit Court
Docket: 6/9/2025 12:24 PM; Submission: 6/9/2025 12:24 PM
Envelope: 21551344

EXHIBIT E

**DENTONS**

**Anthony Williams**

anthony.williams@dentons.com
D    +1 212-905-8308

Dentons US LLP
1221 Avenue of the Americas
New York, NY  10020-1089
United States

dentons.com

April 17, 2024

**Via Email to: MikePostal@TenacityGroup.com**

Michael Postal

Re:    Swain's Landing LaPlata JC LLC re: Member Withdraw and Return of Capital Contribution

Dear Mr. Postal:

This letter follows our telephone discussion on November 21, 2023 and last email correspondence on February 12, 2024.

As you know, we represent Claudia Engelhorn as Trustee of the Whitewater Revocable Trust dated September 30, 2021 (the "Trust"). As Anthony Williams has expressed to you several times, Ms. Engelhorn does not have the appetite to continue the Swain's Landing project any longer and wishes to have her capital contribution of $585,000.00 returned to her.

Per our previous discussions:

- You indicated you are working with a new investor for Swain Landing LaPlata JC LLC ("Swain") who may be able to purchase Claudia's interest.
- You thought you would be able to get Claudia's principal, and potentially some interest, back to her by the end of the first quarter of this year.
- You stated the Project has been delayed due to the Town of LaPlata's ("Town") water availability problem and, therefore, have not made a formal presentation to the investor yet.
- You stated you planned on making the presentation to the new investor regardless of the status of Town's the water availability problem.

We are now past the end of the first quarter. We appreciate your prompt response on when you believe our client will be receiving her capital contribution back.

Very truly yours,

*Patricia L Lincoln*

Patricia L. Lincoln
on behalf of Anthony Williams

AW:pl

Puyat Jacinto & Santos ▶ Link Legal ▶ Zaanouni Law Firm & Associates ▶ LuatViet ▶ For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

US_ACTIVE\126672132\V-1

# EXHIBIT G

**IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND**

| | |
|---|---|
| **CLAUDIA ENGELHORN**<br>1727 Kingsbury Drive,<br>Nashville, Tennessee 37215<br><br>and<br><br>**CLAUDIA ENGELHORN, AS TRUSTEE OF**<br>**THE WHITEWATER REVOCABLE TRUST**<br>**DATED SEPTEMBER 30, 2021**<br>1727 Kingsbury Drive,<br>Nashville, Tennessee 37215<br><br>and<br><br>**WHITE PEARL, LLC**<br>1209 Orange Street<br>Wilmington, Delaware 19801<br><br>     *Plaintiffs*<br><br>v.<br><br>**ERIK D. BOLOG**<br>9312 Chesley Road<br>Potomac, Maryland 20854<br><br>and<br><br>**ERIK D. BOLOG, AS TRUSTEE OF THE**<br>**JAREB IRREVOCABLE TRUST**<br>**AGREEMENT DATED OCTOBER 11, 2021**<br>The Bolog Law Group<br>1763 Columbia Road, NW, Suite 450N<br>Washington, DC 20018<br><br>and<br><br>**WHITEFORD, TAYLOR & PRESTON, LLP**<br>Seven St. Paul Street<br>Suite 1900<br>Baltimore, Maryland 21202 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No.:**    **C-24-CV-24-002631**

Serve On:                                                    )
Resagent, Inc.                                               )
Seven St. Paul Street                                        )
Suite 1900                                                   )
Baltimore, Maryland 21202                                    )
                                                             )
and                                                          )
                                                             )
**MICHAEL POSTAL**                                           )
4302 Broken Arrow Court                                      )
Clinton, Maryland 20735                                      )
                                                             )
and                                                          )
                                                             )
**POJO LAPLATA LLC**                                         )
4302 Broken Arrow Court, Apt. 606                            )
Clinton, Maryland 20735                                      )
Serve On:                                                    )
Anjon Jones                                                  )
4302 Broken Arrow Court                                      )
Clinton, Maryland 20735                                      )
                                                             )
and                                                          )
                                                             )
**DARNESTOWN ROAD, INC.**                                    )
8938 Abbey Terrace                                           )
Potomac, Maryland 20854                                      )
Serve On:                                                    )
Erik D. Bolog                                                )
8938 Abbey Terrace                                           )
Potomac, Maryland 20854                                      )
                                                             )
and                                                          )
                                                             )
**SCIENCE PARK ASSOCIATES, LLC**                             )
6701 Democracy Boulevard                                     )
Suite 515                                                    )
Bethesda, Maryland 20717                                     )
Serve On:                                                    )
Erik D. Bolog, Esq.                                          )
8938 Abbey Terrace                                           )
Potomac, Maryland 20854                                      )
                                                             )
and                                                          )
                                                             )

**SWAIN LANDING LAPLATA JC, LLC**    )
4302 Broken Arrow Court            )
Clinton, Maryland 20735            )
      Serve On:               )
      Anjon Jones             )
      4302 Broken Arrow Court   )
      Clinton, Maryland 20735   )
                             )
      and                   )
                             )
**TENACITY INVESTMENTS, LLC**    )
7333 New Hampshire Avenue    )
Unit 103                    )
Takoma Park, Maryland 20912  )
      <u>**Serve On:**</u>          )
      Mike Postal            )
      7333 New Hampshire Avenue )
      Unit 103               )
      Takoma Park, Maryland 20912 )
                             )
      *Defendants*.          )

_____

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Claudia Engelhorn, individually and as Trustee of the Whitewater Revocable Trust dated September 30, 2021, as amended, and White Pearl, LLC, file this Second Amended Complaint and Demand for Jury Trial against Erik D. Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021, Whiteford, Taylor & Preston, LLP, Michael Postal, POJO LaPlata LLC, Darnestown Road, Inc., Science Park Associates, LLC, Swain Landing LaPlata JC, LLC, and Tenacity Investments, LLC, and respectfully states as follows:

## PARTIES

1.     That Plaintiff, Claudia Engelhorn ("Plaintiff Engelhorn"), is a citizen of the State of Tennessee.

2.      That Plaintiff, Claudia Engelhorn is the Trustee for the Whitewater Revocable Trust dated September 30, 2021, as amended ("Plaintiff Trust").

3.      That White Pearl, LLC is a single-member, limited liability company organized under the laws of Delaware, with Plaintiff Engelhorn being the sole member.

4.      That Plaintiff Engelhorn and Plaintiff Trust are the former clients of attorney Erik D. Bolog, Esquire, and the law firm of Whiteford, Taylor & Preston, LLP.

5.      That Defendant, Erik D. Bolog ("Defendant Bolog"), is, and at all times relevant hereto, was an attorney licensed to practice law in Maryland, Virginia, and the District of Columbia.  Defendant Bolog served as a Trustee of the Whitewater Revocable Trust dated September 30, 2021, until Plaintiff Engelhorn amended and restated the Trust on November 3, 2022, thereby removing Defendant Bolog as a Trustee of the Whitewater Revocable Trust dated September 30, 2021.  Upon information and belief, Defendant Bolog resides at 9312 Chesley Road, Potomac, Maryland 20854.  Defendant Bolog is, and at all times relevant hereto was, the Trustee for the JAREB Irrevocable Trust Agreement Dated October 11, 2021.

6.      That Defendant, Whiteford, Taylor & Preston, LLP (hereinafter "Defendant WTP"), is, and at all times relevant hereto, was a limited liability partnership formed under the laws of the State of Maryland.  Defendant, Whiteford, Taylor & Preston, LLP operates as a law firm, with its principal place of business in Baltimore City, Maryland.  At all relevant times, Defendant WTP was the employer and/or the actual and/or apparent principal of Defendant Bolog and the other attorneys identified herein.  At all relevant times, Defendant Bolog and the other attorneys identified herein were the actual and/or apparent agents of WTP, and WTP made representations to this effect to the public, including Plaintiffs, who reasonably relied upon them.

7.     That, at all times relevant hereto, Defendant Bolog was a Senior Counsel and/or Partner with Defendant WTP.

8.     That Defendant, Michael Postal ("Defendant Postal"), is, and at all times relevant hereto, was a resident of Clinton, Maryland.  Defendant Postal is a long-time friend of, business associate of, and client of Defendant Bolog.  Defendant Postal has also been represented by Defendant WTP.

9.     That Defendant, POJO LaPlata, LLC ("Defendant POJO"), is, and at all times relevant hereto, was a limited liability company organized under the laws of Maryland.  Defendant POJO is a forfeited entity.

10.     That Defendant, Darnestown Road, Inc. ("Defendant DRI"), is, and at all times relevant hereto was, an incorporated entity formed under the laws of the State of Maryland.  The Maryland Department of Assessments and Taxation identifies the principal office of Darnestown Road, Inc. as being 8938 Abbey Terrace, Potomac, Maryland 20854, which is the former residential address for Defendant Bolog.  Upon information and belief, Defendant Bolog, at all times relevant hereto, is and was an owner of Defendant DRI and also serves as its resident agent.

11.     That Defendant, Science Park Associates, LLC ("Defendant Science Park"), is, and at all times relevant hereto was, a limited liability company organized under Maryland law.  Upon information and belief, Defendant Bolog, at all times relevant hereto, is and was a member of Science Park Associates, LLC.

12.     That Defendant, Swain Landing LaPlata JC, LLC ("Defendant Swain Landing") is, and at all times relevant hereto was, a limited liability company organized under Maryland law.  Upon information and belief, the members of Defendant Swain Landing are as follows: (1) The Whitewater Revocable Trust dated September 30, 2021, as amended (50% owner); (2) Defendant

POJO (30% owner); and (3) Defendant Postal (20%). That the proposed operating agreement for Defendant Swain Landing identifies Defendant WTP's D.C. office located at 1800 M Street, Suite #450N, Washington, D.C. 20036, as its principal office and place of business; however, such proposed operating agreement apparently remains unsigned.

13.     That Defendant, Tenacity Investments, LLC ("Defendant Tenacity Investments, LLC") is, and at all times relevant hereto was, a limited liability company organized under Maryland law.  Defendant Tenacity Investments, LLC is a forfeited entity.

## JURISDICTION AND VENUE

14.     That jurisdiction is proper pursuant to Md.  Code Ann., Cts. & Jud. Proc. § 1-501, § 6-102(a), and § 6-103(b)(1)-(5).

15.     That jurisdiction is also proper under Md. Code Ann., Est. & Trusts § 14.5-202.

16.     That venue is proper in Baltimore City, Maryland, under Md.  Code Ann., Cts. & Jud. Proc. § 6-201(a), §6-201(b), and §6-202(8).  To the extent that any of the Defendants are found to be nonresidents, then venue would also be proper under Md.  Code Ann., Cts. & Jud. Proc. § 6-202(11).

17.     That this Honorable Court has jurisdiction to declare the parties' "rights, status, and other legal relations whether or not further relief is or could be claimed."  Md.  Code Ann., Cts. & Jud. Proc. § 3-403.

## FACTUAL BACKGROUND

18.     That, at all times relevant hereto, Defendant Bolog was an attorney licensed in Maryland, the District of Columbia, and Virginia, practicing law with Defendant WTP, and was a Senior Counsel and/or Partner at WTP.

19.    That Defendant WTP has a long-standing relationship with Defendant Bolog that comes in various forms, as Defendant Bolog has been one of the Senior Counsel and/or Partners at Defendant WTP, one of its clients, and one of its co-counsel.

20.    That Defendant WTP knew or should have known that Defendant Bolog has a financial history significant for failing to timely pay his debts, failing to timely pay his taxes, and converting monies for which he was not entitled, as evidenced by the following matters:

a.    The Harbor School Corporation sued Defendant Bolog in the District Court of Maryland for Montgomery County, arising from his failure to pay an $80.00 debt, which resulted in a judgment for $90.00 after the inclusion of a filing fee.  *See* Case No.: 0602-0006927-2002.

b.    The State of Maryland filed a Certification of Assessment and Tax Lien under the Maryland Unemployment Law in the amount of $397.88 on January 26, 2006. *See* Case No.: 268674-V.

c.    The Law Offices of William Johnson sued My New Hampshire, LLC, Defendant Bolog, and Defendant Postal on November 23, 2009, in the United States Bankruptcy Court for the District of Columbia ("USDC Action").  That it was alleged in the USDC Action that Defendants Bolog and Postal had acquired shares of the Metropolitan Cooperative Association and became shareholders therein.  It was further alleged that Defendants Bolog and Postal had become guarantors on a retainer agreement entered into by Metropolitan Cooperative Association, but that they failed to pay the sums allegedly due as guarantors.  Defendants Bolog and Postal were represented by several attorneys from Defendant WTP in the USDC Action.  The USDC Action appears to have resulted in a settlement.

d.    The United States of America filed a Federal tax lien against Defendant Bolog in the Circuit Court for Montgomery County on March 15, 2010, in the amount of $7,218.00.  *See* 87230F.

e.    On or about March 21, 2013, James Westenhoefer, the Chapter 7 Trustee in *In Re Brenda Kay Brown* filed a Complaint sounding in fraud and other allegations against Defendant Bolog and The Bolog Firm in the United States Bankruptcy Court for the Eastern District of Kentucky, Pikesville Division ("EDK Action").  *See* Case No.: 13-07009.  In that Complaint, Defendant Bolog was sued because he "wrongfully converted and transferred property of the [bankruptcy] Estate" to himself and others.  Defendant Bolog and The Bolog Firm settled the claims against them.  The Bolog Firm is a law firm that Defendant Bolog owned and operated before joining Defendant WTP.[1]

f.    The Takoma Overlook Condominium Association, Inc. sued Defendants Bolog and Postal, among others, in the Circuit Court for Montgomery County, Maryland, on March 25, 2015.  *See* 402700-V.  Julianne E. Dymowski, Esquire of Defendant WTP, represented Messrs. Postal and Bolog in that matter.

g.    Congressional Bank sued Erik and Debra Bolog in the matter of *Congressional Bank v. Debra Bolog, et al.*, on May 8, 2018, in the Circuit Court for Montgomery County.  *See* Case No.: 447498.

---

[1] That, on or about January 13, 2014, Mr. Westenhoefer filed a separate Complaint, this time against Whiteford, Taylor & Preston, LLP.  *See* Case No.: 14-07006-acs in the United States Bankruptcy Court for the Eastern District of Kentucky, Pikesville Division (EDK Action #2).  In that Complaint, Mr. Westenhoefer alleged that Defendant Whiteford, Taylor & Preston, LLP had failed to disclose a known, ongoing relationship with Defendant Bolog.  In that case, it was alleged that the Whiteford, Taylor & Preston, LLP had converted the Debtor's property and had engaged in other fraudulent activity.  Mr. Westenhoefer sought for the Court to order Defendant WTP "to turn over immediately to the Trustee the $50,000.00 paid to Defendant WTP by the Debtor…"  Ultimately, the Court entered an Order and Judgment Approving Settlement Agreement pursuant to Bankruptcy Rule 9019 wherein Whiteford, Taylor & Preston, LLP had a judgment entered against it for $50,000.00.

8

h.      American Express National Bank filed a lawsuit against Defendant Bolog for an unpaid debt in the amount of $16,081.54 on September 23, 2019, in the Superior Court of the District of Columbia, Case No.: 2019 CA 006319 C.  American Express National Bank identified Defendant Bolog's address as being Defendant WTP's D.C. office, 1800 M Street, NW, #450N, Washington, DC 20036.

i.      American Express National Bank filed a separate lawsuit against Defendant Bolog seeking $74,491.64 on September 25, 2019, in the Superior Court of the District of Columbia, Case No.: 2019 CA 006316 C.  American Express National Bank identified Defendant Bolog's address as being Defendant WTP's D.C. office, 1800 M Street, NW, #450N, Washington, DC 20036.

21.      That, after both Defendants Erik D. Bolog and Whiteford, Taylor & Preston, LLP settled the claims asserted against them in the EDK Action and EDK Action #2 for conversion and fraudulent activity, Defendant WTP brought Defendant Bolog on as an attorney at its firm, despite having express knowledge as to his financial issues and conversion of monies that did not belong to him and other fraudulent behavior.

22.      That, based on its representation of Defendant Bolog and publicly available information regarding Defendant Bolog's repeat failure to timely pay his debts and conversion of monies, Defendant WTP knew or should have known that Defendant Bolog would be at risk to misuse client funds and take other nefarious actions to raise monies to cover his fraudulent actions and address his financial distress.   Defendant Bolog's failure to live within his means, satisfy his debts, and meet financial obligations were examples of his poor self-control, lack of judgment, and/or unwillingness to abide by rules and regulations, all of which should have alerted Defendant WTP as to the patent issues concerning Defendant Bolog's reliability, trustworthiness, and ability

to competently oversee the monies of clients and third parties. Defendant Bolog, as an individual who was financially overextended, was at greater risk of engaging in illegal or fraudulent acts to generate money.

23.     That Defendant WTP not only knew or should have known of the risks associated with having Defendant Bolog oversee client monies, but it actually placed him in a position to misuse such monies and facilitated his doing so by drafting documents that made him a trustee for the two separate trusts identified herein.

**Fraudulent $10 Million "Gift"**

24.     That Plaintiff Engelhorn retained Defendant WTP on an hourly fee basis to represent her with respect to a legal dispute.

25.     That Defendant WTP assigned Defendant Bolog to work on Plaintiff Engelhorn's legal dispute and/or Defendant Bolog offered to do so, and Defendant WTP permitted him to do so.

26.     That the legal dispute resulted in Plaintiff Engelhorn receiving a monetary settlement.

27.     That Plaintiff paid Defendant WTP all of the undisputed fees and expenses due and owing with respect to its representation of her. There is no balance due and owing to Defendant WTP.

28.     That the proceeds of the settlement arising from the legal dispute were wired to Defendant WTP's escrow account and/or Interest on Lawyers' Trust Account ("IOLTA").

29.     That all three jurisdictions in which Defendant Bolog is licensed to practice law have certain prohibitions and restrictions against soliciting and/or receiving gifts from clients, as set forth below:

10

Maryland

An attorney shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the attorney or a person related to the attorney any substantial gift unless the attorney or other recipient of the gift is related to the client. For purposes of this section, related persons include a spouse, child, grandchild, parent, grandparent or other relative or individual with whom the attorney or the client maintains a close, familial relationship.

Md. Rule 19-301.8(c).

District of Columbia

A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer any substantial gift from a client, including a testamentary gift, except where the client is related to the donee. For purposes of this paragraph, related persons include a spouse, child, grandchild, parent, grandparent or other relative or individual with whom the lawyer or the client maintains a close familial relationship.

D.C. Bar Appx. A, Rule 1.8(b).

Commonwealth of Virginia

A lawyer shall not solicit, for himself or a person related to the lawyer, any substantial gift from a client including a testamentary gift. A lawyer shall not accept any such gift if solicited at his request by a third party. A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer any substantial gift from a client, including a testamentary gift, unless the lawyer or other recipient of the gift is related to the client. For purposes of this paragraph, a person related to a lawyer includes a spouse, child, grandchild, parent, or other relative or individual with whom the lawyer or the client maintains a close, familial relationship.

Va. Sup. Ct. R. pt. 6, sec. II, 1.8(c).

30.     That, on September 9, 2021, MaryEllen Willman, Esquire of Defendant WTP, recorded a time entry that was billed by Defendant WTP to Plaintiff Engelhorn for drafting a "revocable trust." It is believed that Ms. Willman was billing for the drafting of the Whitewater Revocable Trust dated September 30, 2021.

11

31.     That, at or near this same time, Defendant Bolog and/or other attorneys at Defendant WTP coordinated the establishment of a bank account ending in 4855 in the name of Whitewater Revocable Trust Dated September 30, 2021, and used Defendant WTP's office located at 1800 M Street, NW, Suite 450N, Washington, DC 20036-5869 to receive account statements.

32.     That Defendant Bolog, Individually and as an agent or employee of Defendant WTP, coordinated the delivery of the settlement proceeds via wire to Defendant WTP's escrow and/or IOLTA.  On or about September 27, 2021, the settlement proceeds were wired to Defendant WTP's escrow and/or IOLTA.

33.     That, on or about September 30, 2021, Plaintiff Engelhorn, with the assistance of Defendant WTP, and its attorneys, established the Whitewater Revocable Trust dated September 30, 2021, and named Defendant Bolog as one of the Trustees.  Attorneys at Defendant WTP had drafted the Whitewater Revocable Trust dated September 30, 2021.

34.     That, on or about October 7, 2021, Defendant WTP wired approximately $11 million of the settlement proceeds to Plaintiff Engelhorn's personal Bank of America account and the remainder to the Plaintiff's Trust's savings account.

35.     That, on or about October 11, 2021, Defendant Bolog, with the assistance of other lawyers at Defendant WTP, established the JAREB Irrevocable Trust, with Plaintiff Engelhorn as the Grantor and Defendant Bolog as the Trustee, and to be governed by the laws of the State of Maryland.  That WTP charged Plaintiffs for their time drafting documents to establish the JAREB Irrevocable Trust or, at a minimum, recorded time entries for such services.  The JAREB Irrevocable Trust authorized Defendant Bolog, in his sole and absolute discretion as trustee, to distribute the net income and principal of this Trust to himself.  According to the terms of this Trust, at Defendant Bolog's death, the remaining trust property would be equally distributed to his

children.  The JAREB Irrevocable Trust claimed that Plaintiff, as grantor, transferred and delivered $10 million to the JAREB Irrevocable Trust.  That said funds were transferred from a bank account owned by Plaintiff Engelhorn.

36.     That, on or about October 11, 2021, Plaintiff Engelhorn was vacationing in Cape Code, Massachusetts, when Defendant Bolog arrived and advised her that he needed something signed.  Defendant Bolog also stated that he needed the documents notarized, so he had Sarah Mayo arrive and notarize the documents.  Defendant Bolog directed Plaintiff Engelhorn to sign numerous documents that were upside down.  Unbeknownst to Plaintiff, Defendant Bolog tricked Plaintiff into signing the JAREB Irrevocable Trust Agreement dated October 11, 2021, a Notice of Gift for an irrevocable trust for Defendant Bolog's benefit and wire instructions to transfer money from Plaintiff's personal account to Defendant Bolog's irrevocable trust, *i.e.*, the JAREB Irrevocable Trust Agreement dated October 11, 2021.  Defendant Bolog did not explain the documents to Plaintiff, did not offer her the opportunity to first read them, and lulled her into believing the documents concerned routine matters requiring her signature.  Plaintiff Engelhorn trusted and relied on Defendant Bolog and, as a result, signed the documents.  At the time Plaintiff signed these documents, she neither intended to give a gift to Defendant Bolog nor transfer any money to him or the JAREB Irrevocable Trust; she did not read the documents and was unaware that she was gifting or transferring $10 million to Defendant Bolog or the JAREB Irrevocable Trust at the time she signed the aforementioned documents.

37.     That Notice of Gift prepared by Defendant Bolog falsely represents that Defendant Bolog "begged" Plaintiff to retain independent counsel to provide her with independent legal advice with respect to the $10 million gift.  The Notice of Gift is dated and signed on the same date, such that there would not have been an opportunity for Plaintiff, Claudia Engelhorn, while

on vacation, to consult with independent counsel had she even realized what she was signing on October 11, 2021.

38.    That Maryland Rule 19-301.8(c) provides that: "An attorney shall not solicit any substantial gift from a client, including a testamentary gift, or prepare on behalf of a client an instrument giving the attorney or a person related to the attorney any substantial gift unless the attorney or other recipient of the gift is related to the client.  For purposes of this section, related persons include a spouse, child, grandchild, parent, grandparent, or other relative or individual with whom the attorney or the client maintains a close, familial relationship."  That Maryland Rule 19-301.8(c) is conceptually the same as Rule 1.8 of the D.C. Rules of Professional Conduct. Defendant Bolog is not related to Plaintiff Engelhorn.

39.    That Plaintiff Engelhorn did not intend to give Defendant Bolog, his family, or the JAREB Irrevocable Trust a $10 million gift.  Further, Defendant Bolog did not advise Plaintiffs Engelhorn and Trust to obtain independent counsel, and Plaintiffs Engelhorn and Trust did not retain independent counsel before signing the Notice of Gift, nor could they have.

40.    That, had Defendant Bolog explained to Plaintiff Engelhorn what she was actually signing, that it was a gift, and that she needed independent counsel, Plaintiff Engelhorn would have obtained such counsel.  She would not have signed the documents, would have retained independent counsel, and would not have made a $10 million gift.  After Plaintiff Engelhorn realized that Defendant Bolog had defrauded her into making a gift of $10M, Plaintiff Engelhorn sent an email on July 6, 2022, demanding a return of the monies.  Defendant Bolog has refused to return the $10M to Plaintiffs Engelhorn and Trust.

41.    That Defendant Bolog knew the Notice of Gift, JAREB Irrevocable Trust, and wire instructions contained false statements, namely that Plaintiffs Engelhorn and Trust intended to

14

make a $10 million gift and transfer said funds to the JAREB Irrevocable Trust, or, at a minimum, he was recklessly indifferent to the truth, and Defendant Bolog made and used these false statements and documents for the purpose of defrauding Plaintiffs Engelhorn and Trust.

42.    That, as a result of the $10M transfer to the JAREB Irrevocable Trust, which Defendant Bolog falsely characterized as a gift, Plaintiff could be subjected to significant federal estate and gift taxes.  Defendant Bolog failed to advise Plaintiff concerning these tax implications.

43.    That, as a direct and proximate result of Defendant Bolog's material misrepresentations and omissions, as described above, Defendant Bolog and/or the JAREB Irrevocable Trust Agreement Dated October 11, 2021, fraudulently obtained $10 million from Plaintiffs Engelhorn and Trust, thus causing Plaintiffs Engelhorn and Trust to suffer $10 million in damages, not to mention the loss of use of these funds.

44.    That, despite Plaintiff Engelhorn's written demand for a return of the $10 million, Defendant Bolog has refused to return the $10M to her or Plaintiff Trust.

45.    That, in addition to false or recklessly causing Plaintiff to make a $10 million transfer to him, Defendant Bolog caused the transfer of millions of dollars belonging to Plaintiffs to entities that he owned and/or were owned by his close friends, business associates, and/or clients.

**Fraud and Embezzlement by Science Park Associates, LLC**

46.    All three jurisdictions in which Defendant Bolog is licensed have restrictions on attorneys entering into business transactions with clients.

47.    That, on or about June 5, 2009, Defendant Bolog executed a Loan and Security Agreement ("Loan Agreement") on behalf of Defendant Science Park as its managing member. As part of this Loan Agreement, the bank loaned Defendant Science Park approximately $5.5

15

million and, in exchange, the bank obtained a security interest, via a Deed of Trust, in a Greenbelt Property, a commercial building and real estate in Prince George's County, Maryland. Thereafter, the Deed of Trust was properly recorded in Prince George's County, Maryland. In addition to the Deed of Trust, on or about June 5, 2009, Defendant Bolog's company, Tenacity Investments, LLC, guaranteed the Loan Agreement.

48.    That on or about November 26, 2014, Defendant Bolog, on behalf of himself and as manager of Tenacity Investments, LLC, executed another guarantee related to the Loan Agreement between Defendant Science Park and the bank.

49.    That, upon information and belief, Defendant Bolog's company, Defendant Science Park, derived rental income from the Greenbelt Property.

50.    That, in or around March 2022, upon information and belief, Defendant Bolog drafted or caused to be drafted an "Assignment of Amended and Restated Deed of Trust, Security Agreement, and Assignment of Leases and Rents" ("March 2022 Assignment"). Under the terms of the March 2022 Assignment, the Plaintiff Trust was assigned and acquired the remaining debt on the Loan Agreement, namely, $4,655,765, and, in exchange, allegedly obtained a security interest via a Deed of Trust (the "March 2002 Deed of Trust"), in the Greenbelt Property. As a result of this transaction, Defendant Science Park's obligation to repay the commercial loan to the bank and the guaranty entered into by Tenacity Investments, LLC, as required by the Loan Agreement, was extinguished.

51.    That, on or about March 24, 2022, Defendant Bolog caused Plaintiff Trust's bank account to wire approximately $3,352,650 to the bank, consistent with the March 2022 Assignment.

16

52.     That, on or about March 24, 2022, upon information and belief, Defendant Bolog drafted or caused to be drafted an "Amendment to Amended and Restated Term Loan Promissory Note" (the "2022 Promissory Note") between Defendant Science Park and the Plaintiff Trust. Under the terms of the 2022 Promissory Note, among other terms, Defendant Science Park agreed to pay the Plaintiff Trust a monthly interest-only payment of $12,572.00, which it never did.

53.     That Defendant Bolog, who was Plaintiff Engelhorn's attorney and trustee of the Plaintiff Trust at the time of this transaction, covered up and concealed his ownership interest in Defendant Science Park from Plaintiff Engelhorn, contrary to his ethical and fiduciary duties as Plaintiff Engelhorn's attorney and contrary to his fiduciary duties as trustee of the Plaintiff Trust. Further, based on information and belief, Defendant Bolog failed to record the March 2002 Deed of Trust to the legal and financial detriment of the Plaintiff Trust.

54.     That, after the 2022 Promissory Note was executed between Defendant Science Park and the Plaintiff Trust, Defendant Science Park failed to make any monthly payments to the Plaintiff Trust.

55.     That, on or about April 19, 2023, Defendant Science Park sold the Greenbelt Property to Prince George's County for $5,545,820.

56.     That Defendant Bolog failed to disclose Defendant Science Park's sale of the Greenbelt Property to Plaintiff Engelhorn and Plaintiff Trust, contrary to his ethical and fiduciary duties as Plaintiffs' attorney and contrary to his fiduciary duties as trustee of the Trust.

57.     That, on or about March 23, 2022, Heidi Aviles of Shore United Bank sent a letter to Defendant Science Park, care of Defendant Bolog at Whiteford, Taylor & Preston, LLP's Washington, D.C. office, identifying the payoff on the Greenbelt property as being $3,352,650.32.

58.     That, on or about November 3, 2022, Plaintiff Engelhorn amended the Plaintiff Trust to remove Defendant Bolog as a Trustee.

59.     That, on or about April 27, 2023, Alexandra L. Neifert, Esquire of Defendant WTP, wrote an email stating that the payoff for the Trust was $3,689,662.77.

60.     That, in or around this time, the Plaintiff Trust learned about the sale of the Greenbelt Property and demanded Defendant Bolog to repay Defendant Science Park's obligation under the 2022 Promissory Note.  As a result of this demand, the Plaintiff Trust was paid $3,689,662.77 from the sales proceeds.

61.     That the Plaintiffs had not received any mortgage payments or assignment of rent payments as of the time of the sale in April 2023, such that they lost out on the use of these monies.

**Embezzlement of $350,000: Darnestown Road, Inc. Scheme**

62.     That, on or about December 21, 2021, Defendant Bolog, as trustee of the Plaintiff Trust and Senior Counsel at Defendant WTP, directed the Plaintiff Trust's bank—via his email account at Defendant WTP—to wire $350,000 to Darnestown Road, Inc.

63.     That, on or about December 21, 2021, as a result of Defendant Bolog's wire instructions, approximately $350,000 was wired from the Plaintiff Trust's bank account to Darnestown Road, Inc.'s bank account.

64.     That, upon information and belief, Defendant Bolog was an officer of and maintained an ownership interest in Darnestown Road, Inc. at the time of the wire transfer.

65.     That Defendant Bolog neither obtained anything of value in return for the Plaintiff Trust, such as stock or debt security, nor any instrument securing the Plaintiff Trust's right to repayment in exchange for this $350,000 payment to Darnestown Road, Inc., and he covered up, concealed, and failed to disclose his interest in this company before authorizing the transaction

and further failed to conceal that these monies were used to replace funds that he had embezzled from Darnestown Road, Inc., contrary to his ethical and fiduciary duties as Plaintiffs' attorney and contrary to his fiduciary duties as trustee of the Plaintiff Trust.

66.    That the Plaintiff Trust has never been repaid these monies.

67.    That, as a direct and proximate result of Defendant Bolog's material misrepresentations and omissions, as described above, Defendant Bolog fraudulently obtained $350,000 from the Plaintiff Trust, thus causing the Plaintiff Trust to suffer $350,000.00 in damages.

**Embezzlement of $585,000: Swain Landing Scheme**

68.    That Defendant Postal is a long-time business associate of Defendant Bolog's and a former client of Defendants WTP and Bolog, as Defendant WTP represented Mr. Postal in the USDC action and Defendant Bolog represented Mr. Postal in the matter of *Postal v. Somerset House Condominium Unit Owners Association, et al.*, which was filed on or about August 31, 2020, in the Superior Court of the District of Columbia.

69.    That, in or around January 5, 2022, Plaintiff Engelhorn sold a home located at 747 High Point Ridge Road, Franklin, Tennessee, which resulted in her having $1,334,737.58 deposited into a Bank of America account ending in 3122.  An entity owned by Plaintiff Engelhorn, White Pearl, LLC, was the account owner of the account ending in 3122.   Defendant Bolog knew that Plaintiff Engelhorn realized these monies from the sale of her home.

70.    That, on or about January 5, 2022, Defendant Postal emailed Defendant Bolog, stating "$585,000" and including Defendant Swain Landing's account and routing numbers.

71.    That Defendant Postal, as the managing member and an owner of Defendant Swain Landing, was a long-time business partner with Defendant Bolog and his former client.

72.     That on or about January 5, 2022, Defendant Bolog emailed Plaintiff White Pearl, LLC's bank, stating White Pearl, LLC "is making a $585,000 transfer from White Pearl, LLC to the account set forth below [Swain Landing], relating to a real estate investment."

73.     That, on or about January 6, 2022, $585,000.00 was transferred from the account ending in 3122 to an account maintained by Defendant Swain Landing.

74.     That Defendant Bolog neither obtained anything of value in return for White Pearl, LLC, such as stock or debt security, nor any instrument securing White Pearl, LLC's right to repayment in exchange for this $585,000 payment to Defendant Swain Landing, and he covered up, concealed, and failed to disclose his interest in this company and/or his connection to its members before authorizing the transaction, contrary to his ethical and fiduciary duties. Defendant Bolog willfully and, with reckless disregard, failed to make reasonable efforts to verify facts relevant to a purported investment between Defendant Swain Landing and NVR Homes.

75.     That Plaintiffs have never been repaid these monies.

76.     That, as a direct and proximate result of Defendant Bolog's material misrepresentations and omissions, as described above, Defendant Bolog fraudulently caused $585,000 to be transferred to Defendant Swain Landing from White Pearl, LLC, thus causing Plaintiff White Pearl to suffer $585,000 in damages.

## **CAUSES OF ACTION**

### **COUNT I – FRAUD**

(Plaintiff Engelhorn v. Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021 and Defendant WTP)

77.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

78.    That, beginning in or about early October 2021, Defendant Bolog intentionally defrauded Plaintiff Engelhorn by embezzling and misappropriating $10 million belonging to Plaintiff Engelhorn by making and using false statements, documents, and misrepresentations.

79.    That Defendant Bolog tricked and deceived Plaintiff Engelhorn by lulling her into believing that she was signing routine legal documents, whereas she was signing a Notice of Gift, the JAREB Irrevocable Trust Agreement Dated October 11, 2021, and wire instructions, which documents affected a transfer of $10 million to the JAREB Irrevocable Trust Agreement Dated October 11, 2021, by misrepresenting they were routine matters requiring her signature.

80.    That, unbeknownst to Plaintiff Engelhorn, at the time, these documents falsely represented that Plaintiff Engelhorn desired to make a $10 million gift to Defendant Bolog and directed the transfer of said funds to the JAREB Irrevocable Trust Agreement Dated October 11, 2021.  At the time Defendant Bolog made, presented to Plaintiff, and used these documents to transfer the $10 million from Plaintiff's bank account to the JAREB Irrevocable Trust Agreement Dated October 11, 2021, he was her attorney, not related to her, and knew these documents contained these false statements and misrepresentations or he made them with reckless indifference to truth.

81.    That Defendant Bolog made these misrepresentations for the purpose of defrauding Plaintiff Engelhorn.

21

82.     That Plaintiff Engelhorn justifiably and reasonably relied on Defendant Bolog's misrepresentations and had the right to rely upon them with full belief of their truth.  Plaintiff Engelhorn would not have transferred $10 million to Defendant Bolog or the JAREB Irrevocable Trust Agreement Dated October 11, 2021, if Defendant Bolog had not made these misrepresentations.

83.     That, as a direct and proximate consequence of Defendant Bolog's misrepresentations, as set forth above, $10 million was wired from Plaintiff Engelhorn's personal bank account to the JAREB Irrevocable Trust Agreement Dated October 11, 2021, causing Plaintiff Engelhorn to suffer at least $10 million in damages.

**WHEREFORE,** Plaintiff Engelhorn demands judgment against Defendants Bolog and WTP, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

<u>**COUNT II – NEGLIGENT HIRING AND RETENTION**</u>
(Plaintiffs v. Defendant WTP)

84.     That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

85.     That Defendant WTP had a duty to use reasonable care to select attorneys to work with it who were competent and fit to perform the duties of an attorney.  That Defendant WTP had a duty to ensure that it retained counsel that were fit for their duties and that there were measures in place to give reasonable assurance that attorneys, such as Defendant Bolog, were conforming to the applicable Rules of Professional Conduct and not otherwise scheming to defraud their clients.  Defendant WTP had actual knowledge as to Defendant Bolog's financial issues and conversion of monies.  A reasonable and prudent employer would not have ignored such

22

indications of Defendant Bolog's unfitness for such duties as acting as a Trustee on a client's trust and representing a client wherein the attorney would have oversight of client funds. Defendant WTP knew or should have known that Defendant Bolog would be likely to interact with and represent clients of the firm. Plaintiffs were members of the public who would foreseeably come into contact with Defendant Bolog based on his employment or agency with Defendant WTP. Therefore, Defendant WTP owed such duties to Plaintiffs, and such duties were breached.

86.     That Defendant WTP knew or should have known that Defendant Bolog was routinely in financial distress and had a propensity to misuse and/or convert the funds of clients' funds for his own benefit, particularly since Defendant Bolog and Defendant WTP had previously engaged in such nefarious behavior together. Because of Defendant Bolog's financial woes and conversion of monies belonging to another, the likelihood of the risk of his stealing from a client, such as Plaintiffs, was foreseeable. Defendant WTP knew, or should have known, that Defendant Bolog was not competent or fit for the duties of an attorney, trustee, or other representative of its firm interacting with clients. Defendant WTP breached its duty to use reasonable care to select an employee that was competent and fit for the position.

87.     That, as a direct and proximate result of Defendant WTP's negligence in hiring and retaining Defendant Bolog, Plaintiffs were injured and damaged as alleged.

88.     That Defendant WTP made no attempt to oversee Defendant Bolog's handling of Plaintiffs' monies, to alert Plaintiffs as to Defendant Bolog's history of converting client funds, or to otherwise mitigate the damage that Defendant Bolog's conversion of Plaintiffs' funds could have on Plaintiffs.

89.     That Defendant WTP's negligence was the proximate cause of the Plaintiffs' injuries and damages. But for Defendant WTP's negligence and breach of the standard of care,

the Plaintiffs would not have worked with or continued to work with Defendant Bolog, or allowed Defendant Bolog to have access to their monies, such that he would not have been placed in the position of executing a fraudulent, Notice of Gift and other documents.

90.     That Plaintiffs did not cause or contribute to the injuries complained of herein.

WHEREFORE, Plaintiffs demand judgment against Defendant WTP, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT III – FRAUD
(Plaintiff Trust v. Defendant Bolog and Defendant WTP)

91.     That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

92.     That, in or around March 2022, Defendant Bolog, individually and on behalf of Tenacity Investments, LLC, caused the Plaintiff Trust to acquire Defendant Science Park's $4,655,765 debt.

93.     That, after the Plaintiff Trust acquired Defendant Science Park's debt, Defendant Bolog apparently sold the Greenbelt Property for $5,545,820.

94.     That, as a result of having this confidential and fiduciary relationship with Plaintiff Engelhorn and the Plaintiff Trust, Defendant Bolog had a duty to disclose certain material facts to Plaintiff Trust before the transaction; namely, he was a principal of Defendant Science Park and had a financial interest in the transaction or, alternatively, that he had an interest in the entities encumbered by the original debt, such as Tenacity Investments, LLC.  Defendant Bolog also had a duty to disclose to Plaintiff Trust that Defendant Science Park had sold the Greenbelt Property, the security interest of the Trust.

95.     That Defendant Bolog intentionally failed to disclose his actual knowledge that he was a principal of Defendant Science Park and had a financial interest in the transactions involving Defendant Science Park.

96.     That had Defendant Bolog truthfully disclosed and not deliberately concealed from Plaintiff his relationship and financial interest in Defendant Science Park, Plaintiff would not have acquired and assumed Defendant Science Park's significant debt.

97.     That, as a direct and proximate consequence of Defendant Bolog's fraudulent acts and omissions, as set forth above, Plaintiff Trust lost the use of its funds, failed to receive mortgage payments, and suffered other damages, as described herein.

**WHEREFORE,** Plaintiff Trust demands judgment against Defendant Bolog and Defendant WTP, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT IV - FRAUD
(Plaintiff Trust v. Defendant Bolog and Defendant WTP)

98.     That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

99.     That, beginning in or about December 2021, Defendant Bolog defrauded the Plaintiff Trust by embezzling and misappropriating approximately $350,000 belonging to the Trust.  To cover up and conceal his scheme to defraud, Defendant Bolog intentionally concealed material facts from Plaintiff Trust that he had an affirmative duty to disclose as the lawyer for Plaintiff Engelhorn and the Trustee of the Plaintiff Trust.

100.     That Defendant Bolog, as trustee of the Plaintiff Trust, caused the Plaintiff Trust to wire $350,000 from its account to Defendant Darnestown Road, Inc.'s account.

101.    That, as a result of his fiduciary relationship with Plaintiff Engelhorn and the Plaintiff Trust, Defendant Bolog had a duty to disclose certain material facts to Plaintiffs before the transaction, namely, he was a principal of Defendant Darnestown Road, Inc. and had a financial interest in the transaction.

102.    That Defendant Bolog intentionally failed to disclose his actual knowledge that he was a principal of Defendant Darnestown Road, Inc. and had a financial interest in the transaction.

103.    That, had Defendant Bolog truthfully disclosed and not deliberately concealed from Plaintiffs Engelhorn and the Trust his relationship and financial interest in Defendant Darnestown Road, Inc., Plaintiffs would not authorized the transfer of $350,000 to Defendant Darnestown Road, Inc.

104.    That, as a direct and proximate consequence of Defendant Bolog's fraudulent concealment, as set forth above, Plaintiffs suffered damages of at least $350,000.

WHEREFORE, Plaintiff Trust demands judgment against Defendant Bolog and Defendant WTP, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT V - FRAUD
(White Pearl, LLC v. Defendant Bolog and Defendant WTP)

105.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

106.    That Plaintiff Engelhorn sold a home located in Franklin, Tennessee, and deposited her proceeds into the bank account for an entity that she solely owned, Plaintiff White Pearl, LLC.

107.    That, on or about December 29, 2021, Defendant Bolog defrauded Plaintiffs by embezzling and misappropriating approximately $585,000 belonging to White Pearl, LLC.

26

108.    That Defendant Bolog caused White Pearl, LLC to wire $585,000 from its account to Defendant Swain Landing's account.

109.    That, as a result of his fiduciary relationship with Plaintiff Engelhorn and the Plaintiff Trust, he had a duty to disclose certain material facts to Plaintiffs before the transaction, namely, that he was a member of Defendant Swain Landing and had a financial interest in the transaction or, at a minimum, it was an entity owned and operated by his close, business colleague, Defendant Postal.

110.    That Defendant Bolog intentionally failed to disclose his actual knowledge that he was a member of Defendant Swain Landing and had a financial interest in the transaction or, at a minimum, Defendant Swain Landing was an entity owned and operated by his close, business colleague, Defendant Postal.

111.    That, had Defendant Bolog truthfully disclosed and not deliberately concealed from Plaintiffs his relationship and financial interest in Defendant Swain Landing, Plaintiffs would not authorized a transfer of $585,000 to Defendant Swain Landing.

112.    That, as a direct and proximate consequence of Defendant Bolog's fraudulent concealment, as set forth above, Plaintiff White Pearl, LLC suffered damages of at least $585,000.

WHEREFORE, Plaintiff, White Pearl, LLC, demands judgment against Defendant Bolog and Defendant WTP, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT VI – LEGAL MALPRACTICE/NEGLIGENCE
(Plaintiffs v. Defendants Bolog and WTP)

113.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

114.    That, at all times relevant to this Complaint, Plaintiff Engelhorn and Plaintiff Trust maintained an attorney-client relationship with Defendants Bolog, Defendant WTP, and other lawyers at Defendant WTP.  That attorneys at Defendant WTP entered time entries for working on the following matters ostensibly on behalf of Plaintiffs, but which were really for the purpose of creating and establishing Defendant Bolog's JAREB Irrevocable Trust:

a.    On October 5, 2021, Shane D. Smith, Esquire of Defendant WTP, recorded a time entry for "draft[ing] of irrevocable trust agreement," *i.e.*, the JAREB Irrevocable Trust Agreement Dated October 11, 2021;

b.    On October 5, 2021, MaryEllen Willman, Esquire of Defendant WTP, recorded a time entry for: "Drafted springing power of attorney and transmitted to E. Bolog; Responded to emailed questions regarding estate planning documents."

c.    On October 6, 2021, David J. Baker, Esquire of Defendant WTP, entered a time entry for: "Prepare Form SS-4 and 3rd Party Authorization Forms to obtain EIN for Irrevocable Trust."

d.    On October 6, 2021, Mr. Smith entered time for: "Finalize Draft of Irrevocable Trust; Forward Same to Ms. Willman."

e.    On October 6, 2021, Ms. Willman entered time for: "Reviewed Irrevocable Trust Prepared by Shane Smith; Emailed Trust to E. Bolog; Drafting Springing General Durable Power of Attorney."

f.    On October 7, 2021, Mr. Bolog entered time for: "Send Trust Agreement to Bank of America to Confirm Form is Acceptable to BOA."

115.    That, as a result of the attorney-client relationship between Plaintiff Engelhorn and Plaintiff Trust, Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman, owed duties to them to exercise care and skill to comply with the accepted and reasonable standards of care for performing such services.  Further, Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman owed Plaintiff Engelhorn and Trust the following duties, among others, to Plaintiff Engelhorn and Plaintiff Trust: (a) the duty of competent representation; (b) the duty of conflict-free representation, including the prohibition against soliciting any substantial gif from a client; (c) the duty to refrain from entering into a business transaction with a client; (d) the duty to meaningfully communicate by explaining matters to Plaintiffs insofar as reasonably necessary to permit Plaintiffs to make informed decisions regarding the representation; and (e) to otherwise act in accordance with the standard of care.

116.    That Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman failed to comply with the standards of care and failed to competently represent Plaintiff Engelhorn and Plaintiff Trust.

117.    That Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman failed to exercise a reasonable degree of care and skill in the performance of their duties.

118.    That Defendant Bolog, Mr. Smith, Mr. Baker, and/or Ms. Willman negligently breached their legal duties to Plaintiff Engelhorn and Trust by, among other ways:

      a.    Failing to advise Plaintiff Engelhorn that she could owe gift taxes on the alleged $10M gift;

      b.    Failing to advise Plaintiff Engelhorn that, in lieu of paying the gift taxes, she would have to use most of her lifetime exemption up if the $10M

29

transfer was a gift, which would mean anything in her estate over the lifetime exemption amount is subject to a 40% tax;

c.    Drafting the JAREB Irrevocable Trust Agreement Dated October 11, 2021, and/or the document(s) that lead to the formation of the JAREB Irrevocable Trust Agreement Dated October 11, 2021, and the transfer of the $10M to the JAREB Irrevocable Trust Agreement Dated October 11, 2021;

d.    Failing to ensure that Plaintiffs Engelhorn intended to transfer $10M to the JAREB Irrevocable Trust Agreement Dated October 11, 2021;

e.    Causing the transfer of $10M to the JAREB Irrevocable Trust Agreement Dated October 11, 2021;

f.    Engaging in transactions on behalf of Plaintiffs in matters for which Defendant Bolog maintained a financial interest or stood to benefit and in which Defendant Bolog knew or reasonably should have known that his personal financial and business interests were adverse to the object of representation, yet failing to disclose his personal interests or obtaining Plaintiffs' consent; and

g.    Undertaking and maintaining representation of Plaintiffs and failing to competently conduct any due diligence related to the investment of Plaintiffs' money.

119.   That Plaintiffs have collectively suffered damages of at least $10M as a direct and proximate result of the breach of the legal duties by Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman.

30

120.     That, at all times relevant hereto, Defendant Bolog, Mr. Smith, Mr. Baker, and Ms. Willman were acting on behalf of Defendant WTP and/or in furtherance of Defendant WTP's business interests.

WHEREFORE, Plaintiffs demand judgment against Defendants Bolog and WTP for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT VII – BREACH OF FIDUCIARY DUTY
(Plaintiffs v. Defendant Bolog and Defendant WTP)

121.     That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

122.     That, as Plaintiff Engelhorn's lawyer and as trustee to the Trust, Defendant Bolog stood in a fiduciary relationship to Plaintiff Engelhorn by way of the attorney-client relationship and the Trust.

123.     That Defendant Bolog breached his fiduciary duties by, among other ways: (a) Soliciting and preparing a Notice of Gift for $10,000,000.00; (b) Engaging in self-dealing and wrongfully causing the Trust to acquire Defendant Science Park's $4,655,765 debt, a transaction in which Defendant Bolog had a financial interest; (c) Failing to record the Trust's security interest in the Greenbelt Property; (d) Transferring $350,000 from the Trust for the benefit of a company, namely, Darnestown Road, Inc., in which he had a financial interest, and failing to disclose it; (e) failing to secure anything of value for the $350,000; and (f) Causing White Pearl, LLC to transfer $585,000 to Swain Landing without conducting any due diligence related to this purported investment; and failing to disclose the principal of Swain Landing – Michael Postal - was his long-time friend, business partner, and client.

31

124.    That Plaintiffs have suffered damages in excess of $10M due to Defendant Bolog's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant Bolog and Defendant WTP, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT VIII – RESCISSION OF GIFT
(Plaintiff Engelhorn v. Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021)

125.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

126.    That Defendant Bolog, as Plaintiff Engelhorn's attorney, owed a duty to Plaintiff Engelhorn to provide accurate and truthful information to Plaintiff Engelhorn and to explain the legal effect of Plaintiff Engelhorn signing the documents that caused the $10 million transfer from Plaintiff Engelhorn's account to the JAREB Irrevocable Trust—namely, the Notice of Gift, wire instructions, and JAREB Irrevocable Trust Agreement.

127.    That Defendant Bolog caused Plaintiff Engelhorn to transfer $10 million to the JAREB Irrevocable Trust through fraud and intentional misrepresentations.

128.    That, as a direct and proximate result of Defendant Bolog's fraud and intentional misrepresentations, at the time Plaintiff Engelhorn signed the documents that caused the transfer of $10 million to the JAREB Irrevocable Trust, Plaintiff Engelhorn believed she was signing routine legal documents.  As a result of Defendant Bolog's words and deeds, Plaintiff was misled concerning the nature of the said documents and their legal effect.

32

129.    That Plaintiff has demanded that Defendant Bolog return the $10 million, which demand Defendant Bolog has refused to do.

130.    That it would be unconscionable for Defendant Bolog to be permitted to retain the funds at issue, *i.e.*, $10 million.

131.    That, as a direct and proximate result of Defendant Bolog's fraud and misrepresentations, Plaintiff is entitled to rescind the $10 million "gift" that Defendant Bolog engineered for his benefit and the benefit of his children and to recover all monies paid to Defendant Bolog.

WHEREFORE, Plaintiff Engelhorn demands that the Notice of Gift be rescinded and to award to her the return of all monies paid by Plaintiff Engelhorn to the JAREB Irrevocable Trust Agreement Dated October 11, 2021, with interest and costs.

## COUNT IX – CONSTRUCTIVE TRUST
(Plaintiff Engelhorn v. JAREB Irrevocable Trust Agreement dated October 11, 2021)

132.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

133.    That Defendant Bolog fraudulently caused $10 million of Plaintiff Engelhorn's money to be transferred to the JAREB Irrevocable Trust Agreement dated October 11, 2021.

134.    That Defendant Bolog represented Plaintiff Engelhorn and owed her a fiduciary duty as counsel.  Defendant Bolog breached his fiduciary duties by causing, permitting, facilitating, or otherwise allowing Plaintiff Engelhorn's money to be transferred to the JAREB Irrevocable Trust Agreement Dated October 11, 2021, for Defendant Bolog and his children's own personal benefit.

135.    That, under the principles of equity and good conscience, Defendant JAREB Irrevocable Trust Agreement Dated October 11, 2021, should not be permitted to retain any of Plaintiff Engelhorn's funds transferred by Defendant Bolog to JAREB Irrevocable Trust Agreement Dated October 11, 2021.

136.    That the JAREB Irrevocable Trust Agreement Dated October 11, 2021, has been unjustly enriched by obtaining said monies, which property rightfully belongs to Plaintiff Engelhorn.

137.    That Plaintiff Engelhorn seeks an accounting for all funds in the possession of the JAREB Irrevocable Trust Agreement Dated October 11, 2021, since October 1, 2021, and the imposition of a constructive trust on all money transferred from Plaintiff Engelhorn's account to Defendant JAREB Irrevocable Trust Agreement Dated October 11, 2021.  In the alternative, Plaintiff requests that all such sums should be disgorged.

WHEREFORE, Plaintiff Engelhorn demands that this Honorable Court: (a) Charge upon Defendant JAREB Irrevocable Trust Agreement Dated October 11, 2021, a constructive trust for the benefit of Plaintiff; (b) Order Defendant JAREB Irrevocable Trust Agreement Dated October 11, 2021 to convey all of its right, title, and interest in said monies to Plaintiff, free of all liens, mortgages, or other encumbrances; and (c) Grant such other and further relief as the Court may claim to be necessary and proper.

### COUNT X – CONSTRUCTIVE TRUST
(Plaintiff Engelhorn v. Defendant Darnestown Road)

138.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

139.    That Defendant Bolog fraudulently caused $350,000.00 of Plaintiff Engelhorn's money to be transferred to Defendant Darnestown Road.

34

140.    That Defendant Bolog represented Plaintiff Engelhorn and owed her a fiduciary duty as counsel.   Defendant Bolog breached his fiduciary duties by causing, permitting, facilitating, or otherwise allowing Plaintiff Engelhorn's money to be transferred to Defendant Darnestown Road.

141.    That, under the principles of equity and good conscience, Defendant Darnestown Road should not be permitted to retain any of Plaintiff Claudia Engelhorn's funds transferred by Defendant Bolog to Defendant Darnestown Road.

142.    That Defendant Darnestown Road has been unjustly enriched by obtaining said monies, which property rightfully belongs to Plaintiff.

143.    That Plaintiff Engelhorn seeks the imposition of a constructive trust on all money transferred from her account to Defendant Darnestown Road.   In the alternative, Plaintiff Engelhorn requests that all such sums should be disgorged.

WHEREFORE, Plaintiff Engelhorn demands that this Honorable Court: (a) Charge upon Defendant Darnestown Road, Inc. a constructive trust for the benefit of Plaintiff; (b) Enter a monetary judgment against Defendant Darnestown Road for an amount in excess of $75,000; and (c) Grant such other and further relief as the Court may claim to be necessary and proper.

## COUNT XI – CONSTRUCTIVE TRUST
(Plaintiff White Pearl, LLC v. Defendant Swain Landing LaPlata JC, LLC)

144.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

145.    That Defendant Bolog fraudulently caused $585,000.00 of Plaintiff White Pearl, LLC's money to be transferred to Defendant Swain Landing.

146.    That Defendant Bolog represented Plaintiff Engelhorn and owed her a fiduciary duty as counsel.   Defendant Bolog breached his fiduciary duties by causing, permitting,

facilitating, or otherwise allowing the proceeds from Plaintiff Engelhorn sale of her Franklin, Tennessee home, which were deposited into White Pearl, LLC's account, to be transferred to Defendant Swain Landing.

147.    That, under the principles of equity and good conscience, Defendant Swain Landing should not be permitted to retain any of Plaintiff White Pearl, LLC's funds transferred by Defendant Bolog to Defendant Swain Landing.

148.    That Defendant Swain Landing has been unjustly enriched by obtaining said monies, which property rightfully belongs to Plaintiff.

149.    That Plaintiff White Pearl, LLC seeks the imposition of a constructive trust on all money transferred from its account to Defendant Swain Landing.  In the alternative, Plaintiff White Pearl, LLC requests that all such sums should be disgorged.

WHEREFORE, Plaintiff, White Pearl, LLC, demands that this Honorable Court: (a) Charge upon Defendant Swain Landing LaPlata JC, LLC a constructive trust for the benefit of Plaintiff; (b) Enter a monetary judgment against Defendant Darnestown Road for an amount in excess of $75,000; and (c) Grant such other and further relief as the Court may claim to be necessary and proper.

## COUNT XII – AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
(Plaintiff White Pearl, LLC v. Defendant Postal)

150.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

151.    That Defendant Postal aided and abetted Defendant Bolog in breaching his fiduciary duties owed to the Plaintiffs.

152.    That Defendant Bolog owed to Plaintiffs certain fiduciary duties as set forth above.

36

153.    That, by committing the acts alleged herein, Defendants Bolog breached his fiduciary duties to Plaintiffs.

154.    That Defendant Postal colluded in or aided and abetted Defendant Bolog's breach of his fiduciary duties and was an active and knowing participant in Defendant Bolog's breach of fiduciary duties owed to Plaintiffs.

155.    That Defendant Postal participated in the breach of the fiduciary duties by Defendant Bolog for the purpose of advancing his own interests.  Defendant Postal obtained and will obtain both direct and indirect benefits from colluding or aiding and abetting the breaches by Defendant Bolog, as the monies taken from Plaintiff White Pearl, LLC were used to pay down the purchase price of the real property owned by Defendant Swain Landing.  Defendant Postal will specifically benefit, among other things, from the acquisition of real property for an entity he owns without any meaningful financial contribution by him or said company.

156.    Plaintiffs have been irreparably injured as a direct and proximate result of the aforementioned acts.

WHEREFORE, Plaintiff White Pearl, LLC demands injunctive relief and compensatory damages, in its favor and against Defendant Postal as follows:

    A.    Entering a judgment for $585,000.00 in compensatory damages, plus prejudgment interest;

    B.    Imposition of a constructive trust in favor of Plaintiff upon any benefits improperly received by Defendant Postal as a result of his wrongful conduct;

    C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

    D.    Granting such other and further equitable relief as deemed just and proper.

**COUNT XIII – PETITION FOR DISSOLUTION & LIQUIDATION - STATUTORY
UNDER CORPS. & ASSOC. 4A-903, ET SEQ.)**
(Whitewater Revocable Trust dated September 30, 2021, as amended and White Pearl, LLC v.
Defendants Bolog, Postal, POJO, and Swain Landing)

157.     That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully
set forth herein.

158.     That, based on Plaintiff Trust's rights as a member in liquidation and dissolution-
related matters, the nefarious condition under which the Plaintiff Trust became a member, and
coupled with the fraudulent matters described herein, Plaintiff Trust hereby petitions the Court to
order the liquidation of Defendant Swain Landing and otherwise seeks to pursue its rights and
claims as permitted under Maryland law.

WHEREFORE, Plaintiff Trusts requests that this Court enter an Order:

a.     Requiring the judicial dissolution of Defendant Swain Lnading, the winding
up of its affairs, and the distribution of its assets (including the sale of
Defendant Swain Landing and/or its assets so that Plaintiff White Pearl,
LLC's payment of $585,000.00 can be reimbursed in full);

b.     Holding Defendants Bolog, Postal, and Swain Landing liable, jointly and
severally, for reimbursement of Plaintiff Trusts's attorney's fees and cost
and all professional fees incurred in carrying out the remedies so ordered;
and

c.     Awarding damages from Defendants Bolog, Postal, and Swain Landing,
jointly and severally, for $585,000.00, plus prejudgment interest, so that
White Pearl, LLC can be and is repaid in full.

**COUNT XIV – PETITION SEEKING LIQUIDATION AND DISSOLUTION OF DEFENDANT SWAIN LANDING AND APPOINTMENT OF RECEIVER OR SPECIAL FISCAL AGENT (OR FOR THE COURT TO FASHION ALTERNATIVE EQUITABLE REMEDIES) AT COMMON LAW**

(Plaintiffs Trust and White Pearl, LLC v. Defendants Bolog, Postal, POJO, and Swain Landing)

159.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

160.    That Defendant Bolog, as set forth herein, had acted oppressively and/or illegally and/or fraudulently toward Plaintiff Trust during a period when he owed fiduciary duties to Plaintiff Trust, thereby threatening the interests of Plaintiff.   That, but for Defendant Bolog misleading Plaintiff Engelhorn and/or otherwise defrauding her, Plaintiff Trust would never have become a member of Defendant Swain Landing.

161.    That, under such circumstances, Plaintiff may obtain a judicially mandated liquidation and dissolution of Defendant Swain Landing.

162.    That, pending such dissolution or alternatively, for the reasons set forth above, Plaintiff Trust may request that this Court appoint a receiver to take control of Defendant Swain Landing and oversee the operation of the business and its finances for such a period of time to allow for an accounting for the benefit of Plaintiff Trust and Plaintiff White Pearl, LLC and to carry out a sale of the business to ensure full payoff of Plaintiff White Pearl, LLC's contribution in the amount of $585,000.00.

WHEREFORE, Plaintiffs Trust and White Pearl, LLC hereby petition this Honorable Court seeking liquidation and dissolution of Defendant Swain Landing (and/or sale thereof) and seeking the appointment of a receiver or special fiscal agent to oversee the current day-to-day operations of Defendant Swain Landing; or alternatively, for this Honorable Court to fashion alternative equitable remedies including for this Honorable Court to require Defendants Bolog, Postal, and Swain Landing, jointly and severally, to repay Plaintiff White Pearl, LLC $585,000.00,

plus prejudgment interest; specifically, Plaintiffs Trust and White Pearl, LLC pray that this Honorable Court enter an Order:

    a.    Effectively undoing any misappropriations or requiring reimbursement thereof, and voiding the transfer of control of Defendant Swain Landing to any third-party and/or in any event authorizing the judicial dissolution of Defendant Swain Landing, the winding up of its affairs, and the distribution of its assets (including, if this Honorable Court so considers, the sale Defendant Swain Landing as a going concern so that Plaintiff White Pearl, LLC can be and is paid off in full); and/or

    b.    Pending such dissolution or alternatively, appointing a receiver or special fiscal agent to oversee the business affairs of Defendant Swain Landing during the pendency of these proceedings; (a) authorizing and empowering the said receiver or special fiscal agent to take any and all actions deemed necessary and proper to manage and protect the value of Defendant Swain Landing during the dissolution; (b) authorizing and empowering the said receiver or special fiscal agent to hire such accountants, appraisers, business brokers and such other related agents or contractors as he/she may deem necessary to protect and preserve the value of Defendant Swain Landing for the benefit of creditors including, but not limited to, Plaintiff White Pearl, LLC, all at the cost of Defendants Bolog, Postal, and Swain Landing, jointly and severally; and/or

    c.    As an alternative to the above remedies, requiring that either Defendant Swain Landing reimburse White Pearl, LLC for $585,000, plus

prejudgment interest or, alternatively, Defendants Bolog and Postal, jointly and severally, pay Plaintiff White Pearl, LLC $585,000, plus interest; and/or

d.      Ordering such other and further relief as this Honorable Court deems appropriate, including fashioning such alternative equitable remedies as may be just to Plaintiff Trust and Plaintiff White Pearl, LLC under the circumstances.

## COUNT XV – DECLARATORY JUDGMENT
(Plaintiff Engelhorn v. Defendants Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021)

163.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

164.    That, at all times relevant hereto, Defendant Bolog was an attorney licensed to practice law in Maryland, the District of Columbia, and Virginia.

165.    That, at all times relevant hereto, Defendant Bolog represented Plaintiff Engelhorn.

166.    That Plaintiff Engelhorn seeks a declaration by this Honorable Court that the alleged gift in the amount of $10M from her to Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021, was invalid as a matter of law and that Plaintiff Engelhorn is entitled to a return of the monies.

WHEREFORE, Plaintiff Engelhorn prays for entry of the declaratory judgment that the alleged gift of $10M to the JAREB Irrevocable Trust Agreement dated October 11, 2021, was invalid as a matter of law and that monies should be returned to her by Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement dated October 11, 2021, for her costs, and for such other and further relief as may be appropriate under the circumstances.

## COUNT XVI – UNJUST ENRICHMENT

(Plaintiff Engelhorn v. Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable
Trust Agreement Dated October 11, 2021)

167.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

168.    That Defendant Bolog, as Plaintiff Engelhorn's attorney, owed a duty to Plaintiff Engelhorn to provide accurate and truthful information to Plaintiff Engelhorn and to explain the legal effect of Plaintiff Engelhorn signing the documents that caused the $10 million transfer from Plaintiff Engelhorn's account to the JAREB Irrevocable Trust—namely, the Notice of Gift, wire instructions, and JAREB Irrevocable Trust Agreement.

169.    That Defendant Bolog caused Plaintiff Engelhorn to transfer $10 million to the JAREB Irrevocable Trust through fraud and intentional misrepresentations.

170.    That, as a direct and proximate result of Defendant Bolog's fraud and intentional misrepresentations, at the time Plaintiff Engelhorn signed the documents that caused the transfer of $10 million to the JAREB Irrevocable Trust, Plaintiff Engelhorn believed she was signing routine legal documents.  As a result of Defendant Bolog's words and deeds, Plaintiff Engelhorn was misled concerning the nature of the said documents and their legal effect.

171.    That Plaintiff Engelhorn has conferred a benefit on Defendants Bolog and JAREB in the amount of $10 million.

172.    That Defendant Bolog, individually, and the Trustee for JAREB, was aware of and had knowledge of, the $10 million benefit conferred by Plaintiff Engelhorn, as well as the dishonest means by which the funds were obtained from Engelhorn.

173.    That Plaintiff Engelhorn has demanded the return of the $10 million, and Defendant Bolog, individually and on behalf of JAREB, has refused to do so.

174.    That Defendant Bolog's, individually and as Trustee for JAREB, acceptance and retention of the $10 million under the circumstances described herein make it inequitable and unconscionable for Defendant Bolog and JAREB to retain the $10 million.

175.    That, at all times relevant hereto, Defendant Bolog represented Plaintiff Engelhorn.

176.    That client "gifts" to attorneys are presumptively fraudulent.  Md. Rule 19-301.8 cmt.  6.

WHEREFORE, Plaintiff Engelhorn demands judgment against Defendant Bolog, Individually and as Trustee of the JAREB Irrevocable Trust Agreement Dated October 11, 2021, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, costs of this action, and such further relief as this Court deems appropriate.

### COUNT XVII – FRAUDULENT CONVEYANCE
(Plaintiff Trust v. Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC)

177.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

178.    That, upon information and belief, Defendant Science Park would have received monthly payments from tenants at the real property owned by Defendant Science Park.

179.    That, upon information and belief, Defendant Science Park conveyed and transferred these rental payments, either directly or indirectly, to Defendant Bolog, without remitting the monthly interest payments to the Plaintiff Trust, without fair consideration, thereby rendering Defendant Science Park insolvent and unable to pay the monies to Plaintiff in violation of the Maryland Uniform Fraudulent Conveyance Act.  The assets so conveyed exceeded the amounts due to Plaintiff Trust.

180.    That Defendant Science Park conveyed and transferred substantially all of its assets to Defendant Bolog, including the monthly rental payments, either directly or indirectly, with the actual intent to hinder, delay, and defraud present and future creditors, including the Plaintiff Trust and removed said assets from Plaintiff Trust's reach, all in violation of the Maryland Uniform Fraudulent Conveyance Act.

181.    That these transfer of assets by Defendant Science Park were fraudulent as to Plaintiff Trust, who is and was a creditor of Defendant Science Park with a matured claim in amount that was substantially less than the amount and value of the aforesaid assets transferred.

182.    That each of the Defendants had knowledge of the fraud at the time of each transfer and conveyance and none acted in good faith in connection with each transfer and conveyance.

WHEREFORE, Plaintiff Trust requests that this Honorable Court enter a judgment as follows:

a.    Declaring that each of the aforesaid conveyances and transfer as fraudulent as to Plaintiff Trust;

b.    Setting aside all such conveyances and transfers of assets by Defendant Science Park to Defendant Bolog with such transfers returned to Defendant Science Park to satisfy Plaintiff's claims against Defendant Science Park.

c.    Awarding Plaintiff interest from the date of each transfer and conveyance.

d.    Entering a judgment against Defendants, jointly and severally, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

e.    For such other and further relief as may be appropriate under the circumstances.

## COUNT XVIII – FRAUD

(Plaintiff Trust v. Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC)

183.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

184.    That Defendant Bolog defrauded Plaintiff Trust by embezzling and misappropriating approximately $3,352,650 belonging to it.

185.    That Defendant Bolog caused Plaintiff Trust to pay $3,352,650 to resolve the encumbrance owed by Defendant Science Park and to satisfy guarantees owed by Defendants Bolog and/or Tenacity Investments, LLC.

186.    That, as a result of his fiduciary relationship with Plaintiff Engelhorn and the Plaintiff Trust, he had a duty to disclose certain material facts to Plaintiffs before the transaction, namely, that he was an owner of Defendant Science Park and had a financial interest in the transaction.

187.    That Defendant Bolog intentionally failed to disclose his actual knowledge that he was an owner of Defendant Science Park and had a financial interest in the transaction.

188.    That, had Defendant Bolog truthfully disclosed and not deliberately concealed from Plaintiffs his relationship and financial interest in Defendant Science Park, Plaintiffs would not authorized a transfer of $3,352,650 to the lender for Defendant Science Park.

189.    That, as a direct and proximate consequence of Defendant Bolog's fraudulent concealment, as set forth above, Plaintiff Trust has suffered significant economic losses.

WHEREFORE, Plaintiff Trust demands judgment against Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC, jointly and severally, for an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in the amount of

$20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT XIX – UNJUST ENRICHMENT
(Plaintiff Trust v. Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC)

190.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

191.    That Defendant Bolog, as an attorney and trustee for the Plaintiff Trust, owed a duty to act in a conflict-free fashion and to make prudent investments on behalf of Plaintiff Trust.

192.    That Defendant Bolog caused Plaintiff Trust to satisfy an obligation that he and the two corporate Defendants owed without paying any consideration to Plaintiff Trust.

193.    That, as a direct and proximate result of Defendant Bolog's fraud and intentional misrepresentations, Plaintiff Trust paid off a debt due and owing by the Defendants with respect to the real property owned by Defendant Science Park.

194.    That Plaintiff Trust has conferred a benefit on Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC, both for the face value of the loan and in terms of the monthly payments that Defendant Science Park failed to pay.

195.    That Defendant Bolog, individually, and as the principal and/or agent of the two entities, was aware of and had knowledge of the benefit conferred by Plaintiff Trust on Bolog and the two entities, as well as the dishonest means by which the funds were obtained from Plaintiff Trust.

196.    That the Defendants' acceptance and retention of said monies under the circumstances described herein make it inequitable and unconscionable for Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC to retain them.

WHEREFORE, Plaintiff Trust demands judgment against Defendant Bolog, Defendant Science Park, and Defendant Tenacity Investments, LLC, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest, costs of this action, and such further relief as this Court deems appropriate.

## COUNT XX – AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
(Plaintiffs v. Defendant WTP)

197.    That Plaintiffs adopt and incorporate by reference all paragraphs above as if fully set forth herein.

198.    That Defendant WTP aided and abetted Defendant Bolog in breaching his fiduciary duties owed to the Plaintiffs.

199.    That Defendant Bolog owed to Plaintiffs certain fiduciary duties as set forth above.

200.    That, by committing the acts alleged herein, Defendants Bolog breached his fiduciary duties to Plaintiffs.

201.    That Defendant WTP colluded in or aided and abetted Defendant Bolog's breach of his fiduciary duties and was an active and knowing participant in Defendant Bolog's breach of fiduciary duties owed to Plaintiffs.

202.    That Defendant WTP participated in the breach of the fiduciary duties by Defendant Bolog for the purpose of advancing its own interests.  Defendant WTP obtained and will obtain both direct and indirect benefits from colluding or aiding and abetting the breaches by Defendant Bolog.

203.    Plaintiffs have been irreparably injured as a direct and proximate result of the aforementioned acts.

WHEREFORE, Plaintiffs demand judgment against Defendant WTP for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive

damages in the amount of $20,000,000.00, plus interest, costs of this action, and such further relief as this Court deems appropriate.

Respectfully submitted:

/s/*Patrick D. Gardiner*
Wes P. Henderson, Esq. (AIS# 0212180062)
Patrick D. Gardiner, Esq. (AIS# 1506160113)
Henderson Law, LLC
2127 Espey Court, Suite 204
Crofton, MD 21114
T: 410.721.1979
F: 410.721.2258
wph@hendersonlawllc.com
patrick@hendersonlawllc.com

Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial in this action with respect to all issues and claims triable before a jury.

/s/ *Patrick D. Gardiner*
Patrick D. Gardiner, Esq. (AIS# 1506160113)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of February 2025 that, a copy of the foregoing

was sent via MDEC to the following:

William J. Murphy, Esq.
John J. Connolly, Esq.
Kirk E. MacKinnon Morrow
Zuckerman Spaeder, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
wmurphy@zuckerman.com
jconnolly@zuckerman.com
kmackinnonmorrow@zuckerman.com

*Counsel for Defendant Whiteford, Taylor & Preston, LLP*

Douglas F. Gansler, Esq.
John B. Howard, Jr., Esq.
Cadwalader, Wickersham & Taft, LLP
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
Douglas.gansler@cwt.com
J.B.Howard@cwt.com

*Counsel for Defendants Erik D. Bolog, Individually,*
*and as Trustee of The JAREB Irrevocable Trust*
*Agreement dated October 11, 2021,*
*Science Park Associates, LLC; and Darnestown Road, Inc.*

AND via first class mail, postage prepaid on the following:

Michael Postal
1801 16th Street NW, Apt 608
Washington, DC 20009

*Defendant pro se*

POJO LaPlata, LLC
4302 Broken Arrow Court, Apt 606
Clinton, MD 20735

*Defendant pro se*

49

Swain Landing LaPlata JC, LLC
4302 Broken Arrow Court
Clinton, MD 20735

*Defendant pro se*

Tenacity Investment, LLC
7333 New Hampshire Ave., Unit 103
Takoma Park, MD 20912

*Defendant pro se*

/s/ *Patrick D. Gardiner*
Patrick D. Gardiner, Esq. (AIS# 1506160113)

50

# EXHIBIT F

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

CLAUDIA ENGELHORN, et al,

                          Plaintiff,
        vs.                          Case Number:
                                     C-24-CV-24-002631

ERIK BOLOG, et al.,

                          Defendant.
_____/

            REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
                        (Motion's Hearing)

                          Baltimore, Maryland

                          Monday, January 27, 2025

        BEFORE:

            THE HONORABLE JEFFREY GELLER, Associate Judge


        APPEARANCES:

            For the Plaintiff:

                PATRICK GARDNER, ESQUIRE

            For the Defendants, Whiteford, Taylor, and
            Preston:

                JOHN J. CONNOLLY, ESQUIRE
                WILLIAM J. MURPHY, ESQUIRE

            For the Defendant Erik Bolog individually and
            as Trustee for the Jareb Irrevocable Trust
            Agreement; Science Park Associates, LLC; and
            Darnestown Road, Inc. et al.:

                DOUGLAS GANSLER, ESQUIRE
                J.B. HOWARD, ESQUIRE
                ZACK SCHRIEBER, ESQUIRE

* Remote Electronic Proceedings Digitally Recorded *

Transcribed by:
Patricia Trikeriotis
Chief Court Reporter
111 N. Calvert Street
Suite 619, Cummings Courthouse
Baltimore, Maryland 21202

1          By the time the gift was made or any of the

2     transactions in this case occurred, that case was long

3     over, right for Taylor got its $4 million, Ms. Englehorn

4     got her $130 million as a result of the settlement of

5     that case, of the Swiss litigation case.  So -- and there

6     exists no other retainer letters regarding any other of

7     these matters, so that's it.  I mean, it's that simple.

8          It's clearly -- look, had there been a

9     disagreement or an issue that had come up during the

10    course of the Swiss litigation, then of course this

11    exegesis regarding Colorado versus Maryland law and the

12    Rules of Professional Conduct and all those things would

13    come into play.  But here, there is no arbitration clause

14    relevant to any of the issues that are brought in the

15    complaint by the Plaintiff.  So we have no we have no dog

16    in the fight, but it seems clear to me that there is no

17    fight.

18          THE COURT:  All right.  Thank you.

19          Back to Mr. Connelly.

20          MR. CONNOLLY:  Your Honor, I was on mute.  I

21    apologize.

22          With respect to what Mr. Gansler just said, I'm

23    not sure I fully understand it, but it's contrary to what

24    he wrote.  If he's saying that the arbitration clause

25    does not apply to the current dispute, he's totally

REPORTER'S CERTIFICATE

      I, Patricia Trikeriotis, Chief Court Reporter of the Circuit Court for Baltimore City, do hereby certify that the proceedings in the matter of Claudia Engelhorn, et al., vs. Erik Bolog, et al., Case Number C-24-CV-24-00263, before the Honorable Jeffrey Geller, Associate Judge, on January 27, 2025 were duly recorded by means of digital recording.

      I further certify that the page numbers 1 through 92 constitute the official transcript of these proceedings as transcribed by me or under my direction from the digital recording to the within typewritten matter in a complete and accurate manner.

      In Witness Whereof, I have affixed my signature this 6th day of April, 2025.

_____
Patricia Trikeriotis
Chief Court Reporter

93

**IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND**

| | |
|---|---|
| **CLAUDIA ENGELHORN**, *et al.*, | ) |
| | ) |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| **v.** | )   **Case No.: C-24-CV-24-002631** |
| | ) |
| **WHITEFORD, TAYLOR & PRESTON,** | ) |
| **LLP et al.,** | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

---

## AFFIDAVIT OF DOUGLAS F. GANSLER

1.      I am over the age of 18 and competent to testify from personal knowledge as to the matters set forth herein.

2.      I am a partner at Cadwalader, Wickersham & Taft LLP and I represent Defendants Erik Bolog, in his individual capacity and as Trustee for the JAREB Irrevocable Trust Agreement Dated October 11, 2021; Science Park Associates, LLC ("Science Park"); and Darnestown Road, Inc., ("Darnestown Road") (collectively, the "Bolog Defendants") in the above-captioned action.

3.      I am licensed to practice law in the state of Maryland.

4.      To the best of my knowledge based on reasonable inquiry, at the time the above-captioned action was initiated by Plaintiffs, I was not in possession of the Whitewater Trust Agreement.

5.      On or about February 20, 2025, I received a copy of the Whitewater Trust Agreement from the law firm Zuckerman Spaeder LLP.

I solemnly affirm on this 9th day of June, 2025, under penalty of perjury that the contents of this

document are true to the best of my knowledge, information, and belief.

Douglas F. Gansler

**IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND**

| | | |
|---|---|---|
| **CLAUDIA ENGELHORN, *et al.*,** | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| **v.** | ) | **Case No.: C-24-CV-24-002631** |
| | ) | |
| **WHITEFORD, TAYLOR & PRESTON,** | ) | |
| **LLP et al.,** | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## AFFIDAVIT OF ERIK D. BOLOG

1.     I am over the age of 18 and competent to testify from personal knowledge as to the matters set forth herein.

2.     I was an attorney with the law firm Whiteford, Taylor & Preston, LLP.

3.     I am a signatory, as trustee, to the Whitewater Trust Agreement, dated September 30, 2021 (the "Whitewater Trust Agreement").

4.     I served as trustee of the Whitewater Trust from approximately September 30, 2021, through November 3, 2022.

5.     Following the end of my relationship with Whiteford, Taylor & Preston, LLP on approximately May 1, 2023, I was not in possession of a copy of the Whitewater Trust Agreement.

6.     To the best of my knowledge based on reasonable inquiry, at the time the above-captioned action was initiated by Plaintiffs, I was not in possession of the Whitewater Trust Agreement.

7.     I understand that my attorneys received a copy of the Whitewater Trust Agreement on approximately February 20, 2025.

I solemnly affirm on this 8th day of June, 2025, under penalty of perjury that the contents of this document are true to the best of my knowledge, information, and belief.

Erik D. Bolog